**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

MARVIN GONG, Individually and On
Behalf of All Others Similarly Situated,

                              Plaintiff,

              v.

NEPTUNE WELLNESS SOLUTIONS
INC., MICHAEL CAMMARATA, MARIO
PARADIS, CLAUDIE LAUZON, and
TONI RINOW,

                              Defendants.

**Case No.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Marvin Gong ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Neptune Wellness Solutions Inc. ("Neptune" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Neptune securities between July 24, 2019 and February 16, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Neptune operates as an integrated health and wellness company.  The Company builds a portfolio of lifestyle brands and consumer packaged goods products under the Forest Remedies and, Ocean Remedies, Neptune Wellness, Mood Ring, and OCEANO3 brands.  Neptune offers turnkey product development and supply chain solutions to businesses and government customers in various health and wellness verticals, such as legal cannabis and hemp,

2

nutraceuticals, and white label consumer packaged goods.  The Company also provides extraction and purification services from cannabis and hemp biomass; raw material sourcing, formulation, quality control, and quality assurance primarily for omega-3 and hemp-derived ingredients under various delivery forms, such as soft gels, capsules, and liquids; and formulation and manufacturing solutions for value added product forms comprising tinctures, sprays, topicals, vapor products, and edibles and beverages.

3.      On May 9, 2019, Neptune announced that it had signed a definitive agreement to acquire the assets of SugarLeaf Labs, LLC and Forest Remedies LLC (collectively, "SugarLeaf"), a registered North Carolina-based commercial hemp company providing extraction services and formulated products (the "SugarLeaf Acquisition").  On July 24, 2019, Neptune announced the closing of the SugarLeaf Acquisition.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the cost of Neptune's integration of the assets and operations acquired in the SugarLeaf Acquisition would be larger than the Company had acknowledged, placing significant strain on the Company's capital reserves; (ii) accordingly, it was reasonably foreseeable that the company would need to conduct additional stock offerings to raise more capital; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On February 15, 2021, Neptune announced disappointing financial results for the third quarter of the Company's fiscal year 2021, missing analyst expectations.  Among other results, Neptune reported third quarter revenues of CA$3.32 million and a net loss of CA$73.8 million, down 63.81% and over 1,000% year-over-year, respectively.  Neptune attributed the net

loss, in part, to a CA$35.6 million impairment of goodwill and a CA$2.1 million impairment of "property, plant and equipment and right-of-use assets related to the acquisition of SugarLeaf in July 2019," as well as accelerated amortization of CA$13.95 million "also related to the SugarLeaf acquisition." Additionally, the Company disclosed that its "[g]ross margin declined to a loss of 268.3%," which included a non-cash CA$7.39 million "write-down of inventory and deposits to reflect their net realizable value."

6.      On this news, Neptune's stock price fell $0.86 per share, or 30.71%, to close at $1.94 per share on February 16, 2021.

7.      Then, on February 17, 2021, prior to the start of the day's trading session, Neptune issued a press release announcing the termination of an at-the-market offering conducted by the Company, selling 9,570,735 of its common shares and raising approximately $18.6 million in gross proceeds. Just minutes later, Neptune issued a second press release announcing that the Company was conducting a $55 million registered direct offering.

8.      On this news, Neptune's stock price fell another $0.21 per share, or 10.82%, to close at $1.73 per share on February 17, 2021.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Neptune's most recent quarterly report, appended as an exhibit to a Form 6-K, as of February 15, 2021, there were 137,992,528 of the Company's common shares outstanding.  Neptune's securities trades on the Nasdaq Global Select market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Neptune's ordinary shares located within the U.S., some of whom undoubtedly reside in this Judicial District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Neptune securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Neptune is a Canadian company with principal executive offices located at 545 Promenade du Centropolis, Suite 100, Laval, Québec, Canada H7T 0A3.  The Company operates as an integrated health and wellness company and its securities trade on the NASDAQ under the ticker symbol "NEPT."

16.     Defendant Michael Cammarata ("Cammarata") has served as Neptune's President, Chief Executive Officer, and a Director at all relevant times.

