## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVIN GONG, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEPTUNE WELLNESS SOLUTIONS INC., *et al.*,<br><br>Defendants. | Case No. 2:21-cv-01386-ENV-AKT<br><br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Kenneth Rickert ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Amended Complaint (the "Complaint") against Defendants Neptune Wellness Solutions Inc., Michael Cammarata, Toni Rinow, and Martin Landry (collectively, "Defendants"), alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, the investigation conducted by and through his attorneys, including, among other things, a review of Defendants' public statements and filings made with the U.S. Securities and Exchange Commission (the "SEC"), wire and press releases either issued by or regarding Neptune Wellness Solutions Inc. ("Neptune" or the "Company"), analysts' reports, and information obtained from interviews with knowledgeable former employees of the Company. Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Neptune securities on the NASDAQ or another trading venue within the United States between July 24, 2019, and July 15, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.  Excluded from the Class are Defendants, officers, and directors of Neptune, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

2.      Throughout the Class Period, Neptune misled investors about the production capacity of its facilities, its abilities to meet production and delivery commitments, and the success of its failed business ventures all to buoy its stock price and influence capital raises. Neptune only admitted the truth after it failed to report revenue realized from these business ventures and analysts asked pointed questions about the statuses of Neptune's highly touted SugarLeaf Acquisition, hand sanitizer business, and CAD$100 million in supposed purchase orders.

3.      Neptune operates as an integrated health and wellness company. The Company claims to have a portfolio of lifestyle brands and consumer packaged goods products under the Forest Remedies, Ocean Remedies, Neptune Wellness, Mood Ring, and OCEANO3 brands. Neptune offers turnkey product development and supply chain solutions to businesses and government customers in various health and wellness verticals, such as legal cannabis and hemp, nutraceuticals, and white label consumer packaged goods. The Company also provides extraction

and purification services for cannabis and hemp biomass; raw material sourcing, formulation, quality control, and quality assurance primarily for omega-3 and hemp-derived ingredients under various delivery forms, such as soft gels, capsules, and liquids; and formulation and manufacturing solutions for value-added product forms comprising tinctures, sprays, topicals, vapor products, and edibles and beverages.

4.      On July 24, 2019, Neptune announced the closing of its purchase of SugarLeaf Labs, LLC and Forest Remedies LLC (collectively, "SugarLeaf") for $18.1 million (the "SugarLeaf Acquisition"). Significantly, Neptune's announcement omitted that SugarLeaf did not have the production capabilities to produce CBD oil free of THC—the type of CBD oil in demand by most consumers—and that, because of SugarLeaf's lack of capabilities, intensive work and resources would be needed to provide the type of production and sales that Neptune was promising investors. Because of these concealed deficiencies, within six months, production at the SugarLeaf facility was slowed, and within a little over a year, all production was halted and workers were furloughed and/or fired. Significantly, Neptune kept the public in the dark about these failures for over a year and a half after the SugarLeaf Acquisition, even when asked pointed questions by analysts.

5.      Neptune also misled investors about its entry into the hand sanitizer business. In April 2020, Neptune capitalized on fears of Covid by announcing that it had received authorization to begin production on hand sanitizer at its SugarLeaf facility in North Carolina and would soon be producing over one million units of hand sanitizer per week. In reality, Neptune did not have the production capabilities to produce hand sanitizer at the SugarLeaf facility nor had it implemented any plans enable such production. Instead, contradicting its public statements to investors, Neptune secretly planned to import cheap hand sanitizer from Mexico and elsewhere,

re-label it as if produced by Neptune, and sell it to consumers. And Neptune knew at the time that it had no control over the timing of those imports. Thus, Neptune was incapable of delivering "one million units weekly" as announced in April 2020.

6.      Having opted to pass off cheap hand sanitizer it imported from Mexico instead of making hand sanitizer at SugarLeaf as it told investors, Neptune faced further problems because of the low product quality.  As a result, touted deals with retailers like Costco fell through. Instead of coming clean, Neptune continued to mislead investors about the success of its hand sanitizer business long after Neptune's deal with Costco collapsed.

7.      As its SugarLeaf Acquisition and hand sanitizer business were both failing, Neptune announced in November 2020 that it had received CAD$100 million in purchase orders, later revealed to be for PPE equipment. This announcement omitted that Neptune did not have the production capabilities to manufacture the PPE equipment itself and had not secured a supply chain to provide the PPE equipment.

8.      Neptune's house of cards eventually began to collapse on February 15, 2021, when Neptune announced disappointing financial results for the third quarter of the Company's fiscal year 2021, a direct result of the risks it had misrepresented and concealed to investors. Among other results, Neptune reported third-quarter revenues of $2.63 million and a net loss of $58.6 million, down 63.81% and over 1,000% year-over-year, respectively. Neptune attributed the net loss, in part, to a $28.2 million impairment of goodwill and a $1.66 million impairment of "property, plant and equipment and right-of-use assets related to the acquisition of SugarLeaf in July 2019," as well as accelerated amortization of $11.08 million "also related to the SugarLeaf acquisition." Additionally, the Company disclosed that its "[g]ross margin declined to a loss of 268.3%," which included a non-cash $5.87 million "write-down of inventory and deposits to

4

reflect their net realizable value." On February 16, 2021, in its Q3 2021 Earnings Call, Neptune further announced that it had seen a decline in its hand sanitizer business and the previous announcement of expansion into Midwest and West Coast stores was, in fact, false.

9.      On this news, Neptune's stock price fell $0.86 per share, or 30.71%, to close at $1.94 per share on February 16, 2021. Neptune's stock price fell again on February 17, 2021, by $0.21 per share, or 10.82%, to close at $1.73 per share.

10.     On July 15, 2021, in its fiscal Q4 2021 Earnings Call, Neptune admitted that, despite previous assurances, it lacked sufficient production or supply to fulfill its previously announced CAD$100 million purchase orders of PPE equipment. On the date of Neptune's admission, its stock dropped by 22%, from $1.09 to close at $0.84 per share.

11.     Thus, throughout the Class Period, Neptune consistently provided investors with misleading affirmations of its production capabilities and its business operations, while concealing significant risks, setbacks, and failures that were highly material to investors. As a result of these actions, and the precipitous decline in market value of Neptune's securities once the truth became known to the public, Plaintiff and other Class members suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Neptune's most recent quarterly report,

appended as an exhibit to a Form 6-K, as of August 12, 2021, there were 167,175,385 of the Company's common shares outstanding.  Neptune's securities trade on the Nasdaq Capital Market ("NASDAQ") and the Toronto Stock Exchange ("TSX").  Accordingly, hundreds, if not thousands, of investors in Neptune's ordinary shares are located within the U.S., some of whom undoubtedly reside in this Judicial District. Further, on information and belief, Neptune sells products in this District.  Plaintiff bases this, in part, on Neptune's own advertisements during the Class Period that, through its SugarLeaf subsidiary, Neptune would be able to sell its products "to a broad U.S. customer base."

15.    The NASDAQ is a national securities exchange that has registered with the SEC under Section 6 of the Securities Exchange Act of 1934. *See National Securities Exchanges*, U.S. Sec. & Exch. Comm'n, https://www.sec.gov/fast-answers/divisionsmarketregmrexchangesshtml.html (last visited Oct. 1, 2021) (listing registered national securities exchanges).

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

### PARTIES

17.    Lead Plaintiff Kenneth Rickert purchased Neptune common stock at artificially inflated prices during the Class Period. Mr. Rickert purchased his securities from his Florida address through TD Ameritrade[1], a U.S.-based financial services company, on the NASDAQ. Further, Rickert's trades were within the daily respective trading ranges for the U.S. security (which is priced in U.S. dollars)—but outside of the trading ranges for the Canadian security

---

[1] Trades on NASDAQ bind the parties on matching and members are required to honor all bids or offers that have not been withdrawn from the market.

(which is priced in Canadian dollars)—demonstrating that Mr. Rickert purchased his securities domestically. Mr. Rickert was damaged upon the disclosure and/or materialization of the risks concealed by Defendants' Class Period material misrepresentations and omissions.

18.     Defendant Neptune Wellness Solutions Inc. is a Canadian company with principal executive offices located at 545 Promenade du Centropolis, Suite 100, Laval, Québec, Canada H7T 0A3. The Company operates as an integrated health and wellness company and its securities trade on the NASDAQ under the ticker symbol "NEPT."

19.     Defendant Michael Cammarata ("Cammarata") has served as Neptune's President, Chief Executive Officer, and a Director at all relevant times. Cammarata made misleading statements in response to analyst questions identified in Paragraphs 35-38, 61-62, 66-67, 72-75, 84-85, 90, 96-101, 104-105, and 109-110, and signed the Annual Report that was filed with the SEC and contained the misleading statements identified in Paragraphs 86-87.

20.     Defendant Toni Rinow ("Rinow") has served as Neptune's Chief Financial Officer, Vice President, and Global Operating Officer since April 2020. Rinow made misleading statements in response to analyst questions identified in Paragraphs 82-83, 102-103, and 111-112, and signed the Annual Report that was filed with the SEC and contained the misleading statements identified in Paragraph 86-87.

21.     Defendant Martin Landry ("Landry") served as Neptune's Chief of Corporate Development & Strategy from prior to the start of the Class Period until February 2020. Landry made misleading statements in response to analyst questions identified in Paragraphs 68-69.

22.     Defendants Cammarata, Rinow, and Landry are sometimes referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Neptune's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Neptune's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within Neptune, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.     Neptune and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

I.     **Background**

   A.     **Neptune and its Business Strategy**

25.     Founded in 1998, Neptune operated for most of its existence as a manufacturer and distributor of nutraceutical products, including krill oil. Starting in April 2017, Neptune began to shift its focus to the legal cannabis market and began the process to obtain a license to pursue cannabis-related activities.

26.     To facilitate its turn to cannabis, Neptune sold its krill oil business in August 2017 for $43 million.  Having sold its major product line, the remaining cannabis business became the core operation of Neptune.

27.     In January 2019, after a lengthy review process, Neptune finally obtained a license to handle and produce cannabis products in Canada. Neptune initially focused primarily on Business to Business ("B2B") cannabis and hemp extraction. This encompasses extraction and purification services from cannabis and hemp biomass; raw material sourcing, formulation, quality control, and quality assurance primarily for omega-3 and hemp-derived ingredients under various delivery forms, such as soft gels, capsules, and liquids; and formulation and manufacturing solutions for value-added product forms comprising tinctures, sprays, topicals, vapor products, and edibles and beverages.

28.     Hemp and cannabis extraction is a booming industry, with the global cannabis extract market size estimated to be $7.8 billion in 2020, with a predictive size of $31.5 billion by 2030. *Cannabis Extract Market to Garner Growth 18.6% by 2030*, YAHOO!, Feb. 24, 2021, https://www.yahoo.com/now/cannabis-extract-market-garner-growth-141300621.html.   One   of the most popular products that results from hemp extraction is cannabidiol ("CBD") oil – a product that has become increasingly popular in recent years. As of 2019, it was estimated that 7% of Americans were using CBD in some form, with that figure projected to grow to 10% by 2025. Ryan Miller, *Everyone is asking Google about CBD. But does it actually work?*, USA TODAY, Oct. 23, 2019, https://www.usatoday.com/story/news/health/2019/10/23/cbd-google-searches-cannabidiol-skyrocket-do-products-works/4062879002/.

29.     Neptune, taking advantage of this trend, conducted its extraction activities at its 50,000-square-foot production facility in Sherbrooke, Quebec.

30.     As Neptune began to expand its activities in the legal cannabis market, it set its eye towards Business to Consumer ("B2C") products, which provide higher margins than B2B activities. B2C products include cannabis, nutraceuticals, hemp-based beauty & personal care

products, and hemp-based organic foods & beverages. In late 2019, Neptune announced that it had begun to implement a dual B2B and B2C approach that would allow Neptune to expand into the B2C market. Consistent with its dual-pronged approach, Neptune began to develop its B2C activities under the Ocean Remedies, Neptune Wellness, Mood Ring, and OCEANO3 brands.

**B.      Neptune's Acquisition of SugarLeaf**

31.      On May 9, 2019, Neptune announced that it had signed a definitive agreement to acquire all the assets of SugarLeaf, a registered North Carolina-based commercial hemp company providing extraction services and formulated products. These assets included SugarLeaf Labs, LLC, which primarily conducted B2B hemp extraction that produced crude extract, and Forest Remedies LLC, which was focused on producing and selling B2C products such as Omega soft gels, CBD oil for consumers, and essential oils. The SugarLeaf Acquisition also included acquiring SugarLeaf's 24,000 square foot hemp extraction facility in Conover, North Carolina.

