# POMERANTZLLP

July 20, 2022

Judge Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> **Re:** *Marvin Gong v. Neptune Wellness Solutions Inc., et al.*, Case No. 2:21-cv-01389-ENV-AKT – Notice of Supplemental Authority to be Included in the Motion to Dismiss Bundle

Dear Judge Vitaliano,

On July 15, 2022, after Plaintiff served Defendants with his Opposition to Defendants' Motion to Dismiss ("Opposition"), the United States Court of Appeals for the Second Circuit issued its ruling in *Sec. & Exch. Comm'n v. Rio Tinto plc*, No. 21-2042, 2022 WL 2760323 (2d Cir. July 15, 2022), a copy of which is attached as **Exhibit A**. Plaintiff provides this supplemental authority in further support of his Opposition, because it sets forth a rule demonstrating the sufficiency of Plaintiff's scheme liability allegations against Defendants Michael Cammarata ("Cammarata") and Neptune Wellness Solutions Inc. ("Neptune").

In *Rio Tinto*, the Second Circuit affirmed dismissal of a scheme liability claim based *solely* on alleged misstatements and omissions. The Second Circuit explained that under *Lentell v. Merrill Lynch & Co.*, 296 F.3d 161 (2d Cir. 2005) and *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), a plaintiff pleading scheme liability under Rule 10b-5(a) and (c) must allege a misstatement or omission and "something extra that makes a violation a scheme." *Rio Tinto*, 2022 WL 2760323, at *6 (recognizing that *Lorenzo* involved dissemination of a misleading statement). Here, Plaintiff does just that by alleging that Cammarata and Neptune not only made misleading statements and omissions, *but also*:

- secretly diverted opportunities and capital from SugarLeaf to avoid paying out over a hundred million dollars in earnout payments (¶¶53-54, 167);
- deprived SugarLeaf of maintenance necessary to sustain existing CBD processing machinery (¶54);
- did not advance SugarLeaf's application to obtain GMP certification (¶55);
- steered extraction business away from SugarLeaf and towards third parties (¶¶56-57; 144-147); and
- disseminated and amplified the misrepresentations and omissions of each other (¶¶33-38, 61-62, 64-69, 80-87, 95-97, and 102-103).

Thus, as Plaintiff has alleged that Cammarata and Neptune both made misleading statements and omissions *and* engaged in numerous "extra" acts in furtherance of their scheme, Plaintiff has adequately pled scheme liability pursuant to *Rio Tinto*.



Sincerely,

/s/ Christopher P.T. Tourek

Christopher P.T. Tourek
**POMERANTZ**LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Office – (312) 377-1181
Direct – (312) 377-2839
ctourek@pomlaw.com

# EXHIBIT A

**2022 WL 2760323**
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

SECURITIES AND EXCHANGE
COMMISSION, Plaintiff-Appellant,

v.

RIO TINTO PLC, Rio Tinto Limited, Thomas Albanese,
and Guy Robert Elliott, Defendants-Appellees.

No. 21-2042
|
August Term 2021
|
Argued: May 19, 2022
|
Decided: July 15, 2022

ON REVIEW OF AN INTERLOCUTORY ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Attorneys and Law Firms**

Emily True Parise, Senior Litigation Counsel (Dan M. Berkovitz, General Counsel; Michael A. Conley, Solicitor; Dominick V. Freda, Assistant General Counsel; Hope Hall Augustini, Martin Totaro, Senior Litigation Counsel, on the brief), Securities & Exchange Commission, Washington, D.C. for Plaintiff-Appellant.

Thomas H. Dupree Jr., Gibson, Dunn & Crutcher LLP, Washington, D.C. (Mark A. Kirsch, Jennifer L. Conn, Avi Weitzman, Gibson, Dunn & Crutcher LLP, New York, NY; Mark A. Perry, Richard W. Grime, Kellam M. Conover, Gibson, Dunn & Crutcher LLP, Washington, D.C., on the brief), for Defendants-Appellees Rio Tinto plc and Rio Tinto Limited.

Sarah L. Levine, Jones Day, Washington, D.C. (James P. Loonam, Jones Day, New York, NY; Matthew J. Rubenstein, Jones Day, Minneapolis, MN, on the brief), for Defendant-Appellee Thomas Albanese.