17.     Defendant Mario Paradis ("Paradis") served as Neptune's Chief Financial Officer from prior to the start of the Class Period until November 2020.

18.     Defendant Claudie Lauzon ("Lauzon") served as Neptune's Interim Chief Financial Officer from November 2020 to April 2020.

19.     Defendant Toni Rinow ("Rinow") has served as Neptune's Chief Financial Officer, Vice President, and Global Operating Officer since April 2020.

20.     Defendants Cammarata, Paradis, Lauzon, and Rinow are sometimes referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of Neptune's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Neptune's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Neptune, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Neptune and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Neptune operates as an integrated health and wellness company.  The Company builds a portfolio of lifestyle brands and consumer packaged goods products under the Forest Remedies and, Ocean Remedies, Neptune Wellness, Mood Ring, and OCEANO3 brands.  Neptune offers turnkey product development and supply chain solutions to businesses and government customers in various health and wellness verticals, such as legal cannabis and hemp, nutraceuticals, and white label consumer packaged goods.  The Company also provides extraction and purification services from cannabis and hemp biomass; raw material sourcing, formulation, quality control, and quality assurance primarily for omega-3 and hemp-derived ingredients under various delivery forms, such as soft gels, capsules, and liquids; and formulation and manufacturing solutions for value added product forms comprising tinctures, sprays, topicals, vapor products, and edibles and beverages.

24.     On May 9, 2019, Neptune announced that it had signed a definitive agreement to acquire the assets of SugarLeaf, a registered North Carolina-based commercial hemp company providing extraction services and formulated products.  On July 24, 2019, Neptune announced the closing of the SugarLeaf Acquisition.

### Materially False and Misleading Statements Issued During the Class Period

25.     The Class Period begins on July 24, 2019, when Neptune issued a press release announcing the closing of the SugarLeaf Acquisition.  The press release stated, in relevant part:

> "[t]he acquisition of SugarLeaf, combined with Neptune allows us to create a leading North American extraction platform with significant capacity available to serve our customers on both sides of the border. Furthermore, considering the significant growth anticipated in hemp-based products, this acquisition provides Neptune with capabilities to satisfy a wide array of clients. Finally, we anticipate a significant contribution from this acquisition, as indicated by the large earnout

structure providing adequate risk sharing," said Michael Cammarata, Neptune President and CEO.

**SugarLeaf brings to Neptune**
- New capabilities to supply hemp extracts and finished products to a broad U.S. customer base.
- Extraction capacity that is expected to reach an annual run rate of 1,500,000 kilos of biomass by the end of 2019 with opportunities to further expand capacity.
- Cutting-edge cold ethanol processing technology producing high-quality broad-spectrum extracts and refined full spectrum extracts.
- Strategic and well diversified sourcing established, with multiple local and large regional hemp farmer partners, ensuring traceability of finished product back directly to the farms.
- Rigorous testing protocols to ensure high quality biomass.
- Pursuit of organic certification and already sourcing from farmers who are certified organic or using organic practices.
- Management team with extensive experience in hemp extraction.
- The U.S. market for hemp-derived CBD based products is evolving rapidly driven by multiple product categories and could reach $US 16 billion (1) by 2025.

26. On August 14, 2019, Neptune issued a press release announcing the Company's

fiscal 2020 Q1 results. The press release stated, in relevant part:

**Completion of the SugarLeaf acquisition**

On July 24, 2019, Neptune announced the closing of the acquisition of the assets of U.S.-based hemp processor SugarLeaf Labs and Forest Remedies LLC (collectively, "SugarLeaf"). The initial consideration paid at closing consisted of US$18 million or US$12 million in cash and US$6 million in common shares. By achieving certain annual adjusted EBITDA and other performance targets, an additional consideration of up to US$132 million would be paid over each of the next three years as a combination of cash and shares for a maximum aggregate purchase price of up to US$150 million, reflecting a valuation multiple below 5x EBITDA.