32.      On July 24, 2019, Neptune completed the SugarLeaf Acquisition. Neptune paid an initial consideration for SugarLeaf of $18.1 million, through a combination of $12.0 million in cash and $6.1 million in Common Shares (1,587,301 Common Shares).  However, the bulk of the total consideration was contingent, providing for up to $132 million in earnouts to SugarLeaf founders but only if certain annual adjusted EBITDA and other performance targets were achieved.

**II.      Defendants Make Material Misrepresentations to Investors**

**A.      Neptune's Announcements of the SugarLeaf Acquisition**

33.      In its July 24, 2019 press release for the SugarLeaf Acquisition, Neptune touted the significant extraction capabilities that SugarLeaf would bring to Neptune's operations:

"SugarLeaf brings to Neptune

- New capabilities to supply hemp extracts and finished products to a broad U.S. customer base.

10

- Extraction capacity that is expected to reach an annual run rate of 1,500,000 kilos of biomass by the end of 2019 with opportunities to further expand capacity.
- Cutting-edge cold ethanol processing technology producing high-quality broad-spectrum extracts and refined full spectrum extracts.
- Strategic and well diversified sourcing established, with multiple local and large regional hemp farmer partners, ensuring traceability of finished product back directly to the farms.
- Rigorous testing protocols to ensure high quality biomass.
- Pursuit of organic certification and already sourcing from farmers who are certified organic or using organic practices.
- Management team with extensive experience in hemp extraction.
- The U.S. market for hemp-derived CBD based products is evolving rapidly driven by multiple product categories and could reach $US 16 billion by 2025."

Press Release, Neptune Wellness Solutions Inc., Neptune closes SugarLeaf Acquisition, Expanding U.S. Extraction Capabilities (Jul. 24, 2019), https://www.newswire.ca/news-releases/neptune-closes-sugarleaf-acquisition-expanding-u-s-extraction-capabilities-826669022.html.

34.     The statements identified in Paragraph 33 were materially false and misleading when made because the statements failed to disclose the following facts that made the statements misleading under the circumstances in which they were made: (a) that SugarLeaf did not possess the production capabilities to produce THC-free CBD oil, which most of the market demanded; (b) that SugarLeaf did not possess the production capacity and facilities necessary to provide the type of production and sales that Neptune was promising, and significant investment that would be needed to scale up SugarLeaf's facilities; (c) that SugarLeaf was not GMP certified—a certification demanded by many purchasers of crude extract and CBD oil—and Neptune would therefore need to expend a great amount of time and resources to make SugarLeaf GMP certified; and (d) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

35.     Neptune continued to tout the SugarLeaf Acquisition months after the deal was finalized. On August 14, 2019, for example, Neptune stated the following in a press release announcing the Company's fiscal 2020 Q1 results:

**Completion of the SugarLeaf acquisition**

On July 24, 2019, Neptune announced the closing of the acquisition of the assets of U.S.-based hemp processor SugarLeaf Labs and Forest Remedies LLC (collectively, "SugarLeaf"). The initial consideration paid at closing consisted of US$18 million or US$12 million in cash and US$6 million in common shares. By achieving certain annual adjusted EBITDA and other performance targets, an additional consideration of up to US$132 million would be paid over each of the next three years as a combination of cash and shares for a maximum aggregate purchase price of up to US$150 million, reflecting a valuation multiple below 5x EBITDA.

The extraction capacity of SugarLeaf is expected to reach an annual run rate of 1,500,000 kg of biomass by the end of 2019 with opportunities to further expand capacity. The company is using a cutting-edge cold ethanol processing technology producing high-quality broad-spectrum extracts and refined full spectrum extracts. SugarLeaf has established strategic and well diversified sourcing, with multiple local and large regional hemp farmer partners, ensuring traceability of finished product directly back to the farms. The acquisition of SugarLeaf, combined with Neptune creates a leading North American extraction platform with significant capacity available to serve customers in both Canada and the United States. The acquisition also offers an opportunity to participate in both B2B and B2C hemp-derived CBD markets in the United States.

* * *

"Once the expansion phases are complete, we expect Neptune's two extraction facilities to have impressive earnings potential. Given that we only recently acquired SugarLeaf and are still in the process of integrating those operations, we estimate that, based on a conservative capacity utilization scenario of 50%, our two facilities could support in excess of $450 million in annual revenues. In addition, our highly automated operations are expected to translate into low production costs benefiting margins, which have the potential to exceed 40% at the EBITDA level. With a focus on bringing the highest quality products to market sustainably, we believe these developments can help us achieve and surpass these scenarios. There can, of course, be no assurance that the integration of SugarLeaf will be successfully implemented, that our utilization capacity will achieve anticipated levels, or that operational costs and margins will benefit from these developments to the extent anticipated at this time." concluded Mr. Cammarata.

36.     The statements identified in Paragraph 35 were materially false and misleading when made because the statements failed to disclose the following facts that made the statements misleading under the circumstances in which they were made: (a) that SugarLeaf did not possess the production capabilities to produce THC-free CBD oil, which most of the market demanded; (b) that SugarLeaf did not possess the production capacity and facilities necessary to provide the type of production and sales that Neptune was promising; (c) that SugarLeaf was not GMP certified—a certification demanded by many purchasers of crude extract and CBD oil, limiting its addressable market; and (d) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

37.     That same day, Neptune hosted its Q1 2020 Earnings Call with investors and analysts, and during the scripted portion of the Q1 2020 Earnings Call, Cammarata stated:

> Thank you, John. Since I joined Neptune, I spent a lot time listening to key stakeholders and evaluating the company. ***And we've made some actions. We've moved our B2B extraction business from preparation to implementation.*** We expect revenues in that business to ramp up beginning in the current quarter. We've also raised a CAD$41 million private placement. ***We've closed on our SugarLeaf acquisition on July 24th, which will enable us to participate in both B2B and B2C, CBD and hemp markets in the United States.*** Cannabis is a well-accepted across generations. And I believe we are standing on the edge of a dynamic shift in the consumer preference and adoption. We are already seeing consumers driving demand for plant-based natural products and cannabis is no exception. ***Neptune's extraction expertise in pharmaceutical and biotech positions us to transform the cannabis ecosystem and identify new uses for the cannabis whole plant.*** I intend to use my experience in the consumer space to support the company in this dynamic market.

38.     The statements identified in Paragraph 37 were materially false and misleading when made because the statements failed to disclose the following facts that made the statements misleading under the circumstances in which they were made: (a) that SugarLeaf did not possess the production capabilities to produce THC-free CBD oil, which most of the market demanded;

(b) that SugarLeaf did not possess the production capacity and facilities necessary to provide the type of production and sales that Neptune was promising; (c) that SugarLeaf was not GMP certified—a certification demanded by many purchasers of crude extract and CBD oil, limiting its addressable market; and (d) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

**B.      SugarLeaf's Concealed Production Deficiencies**

39.      According to confidential witnesses, at the time of Neptune's announcements, SugarLeaf did not have the production capacity or GMP certification necessary to provide the type of production and sales that Neptune was promising.

40.      Beginning in August 2019, Neptune employed Confidential Witness 1 ("CW1") as its U.S. Director of Research & Development. Prior to his hire with Neptune, CW1 was the Chief Operating Officer of SugarLeaf from August 2016 to August 2019. CW1 was a founder of SugarLeaf and was involved with the research and development activities of SugarLeaf. CW1 was personally involved in the negotiations with Neptune over the SugarLeaf Acquisition. According to CW1, the negotiations between SugarLeaf and Neptune commenced in early 2018 and included five months of evaluation, including three separate audits of SugarLeaf. As a result of these audits and evaluations, CW1 stated that Neptune was fully aware that SugarLeaf had been working on a "shoestring budget," and needed significant work and investment to scale to the type of production and sales that Neptune was promising investors.

41.      Moreover, according to CW1, the months-long evaluation process made sure that Neptune knew that SugarLeaf was not "GMP certified." GMP, or "Good Manufacturing Practice," certification is a label under the U.S. Food and Drug Administration ("FDA") that assures the

public that a business has proper design, monitoring, and control of manufacturing processes and facilities. Obtaining a GMP certification is a time-intensive process that can take months, if not years, and involve numerous inspections. Without such certification, sales can suffer, as many consumers and retailers demand the safety and efficacy of a certified product. Some businesses require a GMP certification to complete a B2B transaction.

42.     GMP certification in the cannabis industry is especially complicated, as the federal ban on marijuana still exists in the United States. However, the 2018 U.S. Farm Bill allowed such certification by legalizing non-THC hemp production, including for interstate transport, and for GMP certification of hemp extraction facilities. Some companies like Hemp Depot have since obtained GMP certification for its hemp extraction facilities, but only after "a rigorous 18-month process of reviews, inspections and upgrades specified by federal guidelines." *Hemp Depot Receives One of the First GMP Certifications for Manufacturing and Storing CBD*, BUSINESSWIRE (Feb. 3, 2020), https://www.businesswire.com/news/home/20200203005720/en/Hemp-Depot-Receives-One-of-the-First-GMP-Certifications-for-Manufacturing-and-Storing-CBD.

43.     SugarLeaf did not have GMP certification at the time of the SugarLeaf Acquisition. Instead, according to CW1, Neptune would have to provide SugarLeaf substantial financial and institutional resources to obtain GMP certification. To Plaintiff's knowledge, SugarLeaf never obtained GMP certification.

44.     Beginning in January 2019, SugarLeaf employed Confidential Witness 2 ("CW2") in a variety of positions, including sales and marketing manager, marketing coordinator, and sales planning manager. After approximately eight months at SugarLeaf, CW2 moved over to work for Neptune. While at Neptune, CW2 reported to Senior Vice President of U.S. retail sales, Scott Antony, and Vice President of U.S. sales, Russell Jay. CW2 confirmed that, as part of the

SugarLeaf Acquisition, Neptune was supposed to provide significant capital expenditure and equipment to build out SugarLeaf's North Carolina facility as part of improvements necessary for GMP certification.

45.     Lack of GMP certification was not SugarLeaf's only issue, as it also lacked the production capabilities to produce the THC-free CBD oil then favored by purchasers.

46.     Beginning in June 2014, Neptune employed Confidential Witness 3 ("CW3") as marketing director until CW3 resigned in October 2020. CW3's job entailed covering marketing and communications for all divisions of Neptune, working on trade shows and company events, handling social media postings, working with the investor relations team, reviewing press releases, and dealing with ad campaigns. CW3 also participated in numerous phone calls with Neptune leadership.

47.     According to CW3, demand for CBD oil processed from hemp extraction in 2019 and 2020 was focused on CBD oil free of THC. However, according to CW3, SugarLeaf did not have the production capabilities to produce CBD oil free of THC and was only capable of producing crude extract and CBD oil with THC.

48.     Crude extract is the product of the first step of the extraction of cannabis and/or hemp. Crude extract is essentially cannabis resin separated from the plant. Crude extract contains all of the cannabinoids, including CBD and low levels of THC, found in hemp. Once hemp or cannabis is refined into crude extract, manufacturers can then further refine and finish the crude extract to create a host of different products, including CBD oil.[2]

49.     While there are multiple forms of CBD oil—including full-spectrum CBD oil, broad-spectrum CBD oil, and CBD isolate—the CBD market can be broken down into two

---

[2] Crude extract is also commonly referred to as "crude oil."

segments: CBD oil with THC ("THC CBD") and CBD oil without THC ("THC-free CBD"). Tetrahydrocannabinol, better known as THC, is the main psychoactive compound in cannabis that produces a psychoactive, "high" sensation. As a result of this psychoactive effect, THC and products with THC are targeted by drug tests, which can cause consumers to lose their jobs or face other consequences. THC-free CBD contains neither psychoactive effects nor employment risk because it undergoes an intensive purifying process to remove THC from the CBD oil.  Due to both the psychoactive side effects and employment risk associated with THC CBD, many consumers who purchase CBD oil demand THC-free CBD.

**C.      Turmoil at SugarLeaf**

50.      Despite Neptune's pronouncements during and right after the SugarLeaf Acquisition, SugarLeaf did not have the capabilities touted to investors, and Neptune had not allocated the resources necessary to cure the deficiencies concealed from investors.

51.      Beginning in October 2019, Neptune employed Confidential Witness 4 ("CW4") as vice president of U.S. sales, until CW4 resigned in early 2020. CW4 reported directly to vice president of global sales, Jacqueline Khayat, and indirectly to SugarLeaf founder, Peter Galloway. CW4 was responsible for building out Neptune's sales pipeline in the United States, including via hemp acquired, extracted, and processed at SugarLeaf.