Kannon K. Shanmugam, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C. (Theodore V. Wells, Jr., Walter G. Ricciardi, Geoffrey R. Chepiga, Livia Fine, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, on the brief), for Defendant-Appellee Guy Robert Elliott.

Tara S. Morrissey, U.S. Chamber Litigation Center, Washington, D.C.; Carter G. Phillips, Kwaku A. Akowuah, Sidley Austin LLP, Washington, D.C.; Eamon P. Joyce, James R. Horner, Sidley Austin LLP, New York, NY, for Amicus Curiae Chamber of Commerce of the United States of America.

Jeffrey S. Bucholtz, Marisa C. Maleck, King & Spalding LLP, Washington, D.C., for Amici Curiae Law Professors Joseph Grundfest, Todd Henderson, Adam Pritchard, Andrew Vollmer, and Karen Woody.

Before: JACOBS, WESLEY, NARDINI, Circuit Judges.

**Opinion**

Dennis Jacobs, Circuit Judge:

**\*1** The Securities and Exchange Commission ("SEC") brought scheme liability claims in a 2017 enforcement action against Rio Tinto plc, Rio Tinto Limited, and its CEO and CFO, pursuant to Rule 10b-5(a) and (c), promulgated under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and pursuant to Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"). [1] Citing Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005) ("Lentell"), the United States District Court for the Southern District of New York (Torres, J.) dismissed the scheme liability claims in a March 2019 order (the "Dismissal Order") on the ground that the conduct alleged constituted misstatements and omissions only, and is therefore an insufficient basis for scheme liability. See SEC v. Rio Tinto plc, No. 17 Civ. 7994, 2019 WL 1244933, at \*15–16 (S.D.N.Y. Mar. 18, 2019).

In 2020, the SEC urged the district court to reconsider the dismissal in light of the Supreme Court's intervening decision in Lorenzo v. SEC, ––– U.S. ––––, 139 S. Ct. 1094, 203 L.Ed.2d 484 (2019) ("Lorenzo"), which held that an individual who disseminated a false statement (but did not make it) could be liable under the scheme subsections. Id. at 1100. In the SEC's view, Lorenzo expanded the scope of scheme liability so that allegations of misstatements and omissions alone *are* sufficient to state a scheme liability claim. The district court denied reconsideration. See SEC v. Rio Tinto plc, No. 17 Civ 7994, 2021 WL 818745, at \*1 (S.D.N.Y. Mar. 3, 2021). Lorenzo observes that

the subsections of Rule 10b-5 and Section 17(a) are not hermetically sealed. On this interlocutory appeal, the SEC contends that ⚑Lorenzo thereby abrogates ⚑Lentell. We disagree. While ⚑Lorenzo acknowledges that there is leakage between and among the three subsections of each provision, the divisions between the subsections remain distinct. Until further guidance from the Supreme Court (or in banc consideration here), ⚑Lentell binds: misstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination. Accordingly, we affirm.

**I**

The question presented on appeal is whether misstatements and omissions--without more--can support scheme liability pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and Securities Act Section 17(a)(1) and (3). The answer lies in the interplay of the three subsections of Rule 10b-5, and the interplay of the three subsections of Section 17(a). Rule 10b-5 and Section 17(a), which largely mirror each other, both consist of a "misstatement subsection" that is sandwiched between two "scheme subsections."

Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

**\*2** (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. As clarified in ⚑Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011) ("⚑Janus"), only the "maker" of a misstatement, i.e., the person with ultimate authority over the statement, can have primary liability under Rule 10b-5(b). ⚑Id. at 142, 131 S.Ct. 2296.

Section 17(a) provides:

It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q. [2]

**II**

The following background is based on the district court's recitation of the facts, as supplemented by allegations in the complaint.

In April 2011, defendants Rio Tinto plc and Rio Tinto Limited (together, "Rio Tinto") acquired an exploratory coal mine in Mozambique (the "Mine"). The Mine's $3.7 billion purchase price was premised on assumptions that the Mine would produce a certain volume and quality of coal, that the majority of the coal could be barged down the Zambezi River, and that the rest could be transported by existing rail infrastructure.

Over the ensuing months, the defendants learned that the coal quality was poorer than expected; that the Mozambican government would not permit transport of the coal by

barge; and that the transport of coal by rail would require infrastructure costing upwards of $16 billion--and might not be permitted in any event. At a meeting in Brisbane on May 11, 2012, management from the Mine informed CEO Thomas Albanese and CFO Guy Robert Elliott that, based on the various emerging obstacles, the Mine's net present value was negative $680 million. (Albanese and Elliott are defendants in this action, along with Rio Tinto.)