The extraction capacity of SugarLeaf is expected to reach an annual run rate of 1,500,000 kg of biomass by the end of 2019 with opportunities to further expand capacity. The company is using a cutting-edge cold ethanol processing technology producing high-quality broad-spectrum extracts and refined full spectrum extracts. SugarLeaf has established strategic and well diversified sourcing, with multiple local and large regional hemp farmer partners, ensuring traceability of finished product directly back to the farms. The acquisition of SugarLeaf, combined with Neptune creates a leading North American extraction platform with significant

capacity available to serve customers in both Canada and the United States. The acquisition also offers an opportunity to participate in both B2B and B2C hemp-derived CBD markets in the United States.

* * *

"Once the expansion phases are complete, we expect Neptune's two extraction facilities to have impressive earnings potential. Given that we only recently acquired SugarLeaf and are still in the process of integrating those operations, we estimate that, based on a conservative capacity utilization scenario of 50%, our two facilities could support in excess of $450 million in annual revenues. In addition, our highly automated operations are expected to translate into low production costs benefiting margins, which have the potential to exceed 40% at the EBITDA level. With a focus on bringing the highest quality products to market sustainably, we believe these developments can help us achieve and surpass these scenarios. There can, of course, be no assurance that the integration of SugarLeaf will be successfully implemented, that our utilization capacity will achieve anticipated levels, or that operational costs and margins will benefit from these developments to the extent anticipated at this time." concluded Mr. Cammarata.

27.    That same day, Neptune hosted an earnings call with investors and analysts to discuss the Company's fiscal 2020 Q1 results (the "Q1 2020 Earnings Call"). During the scripted portion of the Q1 2020 Earnings Call, Defendant Cammarata stated, in relevant part, "[w]e've closed on our SugarLeaf acquisition on July 24th, which will enable us to participate in both B2B and B2C CBD and hemp markets in the United States."

28.    On November 11, 2019, Neptune issued a press release announcing the Company's fiscal 2020 Q2 results. The press release listed among Neptune's financial and corporate highlights:

- Total revenues for the three-month period ended September 30, 2019 amounted to $6,512, representing an increase of $2,151 or 49% over the first quarter ended June 30, 2019 and a decrease of $559 or 8% compared to $7,071 for the three-month period ended September 30, 2018.

- On July 24, 2019, Neptune completed the acquisition of the assets of SugarLeaf. Neptune paid an initial consideration for SugarLeaf of $23.7 million (US$18.1 million), a combination of $15.8 million (US$12 million) in cash and 7.9 million (US$6.1 million) or 1,587,301 in common shares."

29.     That same day, Neptune hosted an earnings call with investors and analysts to discuss the Company's fiscal 2020 Q2 results (the "Q2 2020 Earnings Call").  During the scripted portion of the Q2 2020 Earnings Call, Defendant Paradis stated, in relevant part:

> If we now look at the financial results for the quarter, during the second quarter in the Cannabis business the revenue were $1.2 million with a negative profit of $1.7 million in comparison with the negative gross profit of 2.1 in the first quarter of the current year. This improvement is directly related to the increase in revenues slightly offset by the increase in expenses related to salary and overhead of the Sherbrooke plant in preparation for the business expansion.

30.     On January 10, 2020, Neptune issued a press release providing corporate updates and discussing 2020 initiatives.  The press release stated, in relevant part:

> The capacity expansion at Neptune's North Carolina SugarLeaf facility is nearing completion, as expected and on budget. With a second centrifuge installed, Neptune will be able to run multiple batches concurrently, providing more flexibility and reducing downtime. Management is putting the final touches to get the facility ready for a Good Manufacturing Practice ("GMP") pre-inspection audit which should occur in the coming weeks. A GMP certification will enable Neptune to broaden its client base. Recently, the R&D teams from both production facilities collaborated to develop an in-house technology to make a water solubility emulsion of cannabinoids. While testing is still undergoing, the initial stability tests were very positive.

31.     On February 13, 2020, Neptune issued a press release announcing the Company's fiscal 2020 Q3 results.  The press release stated, in relevant part:

> • Total revenues for the three-month period ended December 31, 2019 amounted to $9,175, representing a sequential increase of $2,663 or 41% over the second quarter ended September 30, 2019 and an increase of $2,637 or 40% compared to $6,538 for the three-month period ended December 31, 2018. Revenues from the Cannabis segment reached $2,811, an increase of $1,591 sequentially from the three-month period ended September 30, 2019. Neptune started the commercial operations of its Cannabis segment in March 2019 and hence had no revenues in the prior year period ended December 31, 2018.