52.      Beginning in 2018, Confidential Witness 5 ("CW5") began working for SugarLeaf, and later for Neptune, until October 2020. CW5 worked for then-vice president of business development, Lee Moritz. CW5's job responsibilities included working with hemp farmers to acquire biomass for processing at the SugarLeaf facility, as well as business development.

53.      To build up SugarLeaf's capabilities and capacity to produce THC-free CBD to the level touted in Neptune's July 24th Press Release, Neptune would have had to spend millions of

dollars. However, Neptune had a financial incentive to avoid this investment: by upgrading SugarLeaf to cure the deficiencies concealed from investors and thereby enabling SugarLeaf to meet performance targets, Neptune would have exposed itself to paying out over a hundred million dollars in earnouts to SugarLeaf's founders.

54.     Therefore, according to CW1, CW4, and CW5, Neptune starved SugarLeaf of capital and resources. Their accounts are corroborated by CW2, who confirmed that Neptune deprived SugarLeaf of the necessary capital to integrate and scale up the facility to the capabilities described to investors. As a result, in addition to lacking sufficient equipment to provide the results touted to investors, CW2 confirmed that Neptune had not procured appropriate personnel required for even the substandard equipment SugarLeaf had.  For example, Neptune refused to hire an engineer to handle a major piece of machinery for processing CBD, making it essentially useless.

55.     According to CW2, Neptune also refused to invest the necessary resources for GMP certification.

56.     Neptune also steered its own extraction business away from SugarLeaf and towards third-party entities, the exact opposite of what it told investors when touting the SugarLeaf Acquisition.

57.     According to CW4, in late-November/early-December 2019, Cammarata stated on an internal conference call with other Neptune executives and CW4 that Neptune was arranging to use third-party hemp extractors rather than SugarLeaf to conduct hemp extraction, in part because SugarLeaf did not have the necessary capabilities to make THC-free CBD. Cammarata also warned the other participants on the call to conceal the decision from SugarLeaf founder Peter Galloway.

58.     According to CW3, through the Fall of 2019, the market demand for SugarLeaf's products plummeted, because consumers were primarily demanding THC-free CBD products, which SugarLeaf was unequipped to produce.

59.     Beginning in August 2018, Confidential Witness 6 ("CW6") began work at SugarLeaf as an executive assistant to COO Tod Coles, as well as a customer care representative and inside sales staffer. CW6 also worked directly for SugarLeaf founder, Peter Galloway. CW6 left SugarLeaf in October 2020. According to CW6, at the same time that the market for THC-CBD was drying up, there was also an oversaturation of crude extract, causing prices to drop and leaving Neptune unable to sell much of the crude extract produced at SugarLeaf.

60.     According to CW3, with SugarLeaf unable to produce the desirable form of CBD oil, Neptune began to slow down all extraction activities at the SugarLeaf facility. CW3 also confirmed that sales were impeded by a lack of GMP certification, which consumers demanded and SugarLeaf lacked.

61.     Despite internal knowledge of and reaction to the concealed deficiencies at SugarLeaf, Neptune continued to make materially false and misleading statements to investors about supposed progress at SugarLeaf.  On October 17, 2019, for example, Neptune put out a press release that cited Cammarata, who stated that the expansion of the SugarLeaf facility was then "on time and on budget":

> This large contract will support our capacity expansion at our North Carolina facility and better position us to serve the growing United States market. ***Our expansion in North Carolina is on time and on budget with extraction capacity expected to reach an annual run-rate of 1,500,000 kg of biomass by December 2019***. Demand for extraction and formulation services in the U.S. is currently strong with the ongoing harvest season and our tolling and formulation pipeline to deliver high quality full and broad spectrum extracts remains robust. This announcement represents a further step towards our customer and geographic diversification strategy[.]

62.     The statements identified in Paragraph 61 were materially false and misleading when made because the expansion of the SugarLeaf facility in Conover, North Carolina was not on time or on budget, and in fact was crippled at the time from a lack of resources. In addition, Neptune and Cammarata failed to disclose the following facts that made the statements misleading under the circumstances in which they were made: (a) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (b) that SugarLeaf did not possess the production capacity and facilities necessary to provide the type of production and sales that Neptune was promising; (c) that SugarLeaf was not GMP certified, as required by many purchasers, of crude extract and CBD oil; (d) that Neptune itself was steering business away from SugarLeaf; and (e) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

63.     According to both CW1 and CW3, Neptune also stopped all retail sales of SugarLeaf's Forest Remedies branded products, citing internally both the lack of GMP certification and a desire by Cammarata to "retool" the brand so that it would appeal to more mainstream clientele. Neptune would eventually "re-launch" Forest Remedies branded products in February 2020.

64.     Neptune continued to spin the SugarLeaf Acquisition as a success into 2020, despite extensive internal evidence to the contrary. On January 10, 2020, Neptune issued a press release aimed at investors, stating:

> ***The capacity expansion at Neptune's North Carolina SugarLeaf facility is nearing completion, as expected and on budget***. With a second centrifuge installed, Neptune will be able to run multiple batches concurrently, providing more flexibility and reducing downtime. ***Management is putting the final touches to get the facility ready for a Good Manufacturing Practice ("GMP") pre-inspection audit which should occur in the coming weeks***. A GMP certification will enable

Neptune to broaden its client base. Recently, the R&D teams from both production facilities collaborated to develop an in-house technology to make a water solubility emulsion of cannabinoids. While testing is still undergoing, the initial stability tests were very positive.

65.     The statements identified in Paragraph 64 were materially false and misleading when made because (a) SugarLeaf was not "putting the final touches to get the facility" GMP certified, but instead was far from GMP certification because Neptune had deliberately starved SugarLeaf of the resources necessary to upgrade its facilities to that level; (b) the SugarLeaf expansion was not "nearing completion;" and (c) the statements omitted to disclose the following facts that were necessary to make the statements not misleading under the circumstances in which they were made: (1) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (2) that SugarLeaf had already begun slowing extraction activities because it was only able to produce THC-CBD, and not THC-free CBD; (3) that Neptune had stopped all retail sales of Forest Remedies products; (4) that Neptune itself was steering business away from SugarLeaf; and (5) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

66.     Then on February 13, 2020, Neptune issued a press release announcing the Company's fiscal 2020 Q3 results. The press release quoted Cammarata, who touted the Company's performance:

> Since I joined the company six months ago, we've had to reassess all facets of our business plans. It quickly became apparent that there were several operational challenges that needed to be addressed immediately. With changes and enhancements to our management team, business plans, production lines and customer relationships, we've rapidly become more than an extraction and white label company. We continue to progress in our vision to become a leading player in B2B and B2C cannabis and hemp markets. Our revenue growth of 41% sequentially is a solid testament to this, considering the current cannabis and hemp environment. While our profitability this quarter was short of our expectations due

21

to the slower than expected ramp-up of our Phase II cold ethanol production process and industry factors beyond our control, we are setting up our long-term success by expanding our channel strategy with increased focus on end clients, in Canada and the US.

67.     The statements identified in Paragraph 66 were materially false and misleading when made because Neptune and Cammarata omitted (a) that the previously-touted cornerstone of Neptune's pivot to "extraction," SugarLeaf, had to slow its extraction activities because it was only able to produce crude extract and THC-CBD, which most customers did not want, rather than THC-free CBD, and therefore was accumulating barrels of crude extract and THC-CBD that it was unable to sell; and (b) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

68.     On February 13, 2020, Neptune held its Q3 2020 Earnings Call, where Chief of Corporate Development and Strategy Martin Landry responded to an analyst's direct question about the extent of problems with the SugarLeaf facility:

**Q: Gerald Pascarelli**

My first question just housekeeping item on the impairment. I guess what underpinned the assessment for the CAD$45 million write-down? I know it was CAD$122 million carrying value last quarter. It's still at CAD$78 million as of this quarter and I'm just trying to assess kind of given what we are seeing from a deflationary perspective in the US CBD market, the potential for further write-downs on goodwill? Thank you.

**A: Martin Landry**

Hi Gerald, it's Martin. I think we need to just remind everybody that the purchase price we paid for SugarLeaf is US$18 million or CAD$24 million. But the total purchase price if all the earnouts would be achieved was estimated at CAD$150 million.

So, what we did from an accounting standpoint is account for those earnouts as a liability on our books, and that's what we're writing -- part of what we're writing down today is those potential earnouts.

To answer your questions, what's been the trigger to reflect an impairment today? Well, you may have seen I'm sure the price of the hemp extracts have been extremely volatile this year in the last 12 months and they're down by more than 60%. So that's obviously having an impact on our future sales and our profitability and that's what we've reflected.

And to your point, there are -- there is still $34 million [ph] of earnouts on our book. ***So, we still think that SugarLeaf will hit some of their earnouts and we still think that they have a bright future ahead of them, but we needed to reflect the current environment conditions***.

69.     The statements identified in Paragraph 68 were materially false and misleading when made because the statements omitted to disclose the following facts that were necessary to make the statements not misleading under the circumstances in which they were made: (1) that Neptune had starved SugarLeaf of capital and upgrades, and SugarLeaf had already slowed extraction activities as a result, making it highly unlikely if not impossible for SugarLeaf to reach any earnouts; (2) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (3) that SugarLeaf was not GMP certified and Neptune had not invested the resources necessary to achieve certification in the near future, thereby hindering SugarLeaf's ability to hit its earnouts; (4) that Neptune itself was steering business away from SugarLeaf, thereby hindering SugarLeaf's ability to hit its earnouts; and (5) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

70.     The reality at SugarLeaf was the exact opposite as portrayed to investors.  Rather than making progress, SugarLeaf began to accumulate more and more crude extract and THC-CBD that it could not sell, and Neptune began to furlough and ultimately lay off the majority of SugarLeaf employees. By the second half of 2020, according to CW6, SugarLeaf only had a skeletal staff of one to two people operating the facility, and eventually halted production entirely.

### D.     Separate Misrepresentations About Hand Sanitizer

71.     Neptune not only misled investors about its SugarLeaf Acquisition during the Class Period but also about its hand sanitizer business. As 2020 commenced and COVID-19 spread around the world, hand sanitizer demand spiked. Neptune exploited the health crisis by making misrepresentations to investors suggesting it could use the North Carolina facilities purchased in the SugarLeaf acquisition to profit from this burgeoning market.

72.     On April 9, 2020, Neptune put out a press release touting that it had successfully completed a submission to the U.S. Food and Drug Administration ("FDA") for registration of its SugarLeaf facility in Conover, North Carolina to manufacture hand sanitizers:

> Neptune Wellness Solutions Inc. ("Neptune" or the "Company") (NASDAQ: NEPT) (TSX: NEPT), is pleased to announce today that it has successfully completed a submission to the U.S. Food and Drug Administration (FDA) for registration of its facility in Conover, North Carolina as an over-the-counter (OTC) drug manufacturer to prepare alcohol-based hand sanitizers under the agency's temporary policy for such products during the public health emergency (COVID-19). ***Registration of the Conover facility with FDA enables the company to begin manufacturing alcohol-based hand sanitizers to help address the increased demand for these products by consumers and health care professionals***. This announcement follows the recent announcement that the Company received Health Canada authorization to commercialize natural, plant-based hand sanitizer products. ***The Company anticipates its first shipments of hand sanitizers over the next several weeks with production volume ramping up into summer 2020***. "We are very pleased to have fast tracked our registration with FDA and are committed to supporting our fellow citizens across North America," said Michael Cammarata, Chief Executive Officer of Neptune. "We have already received strong interest from retailers and have worked with our partners to successfully secure initial raw material supplies. ***We anticipate initial shipments over the next several weeks and intend to fully ramp up production over the coming months***. Our hand sanitizers are leveraging our experience and ongoing development of plant-based household products, allowing us to quickly address this growing consumer need with a premium quality solution."

Press Release, Neptune Wellness Solutions Inc., Neptune Successfully Completes Submission to U.S. FDA for Registration of its Conover, NC Facility for Production of Hand Sanitizers (Apr. 9, 2020).

73.     The statements identified in Paragraph 72 were materially false and misleading when made because (a) in April 2020, Neptune did not have the capacity to produce nor ship hand sanitizer commercially within either the "next several weeks" or to fully ramp production over the "coming months"; and (b) Neptune did not have the capability to produce hand sanitizer from "raw material supplies" at its SugarLeaf facility, and to conceal this fact secretly arranged to import cheap hand sanitizer from Mexico and elsewhere.