In the months before and after the Brisbane meeting, Rio Tinto was issuing financial statements and preparing auditing papers. The complaint alleges that these documents contained false statements and omissions, including representations about transportation options and the amount and quality of coal reserves. Importantly, the SEC alleges that none of the documents disclosed that the Mine's valuation was impaired:

**\*3** • The 2011 Annual Report, signed by Albanese and Elliott and filed with the SEC in March 2012, valued the Mine at its $3.7 billion acquisition price.

• A bond offering floated on the New York Stock Exchange that same month incorporated the 2011 Annual Report by reference.

• Rio Tinto's Controller's Group ("Controller") consolidated the information from the Mine for review during Audit Committee meetings, which were attended by Rio Tinto's independent auditors, as well as by Albanese and Elliott. Neither the First Controller's Paper (generated in advance of the June 18, 2012 Audit Committee meeting) nor the Second Controller's Paper (generated in advance of the July 30, 2012 Audit Committee meeting) identified impairment indicators or recorded an impairment.

• Rio Tinto submitted an "Impairment Paper" directly to its independent auditors, which likewise did not record an impairment or identify an impairment indicator.

• The Audit Committee and the independent auditors relied on the Controller's Papers and the Impairment Paper to decide whether to impair the Mine. Thus the Half Year 2012 Report ("HY2012 Report"), filed with the SEC on August 9, 2012, and signed by Albanese and Elliott, carried the Mine at a value of over $3 billion.

• Rio Tinto issued $3 billion in bonds a few days later, and the offerings incorporated the HY2012 Report and the 2011 Annual Report.

• The Third Controller's Paper (together with the First and Second Controller's Papers and the Impairment Paper, the "Papers"), which was prepared in advance of the November 26, 2012 Audit Committee meeting, likewise indicated a recoverable value of $4 to $5 billion (which meant that no impairment was likely to be required).

For their part, Rio Tinto's in-house valuation team disagreed with the over-$3 billion valuation. In August 2012, the team initiated a review that valued the Mine in the range of *negative* "$4.9 billion to $300 million." Joint App'x 82 ¶ 151. In late 2012, the head of the valuation team informed Albanese and Elliott about the shrunken valuation, and then informed the Chairman of Rio Tinto's Board. Following an investigation, at a meeting on January 15, 2013, the Board approved an 80 percent impairment, valuing the Mine at $611 million. In 2014, Rio Tinto again impaired the Mine, this time to $119 million. In October 2014, the Mine was sold for $50 million.

### III

#### A

The SEC brought this twelve-count enforcement action on October 17, 2017, alleging that Rio Tinto should have taken an impairment on the Mine earlier than it did, and that the Papers, SEC filings, and the defendants failed to disclose the setbacks, or timely correct the valuation. At issue now are counts one and three, which allege that the defendants violated Rule 10b-5 and Section 17(a), respectively, by making fraudulent misstatements and omissions and by engaging in a scheme to defraud.

With respect to the misstatements and omissions claims, the SEC cited the 2011 Annual Report, the HY2012 Report, the Papers, the bond offerings, and statements made during various meetings and investor calls. With respect to the claims of scheme liability, the SEC cited corruption of the auditing process--specifically, the failure to correct statements made to the Audit Committee and auditors. The defendants moved to dismiss counts one and three for failure to state a claim on which relief can be granted. See Fed. R. Civ. P. 12(b)(6).

**\*4** Relevant to this appeal is the dismissal of the scheme liability claims. Citing ⚑ Lentell, the Dismissal Order ruled that scheme liability does not exist when "the sole basis

for such claims is alleged misrepresentations or omissions," and that here, all of the alleged "actions" and "conduct" forming the basis for scheme liability were misstatements or omissions." SEC v. Rio Tinto plc, No. 17 Civ. 7994, 2019 WL 1244933, at *15–16 (S.D.N.Y. Mar. 18, 2019) (dismissing the scheme liability claims alleged pursuant to Rule 10b-5(a) and (c)); see also id. at *16 (dismissing the scheme liability claims alleged pursuant to Section 17(a)(1) and (3) for the same reasons). The district court pointed to certain examples of these misstatements and omissions, which included the 2011 Annual Report, statements in the bond offerings, false statements to shareholders, and the failure to disclose information learned at the Brisbane meeting. Id. [3]

About a week after the Dismissal Order issued, the Supreme Court held in Lorenzo that an individual who disseminated a false statement, but who did not make it, could be liable under the scheme subsections. 139 S. Ct. at 1100. The SEC moved to reconsider the dismissal of the scheme liability claims, arguing that Lorenzo expanded the scope of the scheme subsections such that misstatements and omissions alone *could* form the basis for scheme liability.