32.     In addition, the press release quoted Defendant Cammarata, who touted the Company's performance, stating, in relevant part:

"Since I joined the company six months ago, we've had to reassess all facets of our business plans. It quickly became apparent that there were several operational challenges that needed to be addressed immediately. With changes and enhancements to our management team, business plans, production lines and customer relationships, we've rapidly become more than an extraction and white label company. We continue to progress in our vision to become a leading player in B2B and B2C cannabis and hemp markets. Our revenue growth of 41% sequentially is a solid testament to this, considering the current cannabis and hemp environment. While our profitability this quarter was short of our expectations due to the slower than expected ramp-up of our Phase II cold ethanol production process and industry factors beyond our control, we are setting up our long-term success by expanding our channel strategy with increased focus on end clients, in Canada and the US.["]

33.     On May 14, 2020, Neptune issued a press release announcing preliminary fiscal

2020 results and providing a fiscal 2021 Q1 outlook.  The press release stated, in relevant part:

**First Quarter Fiscal 2021 Revenue Outlook**
For the first quarter of fiscal year 2021 ending June 30, 2020, Neptune expects to report strong quarter-over-quarter growth in its company-wide revenues to a range of between $18 million and $22 million. This revenue growth is driven by the accelerated expansion of Neptune's Health and Wellness solutions and its agile adaptation to changing market conditions and demands. This product portfolio expansion, with the recent product announcements of hand sanitizers and Neptune Air non-contact thermometers, utilizes a highly flexible and low cost supply chain infrastructure, relying on internal and third-party manufacturers that can be scaled up or down quickly to adapt to market demand. In a currently volatile market that sees high demand for these product categories, but also increased supply from a wide range of providers, Neptune is not in a position to confirm projected sales or revenue for these new products, beyond those reflected in the first quarter revenue indication provided above. The Company is also seeing growth of its extraction revenue, reflecting the successful implementation of new capacity.

* * *

**Preliminary Fiscal 2020 Financial Highlights**
Neptune also today announced that, based upon information currently available to management, it anticipates reporting revenue of approximately $28.0 million to $29.6 million for the twelve months ended March 31, 2020, compared to $24.4 million for the twelve months ended March 31, 2019, with the year-over-year change resulting primarily from the acquisition of Sugarleaf as well as the increase in revenues from the Company's Cannabis segment. Neptune also announces that negative gross profit between $0.5 and $2.0 million is expected for the twelve months ended March 31, 2020, reflecting costs associated with the start-up operations of the Company's Cannabis segment. For the fourth quarter of fiscal

2020, the Company anticipates reporting revenue of $8.0 million to $9.6 million, compared to $5.7 million in the prior year period, an approximate growth rate of 40% to 69%.

34.     On June 10, 2020, Neptune filed an Annual Report on Form 40-F with the SEC, reporting the Company's financial and operating results for the year ended March 31, 2020 (the "2020 40-F").  Appended as an exhibit to the 2020 40-F was Neptune management's discussion and analysts of the financial situation and operating results for the years ended March 31, 2020 and 2019 (the "2020 MD&A").  The 2020 MD&A stated, in relevant part:

> [o]n July 24, 2019, Neptune completed the acquisition of the assets of SugarLeaf, a hemp processor based in North Carolina. Neptune paid an initial consideration for SugarLeaf of $23,737 (US$18,062), a combination of $15,770 (US $12,000) in cash and $7,967 (US $6,062) or 1,587,301 in common shares (the "SugarLeaf Transaction").
>
> Through SugarLeaf, Neptune established a U.S.-based hemp extract supply chain, gaining a 24,000 square foot facility located in the important U.S. Southeast region. SugarLeaf's cutting-edge cold ethanol technology has a processing capacity of 1,500,000 kg of biomass annually and uses hemp cultivated by licensed American growers consistent with federal and state regulations to yield high-quality full and broad-spectrum hemp extracts. The U.S. market for hemp is developing rapidly and represents a significant opportunity for the consumer products industry.