74.     On April 23, 2020, Neptune put out a second press release touting its hand sanitizer business, claiming that it had "executed on scaling up hand sanitizer production ahead of schedule," and was then successfully accelerating to over one million units weekly:

> Neptune Wellness Solutions Inc. ("Neptune" or the "Company") (NASDAQ: NEPT) (TSX: NEPT), a leader in natural health products, and its subsidiary Biodroga*, is successfully accelerating production of hand sanitizers to over one million units weekly*. Neptune's hand sanitizer gel kills 99.9% of germs and bacteria and is available in 2 oz, 4 oz, 6oz, 8 oz, 16 oz, 1 liter and 1 gallon formats. *Neptune has executed on scaling up hand sanitizer production ahead of schedule to rapidly increase critical supply and meet market demand driven by the COVID-19 pandemic. This scale up will allow Neptune to meet strong demand from its North American retail and government customers, and begin shipping product next week, including fulfilling a purchase order from a large North American retailer*. "I could not be more proud of how our entire team has mobilized to leverage our collective expertise in procurement, manufacturing, product innovation, supply chain management and regulatory affairs to bring significant and continuous supply of hand sanitizer gel to market ahead of schedule during this critical stage in the battle against COVID-19," said Michael Cammarata, Chief Executive Officer of Neptune Wellness Solutions. "We are rapidly responding to the needs of North Americans and playing a key role in meeting customer demand for safe and effective hand sanitizer to help prevent the spread of germs and protect consumer health."

Press Release, Neptune Wellness Solutions Inc., Neptune Scheduled to Ship Over One Million Units of Hand Sanitizer Weekly (Apr. 23, 2020).

75.     The statements identified in Paragraph 74 were materially false and misleading when made because (a) Neptune did not have the production capacity or supply of hand sanitizer to "begin shipping product next week" (at the end of April 2020); (b) Neptune had not "executed

on scaling up hand sanitizer production ahead of schedule;" (c) Neptune did not have the capacity to ship "over one million units" of hand sanitizer per week; and (d) Neptune lacked the internal capacity to viably produce hand sanitizer, and instead secretly arranged to import cheap hand sanitizer from Mexico and elsewhere.

76.     Neptune's stock price skyrocketed in response to the April 23rd announcement, increasing by over 25%. *See* Nick Laba, *Hand sanitizer pivot pumps Neptune stock over 25%*, MUGGLEHEAD MAGAZINE, Apr. 23, 2020, https://mugglehead.com/hand-sanitizer-pivot-pumps-neptune-stock-over-25/.

77.     Beginning in March 2020, SugarLeaf hired Confidential Witness 7 ("CW7") as a regional sales manager. CW7's job responsibilities initially included B2B sales for SugarLeaf. Around June 2020, CW7 transitioned into a similar role with Neptune. CW7 worked for Neptune until September 2020, when CW7 resigned. CW7 was initially hired to work on selling nutraceuticals and supplements. After COVID-19 hit, CW7 was transitioned into Neptune's efforts to sell hand sanitizer products.

78.     According to CW7, Neptune was far from prepared to fulfill any orders for hand sanitizer until at least July 2020, and could not even provide customers with a data sheet on the hand sanitizer product or the actual quantity of hand sanitizer available for sale. At the time of the April press release, Neptune did not have a current supply of hand sanitizer or the means to produce hand sanitizer at the levels promised. According to CW7, Neptune was only just starting to negotiate with outside suppliers in April 2020 and lacked firm supply commitments. As a result, Neptune would often cancel hand sanitizer sales it made around that time, because it could not fulfill the orders.

79.     CW6 and CW7 also disputed Neptune's claim about producing hand sanitizer. According to CW7—and confirmed by CW2, CW3, and CW6—Neptune simply purchased its hand sanitizer from manufacturers in Mexico and elsewhere, and then re-labeled the hand sanitizer as Neptune-branded hand sanitizer at the SugarLeaf facility.

### E.     Neptune's May, June, and July 2020 SugarLeaf Updates to Investors

80.     From May through July 2020, as Neptune was claiming to break into the hand sanitizer market, it continued to make false claims about its SugarLeaf Acquisition to investors. On May 14, 2020, Neptune issued a press release announcing preliminary fiscal 2020 results and providing a fiscal 2021 Q1 outlook that stated, in relevant part:

**First Quarter Fiscal 2021 Revenue Outlook**

For the first quarter of fiscal year 2021 ending June 30, 2020, Neptune expects to report strong quarter-over-quarter growth in its company-wide revenues to a range of between $18 million and $22 million. This revenue growth is driven by the accelerated expansion of Neptune's Health and Wellness solutions and its agile adaptation to changing market conditions and demands. This product portfolio expansion, with the recent product announcements of hand sanitizers and Neptune Air non-contact thermometers, utilizes a highly flexible and low cost supply chain infrastructure, relying on internal and third-party manufacturers that can be scaled up or down quickly to adapt to market demand. In a currently volatile market that sees high demand for these product categories, but also increased supply from a wide range of providers, Neptune is not in a position to confirm projected sales or revenue for these new products, beyond those reflected in the first quarter revenue indication provided above. ***The Company is also seeing growth of its extraction revenue, reflecting the successful implementation of new capacity***.

\* \* \*

**Preliminary Fiscal 2020 Financial Highlights**

Neptune also today announced that, based upon information currently available to management, it anticipates reporting revenue of approximately $28.0 million to $29.6 million for the twelve months ended March 31, 2020, compared to $24.4 million for the twelve months ended March 31, 2019, ***with the year-over-year change resulting primarily from the acquisition of Sugarleaf as well as the increase in revenues from the Company's Cannabis segment***. Neptune also announces that negative gross profit between $0.5 and $2.0 million is expected for the twelve months ended March 31, 2020, reflecting costs associated with the start-up operations of the Company's Cannabis segment. For the fourth quarter of fiscal

2020, the Company anticipates reporting revenue of $8.0 million to $9.6 million, compared to $5.7 million in the prior year period, an approximate growth rate of 40% to 69%.

81.    The statements identified in Paragraph 80 were materially false and misleading when made because the statements failed to disclose the following facts that made the statements misleading under the circumstances in which they were made: (a) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (b) that SugarLeaf had already begun slowing its extraction activities because it was only able to produce crude extract and THC-CBD, and not THC-free CBD; (c) that SugarLeaf was not GMP certified, thereby hindering SugarLeaf's sales; (d) that Neptune was steering business away from SugarLeaf; and (e) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

82.    Neptune doubled down on its misrepresentations about the SugarLeaf Acquisition on June 10, 2020, when it lauded the SugarLeaf Acquisition in two different forums. First, Neptune hosted its Q4 2020 Earnings Call with investors and analysts to discuss the Company's fiscal 2020 Q4 results. During the scripted portion of the Q4 2020 Earnings Call, Rinow discussed SugarLeaf and stated:

> Total revenue for the three-month period ended March 31, 2020 increased 68% to CAD$9.5 million compared to CAD$5.7 million in the prior year. On a sequential basis compared to the third quarter of fiscal 2020, revenue increased 4%. Revenues from the cannabis segment increased sequentially by 42% to CAD$4 million, up from CAD$2.8 million in the first quarter ended December 31, 2019. In the prior year, cannabis revenue was the minimum given the early stage of our market entry.
>
> ***This significant development year-over-year reflects both the acquisition of Sugarleaf during fiscal 2020 and the continued development of Neptune's cannabis operations across North America.***

83.    The statements identified in Paragraph 82 were materially false and misleading when made because they failed to disclose the following facts that made the statements misleading under the circumstances in which they were made: (a) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (b) that SugarLeaf had already begun slowing its extraction activities because it was only able to produce crude extract and THC-CBD, and not THC-free CBD; (c) that SugarLeaf was not GMP certified, thereby hindering SugarLeaf's business; (d) that Neptune was steering business away from SugarLeaf; and (e) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

84.    Further, when asked how the Company's capacity utilization was going to unfold at SugarLeaf, Cammarata responded by describing SugarLeaf's capacity and value for Neptune:

**Q: Douglas Loe**

[…] Maybe shifting gears to Sugarleaf, and we have pretty strong visibility on how your capacity utilization is going to unfold at Sherbrooke, little less in Sugarleaf, and of course, you took the write-down in recent quarters that we're all aware of, like any sort of granularity you want to provide either on the regulatory macro environment or near-term production cycles on hemp oil extraction that you might be able to give us some color on with regard to Sugarleaf, it's little bit challenging to figure how to model Sugarleaf a little bit easier with the Sherbrooke. So any guidance there would be helpful.

**A: Michael Cammarata**

Yeah. So obviously, ***Sugarleaf came from original of an acquisition and/or in the process of doing the integrations and mapping it out***. We did see in the U.S. that hemp actually had different price point and actually had a confession of 60% plus on its hemp pricing, but what's been really unique about Neptune's model is when all the cannabis companies were focusing on what I would call like devices, smoking, drinking and eating. We took a holistic view of the whole household for the consumer. How does hemp play a role in products such as deodorant, which it can add a moisturizing effect. All the different cannabinoids that could use -- that can add an antifungal and antibacterial properties. How do they play into the

cleaning products that people use on a daily basis and those models and those industries are actually much greater we believe to the potential, because some of those categories have been around at retail for a lot longer than as -- than marijuana categories have in the states and obviously there's a lot of restrictions.

So when it looks at the model for looking at the hemp providers and that are selling into like the state-owned and then CBD and hemp because we cannot touch the cannabis in states because we're NASDAQ listed. It's kind of limited.

So what we've done is looked at the model on how we can expand into the personal care and homecare areas. And that's something that we're retooling and we'll be coming back with more detail on with the Sugarleaf asset and *it positions us obviously with a large capacity in the U.S. . . . and we believe that will give us a growth opportunity in the states that will actually be a very good factor for Sugarleaf.*

85.    The statements identified in Paragraph 84 were materially false and misleading when made because they failed to disclose the following facts that made the statements misleading under the circumstances in which they were made: (a) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (b) that SugarLeaf had already begun slowing its extraction activities because it was only able to produce crude extract and THC-CBD, and not THC-free CBD; (c) that SugarLeaf was not GMP certified, thereby hindering SugarLeaf's business; (d) that Neptune was steering business away from SugarLeaf; and (e) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

86.    Neptune's second forum for misrepresentations on June 10, 2020, was an Annual Report on Form 40-F filed with the SEC, reporting the Company's financial and operating results for the year ended March 31, 2020 (the "2020 40-F"). Defendants Cammarata and Rinow signed this Annual Report, and it contains their certifications pursuant to the Sarbanes-Oxley Act of 2002. Appended as an exhibit to the 2020 40-F was Neptune management's discussion and analysis of

the financial situation and operating results for the years ended March 31, 2020 and 2019 (the "2020 MD&A"). The 2020 MD&A addressed, among other things, SugarLeaf:

> On July 24, 2019, Neptune completed the acquisition of the assets of Sugarleaf Labs, LLC and Forest Remedies LLC (collectively, "SugarLeaf"), a North Carolina-based commercial hemp company (the "SugarLeaf Acquisition"). Neptune paid an initial consideration for SugarLeaf of $23.7 million (US$18.1 million), through a combination of $15.8 million (US$12.0 million) in cash and $8.0 million (US$6.1 million) in Common Shares (1,587,301 Common Shares).
>
> * * *
>
> ***Through SugarLeaf, Neptune established a U.S.-based hemp extract supply chain, gaining a 24,000 square foot facility located in the important U.S. Southeast region. SugarLeaf's cutting-edge cold ethanol technology has a processing capacity of 1,500,000 kg of biomass annually and uses hemp cultivated by licensed American growers consistent with federal and state regulations to yield high-quality full and broad-spectrum hemp extracts. The U.S. market for hemp is developing rapidly and represents a significant opportunity for the consumer products industry***.

87. The statements identified in Paragraph 86 were materially false and misleading when made because (a) SugarLeaf did not have "cutting edge" extraction technology; and (b) the statements omitted to disclose the following facts that were necessary to make the statements not misleading under the circumstances in which they were made: (1) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (2) that SugarLeaf had already begun slowing its extraction activities because it was only able to produce crude extract and THC-CBD, and not THC-free CBD; (3) that SugarLeaf was not GMP certified, thereby hindering SugarLeaf's business; (4) that Neptune was steering business away from SugarLeaf; and (5) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

**F.    Neptune and Cammarata Misrepresent Hand Sanitizer Deal With Costco**

88. In the summer of 2020, Neptune not only (misleadingly) touted its SugarLeaf

31

Acquisition, but also its fledgling hand sanitizer business, even though Neptune did not have the hand sanitizer it was advertising and imported the hand sanitizer it did have from Mexico and elsewhere.