The district court declined to reconsider, ruling that Lorenzo held that the dissemination of false information provides a basis for scheme liability--not that "misstatements alone are sufficient to trigger scheme liability." SEC v. Rio Tinto plc, No. 17 Civ. 7994, 2021 WL 818745, at *2 (S.D.N.Y. Mar. 3, 2021). There is no allegation that the Rio Tinto defendants disseminated false statements; the SEC alleged "only that [the defendants] failed to prevent misleading statements from being disseminated by others." Id.

### B

As the procedural history shows, the SEC has exerted substantial effort to shoehorn its allegations into a claim for scheme liability. The SEC's position, however, would undermine two key features of Rule 10b-5(b).

For one, Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011), limits primary liability under Rule 10b-5(b) to the "maker" of a statement, id. at 142, 131 S.Ct. 2296; as neither Albanese nor Elliott made the statements in the Papers or the SEC filings, they cannot be primarily liable under Rule 10b-5(b). But with an expanded conception of scheme liability, the SEC might seek to prove that Albanese and Elliott are primarily liable under the scheme subsections for *participation* in the making of the misstatements.

Second, misstatements and omissions claims brought by private plaintiffs under Rule 10b-5(b) are subject to the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA"). See 15 U.S.C. § 78u-4(b)(1) (a complaint alleging misleading statements or omissions "shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading"). [4] But this heightened standard does not apply to allegations of scheme liability "[b]ecause scheme liability does not require an allegation that the defendant made a statement." Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (Oetken, J.) (internal quotation marks omitted).

**\*5** Expanding the scope of scheme liability would thereby lower the bar for primary liability for securities fraud, along with the pleading standard in cases involving private plaintiffs.

\*\*\*

After the district court denied the SEC's motion for reconsideration, it certified the issue for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This Court granted the petition for leave to appeal an interlocutory order. We are therefore called upon to determine whether, post-Lorenzo, misstatements and omissions alone can form the basis for scheme liability.

### IV

The facts of Lorenzo bear upon whether reconsideration of the Dismissal Order is warranted.

As director of investment banking at an SEC-registered brokerage firm, Lorenzo sent two emails to prospective investors; the content of the emails was supplied by Lorenzo's boss and described a potential investment in a company that

had "confirmed assets" of $10 million. Lorenzo, 139 S. Ct. at 1099. Lorenzo knew, however, that the company recently disclosed that its total assets were worth under $400,000, and Lorenzo conceded scienter. Id. at 1099–1100. The SEC brought enforcement proceedings against Lorenzo (among others). Id. at 1099.

Lorenzo held that the transmission of emails, or "dissemination," could sustain a claim under the scheme subsections that prohibit a "device," "scheme," "artifice to defraud," and/or fraudulent "practice." Id. at 1101 (citing Rule 10b-5(a) and (c) and Section 17(a)(1)). This language was held sufficiently broad to include dissemination. Id.

Lorenzo further observed that there is "considerable overlap" between the subsections of Rule 10b-5 (and, similarly, between the subsections of Section 17(a)). Id. at 1102. Lorenzo rejected the view that only subsection (b) of Rule 10b-5 can regulate conduct involving false or misleading statements. Id. So, even though Lorenzo did not make the false statement and his conduct was beyond the reach of Rule 10b-5(b), scheme liability was not precluded. Id. Accordingly, the scheme subsections can cover conduct that involves a misstatement even if the defendant was not the maker of it. Id.

## V

This interlocutory appeal is limited to the legal issue raised in the SEC's motion for reconsideration: can misstatements and omissions alone form the basis for scheme liability? In our Circuit, this boils down to whether Lorenzo abrogated Lentell.