35.     Neptune issued a corresponding press release announcing the Company's fourth quarter and fiscal 2020 results.  The press release stated, in relevant part:

- Total revenues for the three-month period ended March 31, 2020 amounted to $9,530, representing a sequential increase of $355, or 4%, over the third quarter ended December 31, 2019 and an increase of $3,866, or 68%, compared to $5,664 for the three-month period ended March 31, 2019.

- Revenues from the Cannabis segment reached $4,006, an increase of $1,195, or 43%, sequentially from the three-month period ended December 31, 2019 and an increase of $3,994 from the three-month period ended March 31, 2019.

36.     In addition, the press release quoted Defendant Rinow, who touted the Company's performance, stating, in relevant part:

[. . .] "[w]e have made investments to expand capacity, which is now operational, to launch new brands, to innovate new products with the marketing and sales support to drive distribution and sales. While these investments have negatively impacted near-term profitability, we have built the platform to drive accelerated growth and leverage these investments. As we continue to broaden our portfolio and capitalize on incremental opportunities, we will look to expand with strong incremental margins and an asset-light strategy to new business development. We have completed our phase of heightened capital investment and have the assets in place to drive an improving margin profile and higher capital returns. The recent launches of Neptune Air and hand sanitizers, which are both contributing to the significant growth acceleration we are forecasting in the first quarter, are examples of higher margin, asset-light innovations."

37.     That same day, Neptune hosted an earnings call with investors and analysts to discuss the Company's fiscal 2020 Q4 results (the "Q4 2020 Earnings Call").  During the scripted portion of the Q4 2020 Earnings Call, Defendant Rinow stated, in relevant part:

[t]otal revenue for the three-month period ended March 31, 2020 increased 68% to $9.5 million compared to $5.7 million in the prior year. On a sequential basis compared to the third quarter of fiscal 2020, revenue increased 4%. Revenues from the cannabis segment increased sequentially by 42% to $4 million, up from $2.8 million in the first quarter ended December 31, 2019. In the prior year, cannabis revenue was the minimum, given the early stage of our market entry.

This significant development year-over-year reflects both the acquisition of SugarLeaf during fiscal 2020 and the continuous development of Neptune's cannabis operations across North America. At the end of the fourth quarter, Phase 2 of our Sherbrooke facility became operational, allowing us to expand our cannabis operations to 200,000 kilograms and support additional revenue from both, existing and new extraction customers.

38.     Further, when asked how the Company's capacity utilization was going to unfold at SugarLeaf, Defendant Cammarata responded, in relevant part:

[. . .] when it looks at the model for looking at the hemp providers and that is selling into like state owned and the CBD and hemp, because we cannot touch the cannabis in the States. Because we're NASDAQ listed, it's kind of limited. So, what we've done is look at the model on how we can expand into a personal care, home care. And that's something that we're retooling and we'll be coming back with more detail on, like the SugarLeaf asset. And it positions us obviously with a large capacity in the U.S. which we ultimately believe that there will more demand for cannabis and hemp in personal care items such as like toothpaste, soaps, and such. And

household cleaning products like even from hand sanitizers all the way down in to disinfectant wipes.

And we believe that that will give us a growth opportunity in the states. That will actually be a very good factor for SugarLeaf.

39.     On August 11, 2020, Neptune issued a press release announcing the Company's first quarter fiscal 2021 results.  The press release quoted Defendant Rinow, stating, in relevant part:

[. . .] "[w]e have made significant investments over the last year, including expanding capacity and building a world-class team. We are now leveraging these investments, resulting in accelerated growth and improving margins. We anticipate both to continue and our guidance for second quarter revenue to nearly quadruple once again on a year-over-year basis. In addition to being focused on innovation to drive revenue, it is part of our core financial strategy of closely monitoring the profitability of our new business development to enhance margins and capitalize on asset-light innovations. We have improved our cash position to support growth and are working on additional, non-dilutive, sources of capital to support continued growth. We are seeing strong momentum with our recent hand sanitizer 3 of 9 introduction into the club channel, which began early in the second quarter, but are also seeing continued growth in cannabis with existing key partners and new business."