89.     On July 9, 2020, Neptune announced that it had entered into an agreement to sell its hand sanitizer at Costco by tweeting a picture of a pallet of hand sanitizer and captioning it, "Excited that our hand sanitizer is now shipping to our new retail partner @costco. We developed natural and effective hand sanitizer in collaboration with @IFF. We will continue to innovate to help improve health and wellness. @nasdaq $NEPT":



90.     Similarly, Cammarata used his personal Twitter account to tweet a similar message, stating, "Our hand sanitizer is now shipping to our new retail partner @costco. We developed natural and effective hand sanitizer with @IFF, as part of our mission to redefine health and wellness. @nasdaq $NEPT":



91.    The statements identified in Paragraphs 89 and 90 were materially false and misleading when made because (a) the hand sanitizer was not developed or manufactured by Neptune, but instead imported from Mexico; and (b) the hand sanitizer was not "natural," but rather repackaged inferior hand sanitizer from Mexico and elsewhere.

92.    On the date of this announcement, Neptune's stock price jumped from $3.15 to $3.58.

93.    According to CW2, CW3, and CW7, shortly after Neptune and Cammarata's tweets, the Costco deal collapsed when it was discovered that Neptune had attempted to fill the order with inferior Mexican-imported hand sanitizer instead of domestic product, as Neptune's own July 24, 2019 press release told investors would be manufactured out of the SugarLeaf facility that would provide for "[r]igorous testing protocols to ensure high quality."

94.    Despite touting the so-called deal with Costco, Neptune and Cammarata hid the news that the deal fell apart.  Neptune and Cammarata's failure to come clean with investors about

the failures of the hand sanitizer business worried Neptune executives Scott Antony and Russell Jay, who told CW2 that Cammarata was lying to the market about Neptune's hand sanitizer business. According to CW2, Neptune was misleading the public about Neptune's hand sanitizer production and the Costco deal, which "had been killed for a while, because [Neptune] didn't have the hand sanitizer."

### G.   Neptune's July 13, 2020 Prospectus and August 11, 2020 Q1 2021 Earnings Call

95.     On July 13, 2020, Neptune put out a Prospectus Supplement in connection with its offering of 4,773,584 common shares at a price of $2.65 per share. In its Prospectus Supplement, Neptune discussed several hypothetical risk factors such as "potential for unfavorable or competing interpretations of federal and state law regarding whether certain hemp derivatives and extracts are 'hemp' as defined in the 2018 Farm Bill," but misleadingly omitted to disclose the following to investors: (a) the risks posed by the fact that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (b) that some of the risks associated with SugarLeaf's lacking production capabilities already manifested, and SugarLeaf had already begun slowing the production of its CBD extraction and was accumulating barrels of crude extract and THC-CBD that it was unable to sell; (c) that Neptune was importing its hand sanitizer from cheap sources in Mexico and elsewhere contrary to its statements to investors, relinquishing control over the production and quality; (d) that SugarLeaf was then underperforming, and, as a result, Neptune was then planning to furlough and/or lay off most of SugarLeaf's workforce and was slashing production; and (e) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

96.     On August 11, 2020, Neptune held its Q1 2021 Earnings Call, in which it was directly asked pointed questions about SugarLeaf and its hand sanitizer business. Instead of admitting the failures of both ventures, Neptune misled investors. For example, during the earnings call, Neptune and Cammarata responded to an analyst's request for an update on SugarLeaf and its contribution to revenue for Neptune:

**Q: John Chu**

Okay. That's very helpful, too. Then maybe just an update on the U.S. operations, SugarLeaf in terms of any revenue contribution there and just how things are progressing with the CBD side of the angle, especially with your – some of the relationships you're building about Costco and maybe that's connected with Nestle, Clorox and Webber too, but just any insight you can give there would be helpful.

**A: Michael Cammarata**

Yes. So in the U.S., there's obviously – we're watching very closely the regulatory environment. We've also been able to expand capacity for focusing on uses for personal care, home care and beauty products that we're developing. So I think there's a lot of innovation that will be coming out of the state that really focus on the Personal Care, Home Care and duty product lines. As we move from more from B2B to really going closer to the consumer with our brands and our partnered brands that we're creating with some of the biggest companies in the world. In preparation for launch, that capacity and that utilization is starting to focus on that. ***So we're kind of looking at how the hand sanitizers and the cannabinoids and how they apply to those day-to-day products, and that's definitely where we're going to see the growth in North Carolina.*** And I'd also add that in event that depending on how elections and the regulatory parties change, we're ready for several different scenarios.

***So that's why we do have a huge upside. We do have a huge capacity in North Carolina, that we'll be able to take first move to the market-based on regulations. So there's a couple of different things that we're focusing on in North Carolina, and it's really getting R&D and getting closer to the consumer and working with CPG companies on developing brands and also working with retailers because there's a lot of retailers right now that are looking at the private label businesses.*** So I think that you'll see that a lot of our B2B will go into retailers that are looking for private labels and you'll see them alongside our own brands and even some of our CPG partner brands. So I think we're really building a great portfolio of products with partners that we want to be in business with that have been around for decades or almost 100 years. So I think that we're well-positioned both in the U.S. and in Canada, and we'll continue to support those businesses.

97.     The statements identified in Paragraph 96 were materially false and misleading when made because (a) the referenced Costco deal was falling apart due to Neptune's secret bait-and-switch change to inferior Mexican hand sanitizer and inability to fill ordered quantities with acceptable product; (b) Neptune was not manufacturing hand sanitizer at its SugarLeaf facility "in North Carolina" as referenced, but instead lacking such capability, Neptune turned to inferior Mexican importers; and (c) the statements omitted to disclose the following facts that were necessary to make the statements not misleading under the circumstances in which they were made: (1) that SugarLeaf had begun to lay off and/or furlough a majority of its workers, at Neptune's direction; (2) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (3) that SugarLeaf had already begun slowing its extraction activities because it was only able to produce crude extract and THC-CBD, and not THC-free CBD; (4) that SugarLeaf was not GMP certified, thereby hindering SugarLeaf's sales; (5) that Neptune was steering business away from SugarLeaf; and (6) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

98.     During the Q1 2021 Earnings Call, Neptune and Cammarata also spoke to Neptune's hand sanitizer business:

> Our new hand sanitizers has emerged as an important product for our company. ***Since July, our hand sanitizers have been sold in Costco stores***. With initial distribution in the Northeast and Southeast United States. We have not yet found a ceiling for demand in these regions and will begin shipping to the Midwest and the West Coast in the coming months. ***Our hand sanitizer is effective, safe and provides a premier experience with a pleasant scent and application feel that uses essential oils, Alovera and fruit extracts.*** We currently offer six scented varieties, including Garden Mint, Fresh Linen, Orange Hibiscus, Eucalyptus, Lavender and Fresh Lemon plus Tea Tree. We have plan to feature seasonal scent offerings in the future. We anticipate sustained demand for hand sanitizers as consumers maintain their healthy habits and look for products that are affordable and do more than just

36

fill a practical need. The market for hand sanitizers is robust. We have seen dramatic growth this year, and we are very pleased with the consumer response thus far and working diligently to keep up with demand.

99.    The statements identified in Paragraph 98 were materially false and misleading when made because: (a) the referenced Costco deal was falling apart due to Neptune's secret bait-and-switch change to inferior Mexican hand sanitizer and inability to fill ordered quantities with acceptable product; and (b) Neptune's hand sanitizer did not provide a premier experience, but rather an inferior experience that was known to Neptune and Cammarata because retailers had rejected and/or returned the product, or canceled future orders, due to its inferior quality.

100.    Neptune and Cammarata later expanded upon Neptune's hand sanitizer business in response to an analyst's question:

> Yes. So we started rolling out on the East Coast, basically moving our way West. We've had some good problems that we haven't found our ceiling yet. ***So we're now going towards the Midwest and product will start showing up on the West Coast shortly.*** But all regions, we have yet defined our ceilings when it comes to the hand sanitizers. We've also been focusing on additional SKUs for that retail partner. In addition, we've been working with additional retailers that are starting to open back up especially in the home repair or market as well, like the Home Depots and the Lowe's of the world. So we will expect to see additional retail footprint growing. ***We've been very uniquely focusing on increasing our capacity and having the highest quality product in the market.*** I think that, that's resonated. We're seeing that products are selling out the day they land in the retail stores. So as we're working with our supply chains and our partners like IFF, that has been really crucial to helping increase capacity. That has really been able to allow us to grab such a large share of a market that is very important not only for our hand sanitizer business, but also for the cannabinoids because I think that we've done something very unique as far as taking the approach, getting closer to the consumer as well as looking at areas like cannabinoids and research is showing us that can improve products.

101.    The statements identified in Paragraph 100 were materially false and misleading when made because Neptune's hand sanitizer was not even close to "the highest quality product in the market," which was known to Neptune and Cammarata because retailers had rejected and/or returned the product, or canceled future orders, due to its inferior quality.

37

### H.    Neptune's November 16, 2020 Q2 2021 Earnings Call

102.    On November 16, 2020, Neptune held its Q2 2021 Earnings Call where it addressed SugarLeaf and its hand sanitizer business, as well as its new announcement of CAD$100 million in purchase orders. The earnings call was littered with false and misleading statements. During the scripted portion of the Q2 2021 Earnings Call, Rinow discussed SugarLeaf, stating:

> Accordingly, in addition to our operations at our state-of-the-art 25,000 square foot facility in North Carolina, the organization plans to open a Florida-based office in 2021 to focus around US legislation and the expectations it represents for Neptune.
>
> * * *
>
> ***We will also retool our North Carolina facility to become a multi-purpose and multi-use platform to meet large-scale consumer demand with various products in the hemp, cannabis and other health and wellness sectors. With restructuring activities and costs largely behind us, we are now poised for expansion and profitability. The outlook is indeed positive.*** This leads me to step three and the most important facet of our business, innovation. Having rearchitect the business to take advantage of both internal and external supply chain, making us agile and scalable across all of our divisions, we expect to make tangible progress in the third and fourth quarter through leveraging our extraction and formulation expertise to meet market demand.
>
> * * *
>
> Neptune is pleased with our second quarter results and strong expansion of our product lines and strategic goals of our distribution channels during what has been a restructuring period over the past three months. We continue on the path to transform our Company in order to be best positioned to meet growing consumer demand across the three categories we serve; the health and wellness industry, the consumer packaged goods industry, and the projected CAD$130 billion global cannabis market. To that end, it's important to note that 12 months ago the distribution of our consumer product goods represented zero revenue for Neptune. Today, it is responsible for 70% of our gross revenue. Our second quarter total revenue alone represents 97% October revenues for the full fiscal year 2020. This is proof that our strategic initiatives are working.
>
> As you can see from our top-line growth and channel expansion during the first six months of fiscal year 2021, Neptune revenues have never been better in our 20-year history as a Company. In a short period of time, our newly assembled world-class executive team has executed on our shift from a B2B extraction company to a fully integrated health and wellness platform, centered around a dual go-to-market approach that focuses on delivering B2B and B2C products to millions of consumers around the globe, resulting in diverse and multiple revenue streams. This

approach sets Neptune apart from it's competition and is yielding consistent long-term revenue opportunities.

103.     The statements identified in Paragraph 102 were materially false and misleading when made because (a) restructuring activities and costs were not "largely behind" Neptune; (b) rather than "retool[ing]" SugarLeaf's North Carolina facility to meet "large-scale consumer demand," Neptune had furloughed and/or laid off most of its employees; and (c) the statements omitted to disclose the following facts that were necessary to make the statements not misleading under the circumstances in which they were made: (1) that SugarLeaf did not possess the production capabilities to produce THC-free CBD, which most of the market demanded; (2) that SugarLeaf had already begun slowing its extraction activities because it was only able to produce crude extract and THC-CBD, and not THC-free CBD, which most consumers were demanding; (3) that SugarLeaf was not GMP certified, and thereby hindering SugarLeaf's sales; (4)  that Neptune itself was steering business away from SugarLeaf; and (5) that Neptune's extraction business (including SugarLeaf) was a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

104.     Later in the earnings call, Neptune and Cammarata answered a question related to the distribution of products in the United States and announced that Neptune began to source its hand sanitizer from inside the United States—as opposed to importing it from Mexico and elsewhere—at the behest of retailers:

> Yeah. So we are actively focusing on our mission and we took a unique approach to try and make sure that we optimize our bottom line, as we're focusing heavily on profitability. ***So this distribution that we've set up was evident with the hand sanitizer launch. We set up a distribution pipeline that allowed us within weeks to the scale brand. And I would also point out that our hand sanitizers, we started off with an international supply chain, and then at the request of our US retailer, we actually switched it completely to be made in the US and we did that within a matter of weeks and maybe a month.***

105.    The statements identified in Paragraph 104 were materially false and misleading when made because: (a) Neptune had not, in fact, "set up a distribution pipeline that allowed [it] within weeks to … scale brand;" (b) Neptune had not "actually switched" production within "a matter of weeks" to "completely…be made in the US," and in fact had destroyed the Costco deal by attempting to pass off to partners inferior sanitizer it did not produce at all, but instead imported from Mexico and elsewhere.