We rule that it did not. "[T]o qualify as ... an intervening decision, the Supreme Court's conclusion in a particular case must have broken the link on which we premised our prior decision, or undermined an assumption of that decision." Dale v. Barr, 967 F.3d 133, 142–43 (2d Cir. 2020) (alterations omitted). Lentell held that misstatements and omissions cannot form the "sole basis" for liability under

the scheme subsections. 396 F.3d at 171. Lorenzo held that the "dissemination of false or misleading statements with intent to defraud" does come within the scheme subsections. 139 S. Ct. at 1100. But misstatements or omissions were *not* the sole basis for scheme liability in Lorenzo. The *dissemination* of those misstatements was key. Since the holdings of Lentell and Lorenzo are consistent with one another, Lentell remains vital.

**\*6** On this narrow interlocutory appeal, we have no occasion to determine for ourselves whether the scheme liability claims in this complaint allege something beyond misstatements and omissions. Our analysis is premised on the district court's ruling in the Dismissal Order, which characterized the scheme liability claims as a collection of misstatements and omissions. See Rio Tinto plc, 2019 WL 1244933, at *15-16. Because Lentell withstands Lorenzo, and because the Dismissal Order ruled that the complaint alleges misstatements and omissions only, the district court did not abuse its discretion in declining to reconsider the dismissal of the scheme liability claims.

Whether there are ramifications or inferences from Lorenzo that blur the distinctions between the misstatement subsections and the scheme subsections is a matter that awaits further development. Consider, e.g., WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057–58 (9th Cir. 2011), abrogated by Lorenzo, 139 S. Ct. at 1094. As our opinion today is limited to the legal issue, we make no ruling about the ultimate impact of Lorenzo on this case. We do not consider, for example, whether corruption of an auditing process is sufficient for scheme liability under Lorenzo, or allegations that a corporate officer concealed information from auditors. For now, Lentell tells us that misstatements and omissions alone are not enough for scheme liability, and Lorenzo tells us that dissemination is one example of something extra that makes a violation a scheme.

We reject the SEC's argument that Lentell applies only in cases brought by private litigants. The SEC advances no credible basis for this argument; and courts have applied

the principle of [Lentell](#) in enforcement actions. See, e.g., [SEC v. Pentagon Cap. Mgmt. PLC, 725 F.3d 279, 287 (2d Cir. 2013)](#); [SEC v. Kelly, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011)](#) (McMahon, J.); [SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 467 (S.D.N.Y. 2004)](#) (Marrero, J.) (pre-[Lentell](#)). The district court reached the same conclusion, observing that the SEC "cites no authority from [the Southern District of New York]" to support its argument that [Lentell](#) applies only to suits brought by private parties. [Rio Tinto plc, 2019 WL 1244933, at \*15](#).

**VI**

Maintaining distinctions between the subsections of Rule 10b-5 and between the subsections of Section 17(a) is consistent with the text of each. "One of the most basic interpretive canons is that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." [Mary Jo C. v. New York State & Loc. Ret. Sys., 707 F.3d 144, 156 (2d Cir. 2013)](#) (citation and alteration omitted). Were misstatements and omissions alone sufficient to constitute a scheme, the scheme subsections would swallow the misstatement subsections. And though [Lorenzo](#) ruled that there was "considerable overlap" between the misstatement subsections and the scheme subsections, [139 S. Ct. at 1102](#), it did not announce that the misstatement subsections were subsumed. In concluding that [Lentell](#) remains vital, we are respecting the structure that Congress designed.

We know that [Lorenzo](#) preserved the lines between the subsections because [Lorenzo](#) emphasized the continued vitality of [Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011)](#). [Janus](#) limits primary liability under Rule 10b-5(b) to the "maker" of a statement, i.e., the person with authority over a false statement; individuals who helped draft, research, print, or wordsmith the statement at some point in time, but who lacked ultimate control, cannot be primarily liable. [Id. at 142, 131 S.Ct. 2296](#). Using [Janus](#) as a backstop, [Lorenzo](#) signaled that it was not giving the SEC license

to characterize every misstatement or omission as a scheme. [139 S. Ct. at 1103](#). While [Lorenzo](#) "may have carved out of [Janus](#)" liability for disseminating false statements, it did not go so far as to create primary liability for "participation in the preparation" of misstatements. [Geoffrey A. Orley Revocable Tr. v. Genovese, 2020 WL 611506, at \*7-8, as amended](#) (S.D.N.Y. Feb. 7, 2020) (Ramos, J.).