40.     That same day, Neptune hosted an earnings call with investors and analysts to discuss the Company's fiscal 2021 Q1 results (the "Q1 2021 Earnings Call").  During the scripted portion of the Q1 2021 Earnings Call, Defendant Rinow stated, in relevant part, "[t]he first quarter was a strong quarter, producing robust revenue growth, led by our new health and wellness products and cannabis-related products. We also significantly improved gross margins and EBITDA, with accelerated revenue growth, with minimal additional capital investments."

41.     On November 16, 2020, Neptune issued a press release announcing the Company's second quarter fiscal 2021 results.  The press release quoted Defendant Rinow, stating, in relevant part:

[. . .] "[d]uring the second quarter we saw continued growth to our top line while we made additional strategic investments in the future of the Company and in our

14

distribution channels. These investments were an important steppingstone into the next phase of growth. Moving into the back half of fiscal 2021 we are sufficiently capitalized and well positioned to deliver on growth in purchase orders in the fourth fiscal quarter of 2021 and as we move into the first half of fiscal 2022. We remain focused on innovation that will continue to help customers, from the time they wake up to when they go to sleep."

42.     That same day, Neptune hosted an earnings call with investors and analysts to discuss the Company's fiscal 2021 Q2 results (the "Q2 2021 Earnings Call").  During the scripted portion of the Q2 2021 Earnings Call, Defendant Rinow stated, in relevant part:

Neptune is pleased with our second quarter results and strong expansion of our product lines and strategic goals of our distribution channels during what has been a restructuring period over the past three months. We continue on the path to transform our company in order to be best positioned to meet growing consumer demand across the three categories we serve; health and wellness industry, the consumer packaged goods industry, and the projected $130 billion global cannabis market. To that end, it's important to note that 12 months ago the distribution of our consumer product goods represented zero revenue for Neptune; today it is responsible for 70% of our gross revenue. Our second quarter total revenue alone represents 97% October revenues for the full fiscal year 2020; this is proof that our strategic initiatives are working.

As you can see from our top line growth and channel expansion during the first six months of fiscal year 2021, Neptune revenues have never been better in our 20-year history as a company. In a short period of time, our newly assembled world-class executive team has executed on our shift from a B2B extraction company to a fully integrated health and wellness platform centered around a dual go-to-market approach that focuses on delivering B2B and B2C products to millions of consumers around the globe resulting in diverse and multiple revenue streams. This approach at Neptune apart from it's competition and is yielding consistent long-term revenue opportunities.

43.     The statements referenced in ¶¶ 25-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the cost of Neptune's integration of the assets and operations acquired in the SugarLeaf Acquisition would be larger than the Company had acknowledged, placing significant strain on the Company's capital

reserves; (ii) accordingly, it was reasonably foreseeable that the company would need to conduct additional stock offerings to raise more capital; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

44.    On February 15, 2021, Neptune issued a press release announcing disappointing financial results for the third quarter of the Company's fiscal year 2021, missing analyst expectations.  Specifically, the press release stated, in relevant part:

**Third Quarter 2021 Financial Highlights**

- Total revenues for the three-month period ended December 31, 2020 amounted to $3,320, a decrease from $9,174 for the three-month period ended December 31, 2019.

- Gross profits for the three-month period ended December 31, 2020 decreased to a loss of $8,908 compared to a loss of $39 for the three-month period ended December 31, 2019. Gross margin declined to a loss of 268.3%, inclusive of a non-cash $7,391 write-down of inventory and deposits to reflect their net realizable value.

- Adjusted EBITDA[] of a loss of $8,488 for the third quarter of fiscal year 2021 declined from a loss of $1,916 in the third quarter of fiscal year 2020. The decline in Adjusted EBITDA is mainly attributable to the lower gross profit recorded in the third quarter of fiscal 2021.