I.    **Announcement of CAD$100 Million in Purchase Orders**

106.    During its Q2 2021 Earnings Call, Neptune not only misled investors about its SugarLeaf Acquisition and hand sanitizer business, but also concerning purchase orders it had received. In the prepared remarks, Rinow announced that Neptune has secured "at least CAD$100 million in purchase orders."

107.    When asked by analysts about the CAD$100 million in purchase orders, Neptune and Cammarata expanded on Rinow's announcement and said that the orders Neptune was receiving were "in excess of CAD$1 million to CAD$10 million to CAD$25 million in a single order."

108.    It was later revealed that the CAD$100 million in purchase orders were for nitrile gloves and other PPE equipment. Notably, throughout 2020 and into 2021, significant supply chain issues, well known throughout the industry, caused considerable disruptions to the fulfillment of PPE purchase orders. *See* Matt Leonard, *Supply chains struggle to maintain PPE inventory months into pandemic*, SUPPLY CHAIN DIVE (Sept. 22, 2020), https://www.supplychaindive.com/news/coronavirus-ppe-inventory-stock-supply/585626/ ("The supply chain remains fragile and overtaxed by the worldwide demand for PPE"). Consequently, any provider of PPE would need to secure a stable supply chain or secure capability to manufacture

40

the PPE itself to fulfill a large order.  Neptune did neither, and never mentioned the supply chain risks in its announcement of the CAD$100 million in purchase orders.

109.    For example, when asked about possible uncertainties and timing disparities related to the CAD$100 million in purchase orders during the Q2 2021 Earnings Call, Neptune and Cammarata responded confidently that while there may be some issues, they would be minimal:

**Q: Gerald Pascarelli**

Hi. Good evening. Thank you very much for taking the questions. So I'm going to stick on the top-line as well. I fully understand that given kind of the uncertainty and timing disparities that you're not going to guide anymore, but regarding the large distribution partnership with a CPG company, you did offer the $65 million to $137 million. And so I guess any more color you can provide on how you came up with that range and then maybe what's embedded in the low end of the expectation versus the high end that would be helpful? Thank you.

**A: Michael Cammarata**

Yeah. So that range was worked on obviously by that CPG partner and with our teams. We did see that they had a product change that they made that originally was going to launch in August and then ended up launching, obviously, as we mentioned in December. We feel very confident in that range and see opportunities to actually expand. ***But again, as far as we're not serving one product orders and $100,000 purchase orders. These are very large orders through very large customers as well.***

***One of the unique things that we've even been able to secure is distribution across even professional opportunities like theme parks and cruise ships. And obviously, the frequency of those when they start kicking in and the cruise ships start going back every seven days product is on those ships and theme parks almost daily. So as we're scaling up our customer distribution capabilities, not only for physical retail in the US, but also for the professional retail, the size of the orders are much larger than steadied smaller group of purchase orders. So we feel very confident in the partnership with our CPG customer.***

110.    The statements identified in Paragraph 109 were materially false and misleading when made because the statements omitted to disclose the following facts that were necessary to make the statements not misleading under the circumstances in which they were made: (1) Neptune lacked inventory of nitrile gloves and other PPE sufficient to fulfill "very large orders;" (2)

Neptune lacked the capability to manufacture quantities of nitrile gloves and other PPE sufficient to fulfill "very large orders;" and (3) Neptune had not secured any external supply of nitrile gloves and other PPE sufficient to fulfill "very large orders."

111.    When analysts questioned how much value they should put in the CAD$100 million number, Rinow stated that she was confident that Neptune would not only reach the CAD$100 million in purchase orders but exceed it:

**Q: John Chu**

Hi. Good afternoon. So just following up on that CAD$100 million order that you announced and I can appreciate time frame in terms of shipping, the uncertainty of customs and supply chain, but if all of that were not an issue under the circumstances, can you give us a sense of, if everything is going smoothly on all of those fronts, what kind of timeframe could you see? And obviously, we know they can spillover several quarters beyond that, but can you give us a sense on ideally what that could look like?

**A: Toni Rinow**

Would love to and would make me -- (inaudible) is extremely happy if I have good visibility on getting those orders in, but John, during these times we just have seen so many variables of things that are affecting this from raw materials worldwide, challenges from global supply chain, challenges to logistics, cargo getting on flights, sitting in ports. So it's extremely difficult to get to a normalized scenario, especially knowing that we are in this probably for another, let's say, two or three quarter in the pandemic situation. So it's very hard to predict, but what I can say is, the fact that we are now securing purchase orders in the aggregate of CAD$100 million. ***And I would like to qualify that CAD$100 million as conservative. That's really a very strong indicator for the interest into Neptune's innovation product and also its distribution and channel management capabilities.***

                              * * *

**Q: John Chu**

And presumably, when you say that it's not guaranteed and the orders may not actually reach that number, is it a function of just how the products are performing presumably in terms of the demand and obviously, if it's not performing up to standards or the demand is just not there, then the customers would effectively go below that number, is it as simple as that?

**A: Toni Rinow**

We have seen a lot with fluidity and POs under these circumstances, people are desperately seeking products in the PPE space during the pandemic, so many of our customers that I am speaking to personally they tell me, whatever product we can get -- Neptune can get into its inventory and distribute to them, that they will take. So the bottleneck during these times is not at the consumer end, but it's at the manufacturer end. So that provides just a lot of variables. ***But these CAD$100 million purchase orders again, I would qualify them as being conservative, which tells you that I feel pretty comfortable that we can bring them home and hopefully I don't see any issues with them.*** But again, these are unprecedented times and we have seen that as the pandemic and as CoVID-19 surges, the economic instability is just increasing and it leads us to think about -- I have a certain disclaimer on that.

112.    The statements identified in Paragraph 111 were materially false and misleading when made because the CAD$100 million figure was highly aggressive, not "conservative" and because the statements omitted the following adverse facts necessary to make the statements not misleading under the circumstances in which they were made: (1) Neptune lacked inventory of nitrile gloves and other PPE sufficient to fulfill "very large orders;" (2) Neptune lacked the capability to manufacture quantities of nitrile gloves and other PPE sufficient to fulfill "very large orders;" and (3) Neptune had not secured any external supply of nitrile gloves and other PPE sufficient to fulfill "very large orders."

113.    As a result of the misleading tout of purported CAD$100 million purchase orders, Neptune's stock soared 12%. *See* Mamta Mayani, *Neptune Wellness Solutions secures purchase orders worth $100M*, SEEKING ALPHA, Nov. 17, 2020, https://seekingalpha.com/news/3636944-neptune-wellness-solutions-secures-purchase-orders-worth-100m.

### III.    The Truth About Neptune's Business Begins to Emerge

#### A.    Neptune's February 2021 Disclosures

114.    Neptune's obfuscation about the failure of the SugarLeaf Acquisition began to crack on February 15, 2021, when it issued a press release announcing disappointing financial

results for the third quarter of the Company's fiscal year 2021, missing analyst expectations.

Specifically, the press release stated, in relevant part:

**Third Quarter 2021 Financial Highlights**

- Total revenues for the three-month period ended December 31, 2020 amounted to $3,320, a decrease from $9,174 for the three-month period ended December 31, 2019.

- Gross profits for the three-month period ended December 31, 2020 decreased to a loss of $8,908 compared to a loss of $39 for the three-month period ended December 31, 2019. Gross margin declined to a loss of 268.3%, inclusive of a non-cash $7,391 write-down of inventory and deposits to reflect their net realizable value.

- Adjusted EBITDA[] of a loss of $8,488 for the third quarter of fiscal year 2021 declined from a loss of $1,916 in the third quarter of fiscal year 2020. The decline in Adjusted EBITDA is mainly attributable to the lower gross profit recorded in the third quarter of fiscal 2021.

- Net loss for the three-month period ended December 31, 2020 of $73,799 compared to net income of $5,603 for the three-month period ended December 31, 2019. ***Included in the net loss for the quarter ended December 31, 2020 is a $35,567 impairment of goodwill and a $2,140 impairment of property, plant and equipment and right-of-use assets related to the acquisition of SugarLeaf in July 2019. In addition, the net loss also includes accelerated amortization of $13,953 also related to the SugarLeaf acquisition.***

115.    On February 16, 2021, Neptune filed a Form 6-K where it, for the first time,

acknowledged that SugarLeaf had been shut down:

Neptune has a dual go-to market Business-to-Business ("B2B") and Business-to-Consumer ("B2C") strategy focused on dramatically expanding its global distribution reach. The strategy sets Neptune apart from its competition and has started to yield a consistent, long-term revenue opportunity for the Company as it begins to sell its products in these channels as well. Accordingly, Neptune has transitioned the focus of its Sherbrooke facility more and more from B2B to B2C in the second and third quarters of FY2021. ***Also, the operations of SugarLeaf at the Conover facility were paused; at the moment, no date has been set for resumption of operations.***

116.     Neptune also acknowledged in its Form 6-K—for the first time—that it had furloughed "a number of SugarLeaf employees[,]" purportedly due to the downturn in the low-quality CBD it manufactured, and that Neptune was not producing or selling any products from SugarLeaf:

> The largest increase for both the three-month and nine-month periods ended December 31, 2020 is the accelerated depreciation of the SugarLeaf intangible assets, namely the customer relationships and the famer relationships. ***As a result of the COVID-19 pandemic, the Company was forced to furlough a number of SugarLeaf employees.*** During the quarter ended December 31, 2020, the downturn in oil prices for cannabis persisted (as was the case at the end of the previous fiscal year), and the commercial viability of the SugarLeaf CGU was reviewed. Management noted that the customers for which a customer relationship intangible asset was acquired with the SugarLeaf CGU had ceased placing orders and there was minimal active business relationships with these customers. As the CGU is no longer viable given declining pricing and demand, the Corporation will not benefit from these relationships and thus decided to take accelerated amortization for this intangible asset, in the amount of $7.7 million during the quarter ended December 31, 2020. ***Also, Neptune is not currently producing or selling any products resulting from the farmer relationships acquired with the SugarLeaf CGU. Furthermore, SugarLeaf does not currently have any contracts with customers and there is no commercial viability to these supplier relationships with the farmers.*** Neptune will not realize future economic benefits from these relationships and thus, Management decided to take accelerated amortization for this intangible asset, in the amount of $6.3 million during the quarter ended December 31, 2020.

117.     On the same day, Neptune also held its Q3 2021 Earnings Call with analysts where, when asked about the promised expansion of Neptune's hand sanitizer business and decline in revenue, Cammarata conceded that Neptune was not, in fact, expanding its sales into Costco's West Coast and Midwest stores, as Cammarata had originally promised in Neptune's August 11, 2020 Q1 2021 Earnings Call, and was having problems with sell through of its products at Costco and other retailers:

**Q: John Chu**

Hi. Good morning. My first question is just on the hand sanitizer outlook. You talked about oversaturation impacting demand. But I was also under the impression you're expanding into Costco's West Coast and U.S. Midwest retail outlet there. So,

45

can you maybe just talk about whether or not you did expand into that or whether or not that did not happen and that also contributed to the decline in the hand sanitizer revenue?

**A: Michael Cammarata**

Yes. I think there is two parts to that. We have a great relationship with Costco and we'll be launching products with them and working with them on new product lines. ***When it comes to the particular hand sanitizers, they had some retailers not just Costco, but other retailers had to move out of different brands, and it takes some time to sell off.*** So for instance, some retailers had 18 other brands. And then the retailers have cut it down to three or less, and we've been made the cuts, but we're not going to be able to see the growth until they move through 18 other brands worth of hand sanitizers.