**\*7** Preserving distinctions between the subsections also assures that private plaintiffs remain subject to the heightened pleading requirements for Rule 10b-5(b) claims. Section b(1) of the PSLRA requires a complaint alleging misstatements or omissions to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," [15 U.S.C. § 78u-4(b)(1)](#), whereas "claims brought under Rule 10b-5(a) and (c) need not comport with provision (b)(1) of the PSLRA" because they do not require that a misstatement be made, [Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016)](#) (Oetken, J.) (internal quotation marks omitted). An overreading of [Lorenzo](#) might allow private litigants to repackage their misstatement claims as scheme liability claims to "evade the pleading requirements imposed in misrepresentation cases." [In re Alstom SA, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005)](#) (Marrero, J.). But courts have prohibited plaintiffs from recasting their pleadings in this way. See [id.](#) ("[A] plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made."). [Lorenzo](#) did not announce a rule contravening this principle.

Finally, overreading [Lorenzo](#) would muddle primary and secondary liability. This matters because "[a]iding and abetting liability is authorized in actions brought by the SEC but not by private parties." [Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 162, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)](#) (citing [15 U.S.C. § 78t(e)](#)); see also [Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 180, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)](#) ("[Central Bank](#)") (holding that Section 10(b)'s private right of action does not include suits against aiders and abettors). To respect the line that

Congress has drawn between primary and secondary liability, subsections (a) and (c) have been used historically only "to state a claim against a defendant for the underlying deceptive devices or frauds themselves, and not as a short cut to circumvent Central Bank's limitations on liability for a secondary actor's involvement in making misleading statements." SEC v. Lucent Techs., Inc., 610 F. Supp. 2d 342, 361 (D.N.J. 2009) (citation and quotation marks omitted).

The SEC's reading of Lorenzo would likely "revive in substance the implied cause of action against all aiders and abettors," thereby "undermin[ing] Congress' determination that this class of defendants should be pursued by the SEC and not private litigants." Stoneridge, 552 U.S. at 162–63, 128 S.Ct. 761. In sum, a widened scope of scheme liability would defeat the congressional limitation on the enforcement of secondary liability, multiply the number of defendants subject to private securities actions, and render the statutory provision for secondary liability superfluous. See 15 U.S.C. § 78t(e). It is telling that Lorenzo preserves the distinction between

primary and secondary liability. See Lorenzo, 139 S. Ct. at 1103 ("We do not believe ... that our decision ... weakens the distinction between primary and secondary liability."); id. at 1104 ("The line we adopt today is just as administrable" as the " 'clean line' between conduct that constitutes a primary violation of Rule 10b-5 and conduct that amounts to a secondary violation" under Central Bank and Janus).

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not abuse its discretion when it declined to reconsider the dismissal of the scheme liability claims in light of Lorenzo. Accordingly, we affirm. [5]

**All Citations**

--- F.4th ----, 2022 WL 2760323

## Footnotes

1     For brevity, throughout this opinion, these provisions are referred to as "Rule 10b-5" and "Section 17(a)" without reference to the Exchange Act or the Securities Act.

2     Janus applies to Rule 10b-5(b), and therefore it is not directly applicable to "Section 17(a)(2), which does not explicitly predicate liability on having 'made' a statement." See SEC v. Knight, 694 F. App'x 853, 856 n.2 (2d Cir. 2017), as amended (June 7, 2017).

3     The district court also dismissed most of the misstatements and omissions claims that were alleged pursuant to the misstatement subsections (Rule 10b-5(b) and Section 17(a)(2)).

      But the district court did not dismiss a narrow swathe of misstatements alleged pursuant to Rule 10b-5(b), which Albanese made after the meeting in Brisbane. The district court also sustained the part of the Section 17(a)(2) claim seeking injunctive relief against Rio Tinto with respect to the HY2012 Report and August 2012 bond offering documents. These claims are being litigated in the district court.

4     Of course, the heightened pleading standards of the PSLRA do not apply to cases brought by the SEC. 15 U.S.C. § 78u-4(a)(1).

5     The SEC requests that we direct the district court to permit amendment if Lorenzo abrogates Lentell. Because we hold that Lentell withstands Lorenzo, the SEC's request is moot.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.