- Net loss for the three-month period ended December 31, 2020 of $73,799 compared to net income of $5,603 for the three-month period ended December 31, 2019. Included in the net loss for the quarter ended December 31, 2020 is a $35,567 impairment of goodwill and a $2,140 impairment of property, plant and equipment and right-of-use assets related to the acquisition of SugarLeaf in July 2019. In addition, the net loss also includes accelerated amortization of $13,953 also related to the SugarLeaf acquisition.

45.    On this news, Neptune's stock price fell $0.86 per share, or 30.71%, to close at $1.94 per share on February 16, 2021.

46.     Then, on February 17, 2021, prior to the start of the day's trading session, Neptune issued a press release announcing the termination of an at-the-market offering conducted by the Company, selling 9,570,735 of its common shares and raising approximately $18.6 million in gross proceeds.  Just minutes later, Neptune issued a second press release announcing that the Company was conducting a $55 million registered direct offering.  Specifically, the press release stated, in relevant part:

> [the Company] has entered into definitive agreements with institutional investors for the purchase of 27,500,000 common shares. The Company has also agreed to issue to the investors, in a concurrent private placement, unregistered common share purchase warrants (the "Warrants") to purchase an aggregate of 6,875,000 common shares. Each common share and accompanying quarter of a Warrant are being sold together at a combined offering price of US$2.00, pursuant to a registered direct offering, priced at-the-market under Nasdaq rules, for aggregate gross proceeds of approximately US$55.0 million before deducting fees and other estimated offering expenses (the "Offering"). The Warrants will have an exercise price of US$2.25 per share, will be exercisable commencing on the six month anniversary of the date of issuance, and will expire 5.5 years from the date of issuance.

> The Company expects to use the net proceeds from the Offering for working capital and other general corporate purposes. The Offering is expected to close on or about February 19, 2021, subject to the satisfaction of customary closing conditions and the receipt of regulatory approvals, including the approval of the Toronto Stock Exchange.

47.     On this news, Neptune's stock price fell $0.21 per share, or 10.82%, to close at $1.73 per share on February 17, 2021.

48.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Neptune securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Neptune securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Neptune or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Neptune;

- whether the Individual Defendants caused Neptune to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Neptune securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

55. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Neptune securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Neptune securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

58.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Neptune securities; and

20

(iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Neptune securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Neptune securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Neptune's finances and business prospects.

62.     By virtue of their positions at Neptune, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Neptune, the Individual Defendants had knowledge of the details of Neptune's internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Neptune.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Neptune's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Neptune securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Neptune's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Neptune securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, Neptune securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Neptune securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Neptune securities was substantially lower than the prices paid by Plaintiff and the other

members of the Class.  The market price of Neptune securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

68.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     During the Class Period, the Individual Defendants participated in the operation and management of Neptune, and conducted and participated, directly and indirectly, in the conduct of Neptune's business affairs.  Because of their senior positions, they knew the adverse non-public information about Neptune's misstatement of income and expenses and false financial statements.

70.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Neptune's financial condition and results of operations, and to correct promptly any public statements issued by Neptune which had become materially false or misleading.

71.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Neptune disseminated in the marketplace during the Class Period concerning Neptune's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Neptune to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Neptune within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Neptune securities.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of Neptune.  By reason of their senior management positions and/or being directors of Neptune, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Neptune to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Neptune and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Neptune.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  March 16, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, _____Marvin Gong_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 (the "Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 (the "Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Neptune Wellness Solutions, Inc. ("Neptune" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire Neptune securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or the Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Neptune securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in Neptune securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.


**Executed**    _____**Feb. 22, 2021**_____
                           **(Date)**



_____
                  **(Signature)**


_____Marvin Gong_____
      **(Type or Print Name)**

**Neptune Wellness Solutions Inc. (NEPT)**                                    **Gong, Marvin**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 2/10/2021 | 5,200 | $3.0000 |
| Purchase | 2/12/2021 | 5,200 | $2.7401 |
| Sale | 2/12/2021 | (50) | $2.8001 |
| Sale | 2/12/2021 | (5,200) | $2.6500 |