The good thing that we have noticed on the different distribution points that we're in is that our brand is performing much better than the peers and competing with some of the biggest brands in hand sanitizer. We have seen some of the big competitors in hand sanitizers, actually lose money to try and win back real estate from us. And we're committed to profitability and focusing and developing long-term relationships with not only the consumers, but our retail distribution partners. And so, we do feel that we're in a good position and we're starting to see good movement obviously because of our sales data on our particular brand, but also real estate to start to open up.

I think Q4 would be more like a stabilization side, but across the board. But I think as we move into Q1 and Q2, we should start to see the uptick and hand sanitizes as a business unit. And I think that's something that Neptune has done very good over the last year is to have multiple product lines. And to be able to adapt with demand on the consumers, but also be able to hold our product lines to highest standard and also work with global and domestic supply chain that's seeing improved gross profit margins to be highly competitive against some of the biggest brands in the world.

118.   Cammarata also reiterated his pronouncement from the November 16, 2020 Q2 2021 Earnings Call that Neptune had shifted its production of hand sanitizer to be 100% domestically made:

> ***Regarding hand sanitizer specifically, we did have to shift out some of our international inventory to domestically made, U.S. Made all products for some of our retailers. And we did see that there is a switch in demand on the consumer side. So they're normalizing their levels at retailer. So the unique thing that we were able to do was actually be able to develop a U.S. Made high quality product that actually doesn't leave that sticky feeling or anything along those lines. So our product is superior and been getting great reviews.***

46

And we've had a lot of success with sustaining retail distribution in the hand sanitizer market and having opportunities to pick up additional distribution points. So our hand sanitizers have evolved to our latest formulation.

119.     During the February 16, 2021 Q3 2021 Earnings Call, analysts also asked Neptune about the status of the CAD$100 million of purchase orders that Neptune touted in November 2020. Cammarata stated that, because of higher shipping costs and a shortage of shipping containers, Neptune was *only then* "putting things on cargo ships" that were overdue under the purchase orders:

> ***When it shifts to the $100 plus million purchase orders that we discussed, the international supply chain issues that we've seen, was twofold.*** One, when air freighting product, the cost would normally be around $200,000 to $300,000 and accelerated to over $1.3 million. We are competing with product launches with Apple and others, and Microsoft, internationally at the end of our year, our calendar year. And then it shifted to us moving to containers and shipping it across the seas, those products for those purchase orders, then we saw a shortage, global shortage of containers.
>
> So we've had twofold hit us with fulfilling those, but we're committed to focusing on the profitability and not just rushing in orders to make its time lines. We want to build a sustainable long-term business, and we want to grow our profit margins. And also we've been looking at our P&L to even give more transparency, and we've been working with our accounting teams, and even the former CFO of Unilever to be able to monetize our P&L to be able to -- of North America, but monetize our P&L to be able to better reflect true direct cost to what it costs us to make the products. So the investors can see more along the lines of what the gross profit margin is in each sale. […]
>
> ***And then internationally, regarding the backfill purchase orders that we have, we're putting things on cargo ships. We had a little bit issues with getting containers. We're starting to see improvements in a global supply chain. A lot of the components for those products come from overseas. And we expect to start seeing improvements modest ones in Q4 and then expanding obviously in Q1.***

120.     As a result of these partial disclosures, Neptune's stock price fell $0.86 per share, or 30.71%, to close at $1.94 per share on February 16, 2021. Neptune's stock price fell again on

47

$0.21 per share, or 10.82%, to close at $1.73 per share on February 17, 2021. The two-day fallout of these disclosures caused Neptune's stock price to drop by $1.07, or 38.21%.

121.     Nevertheless, by failing to disclose the full truth about the problems with SugarLeaf and failure to fulfill purchase orders, Neptune stemmed the full decline that would otherwise occur in its stock price.

122.     In the subsequent five months, Neptune gave no indications to investors that its highly touted CAD$100 million in purchase orders had been jeopardized.

**B.     Neptune's July 2021 Disclosures**

123.     On July 15, 2021, Neptune held its Q4 2021 Earnings Call. During that call, analysts pressed Neptune about the previously-touted CAD$100 million purchase order. In response, Rinow conceded that Neptune lacked the capability to fulfill the order:

**Q: John Chu**

Hi, good afternoon. So my first question is just on the health and wellness side. And specifically referring back to some purchase orders and agreements that were announced over the last six months or so. There was one that was announced back in November and that was listed as a conservative $100 million U.S. order -- new purchase orders. And there's also one that was in the $65 million to $100 million dollar range, which was with Unilever and then a third agreement, that was -- what we assumed was a subsidiary of Kraft Heinz. So were all those related to PPE COVID, related protective equipment? And if not, can you just give us an update on the status of where are those standing if any? I mean I know there are minimum orders attached with any of those? But can you just give us an idea of what might we expect from those?

**A: Toni Rinow**

Yes, sure. So with regards to the announcement of the quarter's purchase orders, these were the -- over $100 million, these were mainly for nitrile gloves. There were some global inventory available, but prices are rising so fast that we couldn't literally make this a profitable endeavor for Neptune. So we have -- and it's being -- sourcing around more than 200 suppliers around the world. And ***we couldn't fulfill these POs. So we have a sourcing challenge and it looks logistics challenge, and for the moment, we don't see -- we don't believe that we can fulfill those POs on the PPE side***.

48

124.    As a result of this disclosure, Neptune's stock plunged by 22%, from $1.09 to $0.84 on heavy volume.

## IV.    Additional Allegations of Scienter

### A.    Neptune's Reliance on Capital Raises Provided Motive to Commit Fraud

125.    As Neptune was dealing with its failed SugarLeaf Acquisition, its attempt to break into the hand sanitizer business, and its mirage of CAD$100 million in purchase orders, it also faced large operating losses and existential cash-flow problems.

126.    Since transitioning away from krill oil and into the cannabis industry, Neptune operated at a loss. Neptune's net income in Fiscal Year ("FY") 2019 was negative $18.37 million (CAD$23.19 million); in FY2020 was negative $48.21 million (CAD$60.86 million); and in FY2021 was $133.55 million (CAD$168.59 million).

127.    This had a profound impact on Neptune's operating cash flow over the same period. Neptune's net operating cash flow for FY2019 was negative $6.50 million (CAD$8.21 million), for FY2020 was negative $25.06 million (CAD$31.64 million), and for FY2021 was negative $58.95 million (CAD$74.42 million).

128.    At the same time, Neptune failed to earn sufficient revenue to cover its operating expenses. In FY2019, Neptune brought in only $19.21 million (CAD$24.44 million) in revenue, with only $9,788 (CAD$12,450) from its cannabis and processing activities. In FY2020, Neptune brought in $23.25 million (CAD$29.57 million) in revenue, with only $6.34 million (CAD$8.07 million) from its cannabis and processing activities. Finally, in FY2021, Neptune had revenues of $36.8 million (CAD$46.8 million), with its cannabis and processing activities bringing in only $9.06 (CAD$11.52 million).

129.    Notably, since the SugarLeaf Acquisition in July 2019 through 2021, SugarLeaf contributed only $2,108,436 (CAD$2,681,688) in total revenues through sales and services to Neptune, all at a loss.

130.    As a result of Neptune's failure to generate sufficient revenue to cover its expenses, and its failure to ramp SugarLeaf as described to investors, it was reliant on capital raises to provide influxes of cash.

131.    For example, on July 13, 2020, Neptune announced that it had entered into an agreement with healthcare-focused institutional investors for the sale of 4,773,584 common shares at an offering price of $2.65 per share for gross proceeds of approximately $12.65 million. Press Release, Neptune Wellness Solutions Inc., Neptune Wellness Solutions Inc. Announces US$12.65 Million Registered Direct Offering (July 13, 2020).

132.    On October 20, 2020, Neptune announced that it entered into additional agreements with institutional investors for a private placement of 16,203,700 common shares and 10,532,401 warrants to purchase 10,532,401 common shares at an offering price of $2.16 per share for gross proceeds of approximately $35 million. Press Release, Neptune Wellness Solutions Inc., Neptune Wellness Solutions Inc. Announces US$35 Million Private Placement (Oct. 20, 2020).

133.    Finally, on February 17, 2021, Neptune announced an at-the-market sale of 27,500,000 common shares at a purchase price of $2.00 per share for proceeds of approximately $55 million. Press Release, Neptune Wellness Solutions Inc., Neptune Wellness Solutions Inc. Announces US$55.0 Million Registered Direct Offering Priced At-The-Market Under Nasdaq Rules (Feb. 17, 2021).

134.    Analysts during the Class Period concluded that without raising capital, Neptune would run out of cash. *See* D.H. Taylor, *Neptune Wellness: Changes Focus And Revenues Soar*

*Upward*, SEEKING ALPHA, Dec. 14, 2020, at 6, https://seekingalpha.com/article/4394563-neptune-wellness-changes-focus-and-revenues-soar-upward.

135.    Neptune's heavy reliance on continued capital raises provided incentive to conceal damaging facts that would negatively impact Neptune's ability to attract investors to its stock offerings.

136.    Further, Individual Defendants' positions as high-level executives at Neptune provided the opportunity to conceal the damaging facts, so as to continue to attract investors to Neptune's stock offerings.

### B.    That Defendants Held Themselves Out as Knowledgeable Bolsters Scienter

137.    Defendants own statements show that they repeatedly held themselves out as extremely knowledgeable about the SugarLeaf Acquisition, Neptune's hand sanitizer business, and the announcement of CAD$100 million in purchase orders.

138.    For example, Cammarata spoke with authority and knowledge about the SugarLeaf Acquisition throughout the Class Period, and in a February 12, 2020 press release, he explicitly stated that he "reassess[ed] all facets of [Neptune's] business plans." ¶66. Cammarata was also the key communicator to the public about Neptune's hand sanitizer business, going as far as to promote its deal with Costco on his personal Twitter account on July 9, 2020, and then speaking at length about the hand sanitizer business with analysts on August 11, 2020.

139.    Further, Rinow alleged intimate knowledge with the CAD$100 million in purchase orders, stating on November 16, 2020, "*I* would qualify them as being conservative, which tells you that *I* feel pretty comfortable that we can bring them home and hopefully *I* don't see any issues with them." ¶111.

140. Only two inferences are plausible: that Defendants actually possessed the knowledge they claimed to have, and therefore knew the truth they concealed from investors, or Defendants, despite holding themselves out as knowledgeable, recklessly chose not to inform themselves of the truth and made no attempt to avoid misleading investors.

### C. That Defendants' Misrepresentations Involved Neptune's Core Operations Bolsters Scienter

141. Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned Neptune's core operations. The SugarLeaf Acquisition of $18.1 million, through a combination of $12.0 million in cash and $6.1 million in Common Shares, was Neptune's largest acquisition and the heart of the so-called expansion it touted to investors. Moreover, the SugarLeaf Acquisition was identified by Defendants as crucial to "enable [Neptune] to participate in both B2B and B2C, CBD and hemp markets in the United States." And, Neptune made a dramatic and high-profile shift to break into the hand sanitizer business in 2020, with both Neptune and Cammarata sending out public announcements touting this business venture. Finally, Neptune made a high-profile announcement concerning the $100 million in purchase orders in its November 16, 2020 Q2 2021 Earnings Call. These endeavors were tentpoles for Neptune, and it would be absurd to infer that Neptune's most senior executives were unaware of the actual status of its most important businesses.

### D. That Individual Defendants Are Neptune's Senior Executives Bolsters Scienter

142. That Cammarata, Rinow, and Landry were Neptune's most senior executives and on its management team further supports an inference of scienter. Cammarata, Rinow, and Landry knew facts or had access to information suggesting that their public statements were not accurate or failed to check the information they had a duty to monitor.

### E.    That Defendants Cammarata and Rinow Certified Neptune's Filings with the SEC Bolsters Scienter

143.    Defendants Cammarata and Rinow's actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certifications in connection with Neptune's filing of its Form 40-F and Form 6-Ks with the SEC. These certifications certified, among other things, that the filing "fairly presents, in all material respects, the financial condition and results of operations of [Neptune]." Before vouching for the accuracy of the statements made in Neptune's filings, the certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations of Neptune and SugarLeaf described therein.

### F.    Defendants' Scheme to Avoid Paying SugarLeaf Earnouts Bolsters Scienter

144.    According to CW4, in late November/early December 2019, Cammarata stated on an internal conference call with Neptune executives and CW4 that Neptune was arranging to use third-party hemp extractors, rather than SugarLeaf, to conduct hemp extraction in the United States. Cammarata also warned the other participants on the call to not inform SugarLeaf founder, Peter Galloway, of this decision.

145.    This acknowledgment by Cammarata that Neptune was arranging to use third-party extractors, rather than its own subsidiary, demonstrates that Defendants not only knew of SugarLeaf's business struggles but actively contributed towards those struggles.

146.    Neptune's purported reasoning for using third-party hemp extractors—that SugarLeaf was not equipped to create THC-free CBD—also demonstrates that Defendants knew that SugarLeaf was unequipped to produce the type of CBD oil demanded by consumers, and instead of investing in SugarLeaf, Neptune simply gave its business to other extractors.

147.    Further, the incentive of this scheme was to avoid paying out over a hundred million dollars of much-needed cash to SugarLeaf's founders. That Cammarata ordered other executives

to hide the truth from SugarLeaf founder Galloway, a recipient of the earnouts, demonstrates that he understood his scheme was illicit.

### G. The Sharp Divergence Between Class Period Reassurances and Later Revelations Bolsters Scienter

148.    The sharp divergences between Class Period reassurances and later revelations, including multiple instances in which later negative disclosures completely contradicted Defendants' earlier positive statements, also contributes to a strong inference of scienter.

149.    For example, Defendant Cammarata repeatedly touted the success of the SugarLeaf integration, and on August 11, 2020, stated, "And so that's why we do have a huge upside. And we do have a huge capacity in North Carolina, that we'll be able to take first move to the market-based on regulations." ¶96. But at the time of these statements, nothing could be further from the truth.  SugarLeaf was furloughing most of its employees and would soon be run by a skeleton staff of 1-2 people, before ultimately being shuttered. This statement and others would ultimately be markedly contradicted by Defendants' February 2021 disclosures.

150.    Defendants also promoted the SugarLeaf Acquisition and its benefit to Neptune and its B2B hemp extraction business throughout the second half of 2019 and the whole of 2020. However, on December 1, 2020, Neptune put out a press release admitting that, far from being the lynchpin for financial success, Neptune's B2B hemp extraction business was instead a "low margin high risk" business:

> The Company believes the transition from low margin high risk third-party extraction (bottom of economic waterfall) to its own branded products with higher margins and lower risk (top of economic waterfall) is a critical pivot that will set up Neptune to be a sustainable and world-class innovative business differentiated from its peer set and built for long-term profitability. The Company also believes that building its own branded portfolio will result in higher asset values, more sustainable cash flows and higher gross margins leading to positive adjusted EBITDA sooner than under a low margin B2B business model.

Thus, Neptune's December 1, 2020 press release informed investors that, contrary to Defendants' plethora of earlier statements touting the SugarLeaf Acquisition as the lynchpin to Neptune's B2B business and financial success, Neptune's extraction business (including SugarLeaf) was instead a low margin, high risk business that was extremely vulnerable because it was at the bottom of the economic waterfall.

151.    Additionally, in that same August 11, 2020 call, Defendant Cammarata stated, "We have not yet found a ceiling for demand in these regions and will begin shipping to the Midwest and the West Coast in the coming months. Our hand sanitizer is effective, safe and provides a premier experience with a pleasant scent and application feel that uses essential oils, Alovera, and fruit extracts." ¶98. However, by the time of this statement, Neptune had already tried to ship out tainted Mexican hand sanitizer under the SugarLeaf label, causing deals with retailers like Costco to be disrupted. This statement and others would ultimately be markedly contradicted by Defendants' February 2021 disclosures.

152.    In the same vein, during the Q2 2021 Earnings Call, when speaking about the CAD$100 million in purchase orders, Defendant Rinow stated, "I would qualify them as being conservative, which tells you that I feel pretty comfortable that we can bring them home and hopefully I don't see any issues with them." ¶111. At the time of the statement, however, Neptune lacked inventory of nitrile gloves and other PPE sufficient to fulfill "very large orders," lacked the capability to manufacture quantities of nitrile gloves and other PPE sufficient to fulfill "very large orders," and had not secured any external supply of nitrile gloves and other PPE sufficient to fulfill "very large orders." This statement and others would ultimately be markedly contradicted by Defendants' July 2021 disclosures.

153.   Such confident assurances followed quickly by contradictory revelations contribute to an inference of scienter.

**H.   That Landry Resigned Shortly After His Misrepresentations Bolsters Scienter**

154.   Within weeks of Landry making his misleading statements to investors regarding SugarLeaf's ability to "hit some of their earnouts" and assuring investors that SugarLeaf still had "a bright future ahead of them[,]" Landry resigned from his position as Neptune's Chief of Corporate Development & Strategy. The temporal proximity between Landry's misrepresentations to investors and his abrupt resignation from Neptune contributes to a strong inference of scienter.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

155.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of all persons or entities that purchased or otherwise acquired Neptune's common stock on the NASDAQ or another trading venue within the United States between July 24, 2019, and July 15, 2021 (the "Class Period"), both dates inclusive. Excluded from the Class are Defendants, officers, and directors of Neptune, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above.

156.   The Class is so numerous that joinder of all members is impracticable. Throughout the Class Period, Neptune's common stock was actively traded on the NASDAQ under the ticker symbol "NEPT." An average monthly volume of 36.64 million shares was traded during the Class Period. Plaintiff believes that there are several hundred if not thousands of members in the proposed Class. Potential Class members may be identified from records maintained by Neptune, its transfer agents, and brokers and banks that hold shares beneficially for investors in a street

name and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

157.    Plaintiff's claims are typical of the claims of those of the Class, as all Class members were similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

158.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

159.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

A.  Whether Neptune and the Individual Defendants made false and misleading statements or failed to disclose material information that rendered their Class Period statements misleading;

B.  Whether the Individual Defendants are control persons of Neptune for purposes of Section 20(a) of the Exchange Act;

C.  Whether Neptune and the Individual Defendants made the misrepresentations or omissions with scienter;

D.  Whether the federal securities laws were violated by Defendants' acts as alleged herein;

E.  Whether the prices of Neptune's securities during the Class Period were artificially inflated because of the Defendants' misconduct complained of herein; and

F.  Whether the Class has sustained damages with respect to its Exchange Act claims and, if so, what is the proper measure of damages.

160.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

161.    With respect to the Exchange Act claims, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

A.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

B.  The omissions and misrepresentations were material;

C.  Neptune's common stock traded in an efficient market;

D.  The Company's common stock was liquid and traded with moderate to heavy volume during the Class Period;

E.  The Company traded on the NASDAQ, and was covered by multiple analysts;

F.  The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

G.  Plaintiff and other Class members purchased or otherwise acquired Neptune common stock between the time that the Defendants failed to disclose or misrepresented material facts, and the time that the true facts were disclosed or materialized, without knowledge of the omitted or misrepresented facts.

162.    Based upon the foregoing, Plaintiff and other Class members are entitled to a presumption of reliance upon the integrity of the market if they did not actually rely on Defendants' materially false or misleading statements.

163.    Alternatively, Plaintiff and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the claims herein primarily sound in omission of material information in violation of a duty to disclose such information.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

164.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 to 163 above as if fully set forth herein.

165.    This Count is asserted against Neptune and each of the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly, to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

166.    Plaintiff asserts Section 10(b) and Rule 10b-5(b) claims against Defendants Neptune, Cammarata, Rinow, and Landry; and Section 10(b) and Rule 10b-5(a) and (c) claims against Defendants Neptune and Cammarata.

167.    During the Class Period, Defendants Neptune and Cammarata engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and

deceit upon Plaintiff and the other members of the Class; made various untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Specifically, Defendants Neptune and Cammarata worked to secretly starve SugarLeaf of capital and resources, so as to avoid paying out over a hundred million dollars in earnouts to SugarLeaf's founders. Pursuant to the scheme, Defendants Neptune and Cammarata engaged in a secret plan to withhold resources and steer business away from SugarLeaf so that SugarLeaf could not meet the performance targets that would require earnout payments.

168.    Specifically, Neptune and Cammarata made material misrepresentations and omitted to disclose material information that rendered their statements misleading as particularized in Paragraphs 33-38, 61-62, 64-69, 80-87, 95-97, and 102-103.

169.    During the Class Period, Defendants also engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Specifically, Defendants misled investors about the production capacity of Neptune's facilities, Neptune's abilities to meet production and delivery commitments, and the success of Neptune's failed business ventures all to buoy its stock price and influence capital raises. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including the Plaintiff and other Class members, as alleged

herein; (ii) artificially inflate and maintain the market price of Neptune common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Neptune common stock at artificially inflated prices.

170.    Specifically, Neptune and the Individual Defendants made material misrepresentations and omitted to disclose material information that rendered their statements misleading as particularized in Paragraphs 33-38, 61-62, 64-69, 72-75, 80-87, 89-91, 95-105, and 109-112.

171.    The Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Neptune and the Individual Defendants. In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As the senior managers of Neptune, the Individual Defendants had knowledge of the details of Neptune's internal affairs that were inconsistent with their public statements.

172.    As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding Neptune's business, operations, and finances. As a result of the dissemination of the aforementioned false and misleading statements, the market price of Neptune common stock was artificially inflated throughout the Class Period.

173.     In ignorance of the adverse facts concerning Neptune's business, operations, and finances, which were concealed by the misrepresentations and omissions alleged herein, Plaintiff and the other members of the Class purchased or otherwise acquired Neptune common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock or upon statements disseminated by Defendants and were damaged thereby.

174.     During the Class Period, Neptune's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, directly relying on the materially false and misleading statements described herein, or relying upon the integrity of the market, purchased, or otherwise acquired shares of Neptune at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock or would not have purchased or otherwise acquired it at the inflated prices that were paid. At the time of the purchases or acquisitions by Plaintiff and the Class, the true value of Neptune's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Neptune's common stock declined sharply upon the public disclosure of the facts or materialization of the risks alleged herein to the injury of Plaintiff and other Class members.

175.     By reason of the conduct alleged herein, Neptune and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

176.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of Neptune common stock to decline.

Neptune and the Individual Defendants are liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

177.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 to 176 above, as if fully set forth herein.

178.    During the Class Period, the Individual Defendants participated in the operation and management of Neptune and conducted and participated, directly and indirectly, in the conduct of Neptune's business affairs. Because of their senior positions, they knew the adverse non-public information that rendered Neptune's public statements false and misleading.

179.    As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information concerning Neptune's financial information and results of operations and to correct promptly any public statements issued by Neptune, which had become materially false or misleading. Individual Defendants did in fact represent the Company in communications to investors at investor conferences and earnings calls, and personally validated Company representations in SEC filings. Further, both Cammarata and Rinow signed Neptune's SEC filings and certified, pursuant to the Sarbanes-Oxley Act of 2002, that the information contained in the SEC filings were accurate and truthful.

180.    As described above, the Individual Defendants were able to, and did, control the Company's statements, which Neptune disseminated in the marketplace during the Class Period concerning Neptune's financial information and business. Cammarata served as Neptune's CEO throughout the Class Period and was directly involved in the day-to-day management of the Company, including direct communications with analysts and investors in conference calls where

he himself made, and controlled on behalf of Neptune, false and misleading statements identified in Paragraphs 35-38, 61-62, 66-67, 72-75, 84-87, 90, 96-101, 104-105, and 109-110. Rinow similarly served as CFO and in other high-ranking positions throughout the Class Period and was involved in the day-to-day management of the Company, including direct communications with analysts and investors in conference calls where she herself made, and controlled on behalf of Neptune, false and misleading statements identified in Paragraphs 82-83, 86-87, 102-103, and 111-112. Landry, as the Company's Chief of Corporate Development & Strategy from the start of the Class Period until February 2020, was involved with the management of the Company, including direct communications with analysts and investors in conference calls where he made false and misleading statements identified in Paragraph 68-69. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Neptune to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Neptune within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Neptune's common stock.

181.    The Individual Defendants, therefore, acted as controlling persons of Neptune. By reason of their senior management positions and/or being directors of Neptune, the Individual Defendants had the power to direct the actions of and exercised the same to cause, Neptune to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of Neptune and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiff, and the other members of the Class, complain.

182.    As control persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by Neptune.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class Representative;

B.    Requiring Defendants to pay damages sustained by the Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and,

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  February 16, 2022

Respectfully submitted,

POMERANTZ LLP
*/s/ Christopher P.T. Tourek*
Christopher P.T. Tourek (admitted *pro hac vice*)

Joshua B. Silverman (admitted *pro hac vice*)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: jbsilverman@pomlaw.com
        ctourek@pomlaw.com

-and-
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016

Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
       ahood@pomlaw.com

*Attorneys for Lead Plaintiff Kenneth Rickert*

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2022, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

**POMERANTZ LLP**

By: */s/Christopher P.T. Tourek*
            Christopher P.T. Tourek