**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARVIN GONG, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NEPTUNE WELLNESS SOLUTIONS INC., MICHAEL CAMMARATA, TONI RINOW and MARTIN LANDRY <br><br> Defendants. | **Case No. 2:21-cv-01386-ENV-ARL** <br><br> <u>**CLASS ACTION**</u> <br><br> Hon. Eric N. Vitaliano <br> Hon. Arlene R. Lindsay |

**DECLARATION OF CHRISTOPHER P.T. TOUREK IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, FINAL CERTIFICATION OF SETTLEMENT CLASS, AN AWARD OF ATTORNEYS' FEES AND EXPENSES, AND PLAINTIFF'S COMPENSATORY AWARD**

I, CHRISTOPHER P.T. TOUREK, hereby declare as follows

1.      I am an associate at Pomerantz LLP ("Pomerantz"), Lead Counsel for Court-appointed Lead Plaintiff Kenneth Rickert ("Lead Plaintiff" or "Plaintiff") and the Class in this action (the "Action"), and am an attorney admitted to practice in this Court *pro hac vice*. I have been actively involved in the prosecution of this Action since June 2021, as well as the negotiations resulting in the resolution of this Action, and I have personal knowledge of the matters set forth herein. I have also been kept informed of developments in the Action by attorneys working with me or under my direction. The statements in this declaration are made based upon my personal knowledge unless otherwise indicated.

2.      I am proud of the benefits achieved for the Class Members in the $4,250,000 Settlement proposed herein and I respectfully submit this Declaration in support of Lead Plaintiff's Motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (1) the $4,250,000 Settlement; (2) the proposed plan for allocating the Settlement proceeds to eligible members of the Class (the "Plan of Allocation"); (3) final certification of the Settlement Class; (4) Lead Counsel's application for an award of attorneys' fees of 33 1/3% of the Settlement Fund (supported by Lead Plaintiff), and reimbursement of reasonable litigation expenses of $55,012.88; and (5) a modest $7,000 compensatory award to Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(4). The Settlement Amount was deposited, in parts, into an Escrow Account maintained by the Escrow Agent, The Huntington National Bank, on March 22, 2023, April 21, 2023, and May 4, 2023 and has been earning interest for the benefit of the Class since those dates. The Settlement resolves all claims that were or could have been asserted by Lead Plaintiff in the Amended Consolidated Class Action Complaint (ECF No. 41) (the " Amended Complaint "). *See* Stipulation, ECF No. 57-2 at 11-12 against all remaining Defendants and their affiliates.

3.      This Declaration sets forth the nature of the claims asserted in the Action, which involve alleged misrepresentations and omissions made by Defendants Neptune Wellness Solutions Inc. ("Neptune"), Michael Cammarata ("Cammarata"), Toni Rinow ("Rinow"), and Martin Landry ("Landry") (collectively, "Defendants") concerning known deficiencies in the capability and utilization of the acquired SugarLeaf facility, a deal with Costco that was supposed to cement its entry into the hand sanitizer business at the height of the Covid-19 pandemic, and a purported $100 million purchase order for personal protective equipment ("PPE"). It also details the proceedings to date, including the extensive efforts undertaken by Lead Plaintiff and Lead Counsel in prosecuting the Action. In the face of increasing risks, Lead Plaintiff commenced hard-fought negotiations that ultimately resulted in the Settlement. Lastly, this Declaration provides background facts supporting Lead Counsel's request for an award of attorneys' fees and reimbursement of litigation expenses and modest, proposed awards of $7,000 to Lead Plaintiff Kenneth Rickert for reasonable costs and expenses relating to his time and effort representing the Class, pursuant to 15 U.S.C. § 78u-4(a)(4).

## I.      PRELIMINARY STATEMENT

4.      This Action has been intensively litigated since its commencement on March 16, 2021, through the time the Parties reached an agreement in principle to settle in December 2022. The Settlement was achieved only after Lead Plaintiff, through the efforts of Lead Counsel, expended significant time, effort, and expense. Lead Plaintiff believes the $4,250,000 Settlement represents an excellent result for the Class.

5.      The Amended Complaint alleges violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Lead Plaintiff alleged that, throughout the period from July 24, 2019 and July 15, 2021 (the "Class

3

Period"), Defendants concealed known deficiencies in the capability and utilization of the acquired SugarLeaf facility, misrepresented a deal with Costco that was supposed to cement its entry into the hand sanitizer business at the height of the Covid-19 pandemic, and misled investors about a purported $100 million purchase order for personal protective equipment.

6.      This action was first filed on March 16, 2021.

7.      Lead Counsel has litigated this action on a wholly contingent basis and has advanced substantial litigation expenses in connection with its efforts. The Court-approved plan of notice fully disclosed to potential Class Members that Lead Counsel would seek attorneys' fees of up to 33 1/3% and reimbursement of up to $60,000 in litigation expenses. To date, only one objection has been made against the Settlement. *See infra* at ¶45. Lead Counsel's request for attorneys' fees in the amount of 33 1/3% of the Settlement Fund (supported by Lead Plaintiff) is well justified given the facts of this case, the benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed. Lead Counsel also requests reimbursement of the reasonable expenses incurred in connection with its prosecution of the Action in the amount of $55,012.88, which is substantially below the noticed expense cap.

8.      The reasonableness of the requested fee is further supported by the fact that the requested fee equates to a modest multiplier of 1.77 on Lead Counsel's lodestar, as explained *infra* at ¶¶64-66, at the low end of the range that courts in this Circuit accept as reasonable. *See Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LJL), 2021 WL 5847420, at *8–9 (S.D.N.Y. Dec. 9, 2021) (finding that "a lodestar multiplier of approximately 3.3 … is reasonable" for a $2.65 million settlement); *Springer v. Code Rebel Corp.*, No. 16-CV-3492 (AJN), 2018 WL 1773137, at *5 (S.D.N.Y. Apr. 10, 2018) (approving a multiplier of 2.02); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 245 (E.D.N.Y. 2010) (approving a multiplier of 3.3); *In re Telik, Inc. Sec. Litig.*,

4

576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts[.]"). Thus, Lead Counsel's request for attorneys' fees is eminently reasonable in light of the risk of non-payment undertaken by Lead Counsel and precedent within this Circuit approving lodestar multipliers up to 5.5. *See, e.g.*, *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5). Moreover, Lead Counsel's fee request is supported by Lead Plaintiff and is consistent with the retainer agreements entered into at the beginning of this litigation. *See* Declaration of Kenneth Rickert, attached hereto as **Exhibit 1**, ¶¶1, 6-7.

9. I respectfully submit that the Settlement, for the reasons discussed herein and in the accompanying memoranda, is fair, reasonable, and adequate in all respects; that the Plan of Allocation is fair, reasonable, and has a rational basis; and that the Court should therefore approve them and grant final certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure. Likewise, I respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of litigation expenses, including Lead Plaintiff's request for costs and expenses incurred in connection with his representation of the Class (collectively, the "Fee and Expense Application"), is fair and reasonable and should be approved.

## II. FACTUAL SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS

10. Founded in 1998, Neptune was originally a manufacturer of nutraceuticals, especially krill oil, before pivoting to the legal cannabis market in 2017. ¶¶25-26.[1] After obtaining a Canadian cannabis license in January 2019, Neptune began to extract cannabis and hemp oil for other businesses, but eyed expanding into higher-margin products sold to consumers. ¶¶27-30.

---

[1] Unless otherwise stated, "¶__" citations refer to allegations in the Amended Complaint. ECF No. 41.

11.     On May 9, 2019, Neptune announced it would acquire SugarLeaf, a North Carolina-based manufacturer of hemp extractions and formulated products, for $18.1 million plus up to $132 million in earnout payments if certain EBITDA and other targets were met. ¶¶31-32. This was the largest acquisition in Neptune's corporate history and its foothold into expanding into U.S. markets and consumer products.

12.     On July 24, 2019, Neptune announced its completion of the SugarLeaf Acquisition. ¶33. Beginning on that date, Neptune and its executives made a blitz of statements trumpeting SugarLeaf's supposed capabilities and purported "impressive earnings potential." ¶¶33, 35, 37. Lead Plaintiff alleges that none of the statements disclosed to investors huge, known impediments at SugarLeaf, including that it did not then possess the capability to produce the THC-free CBD oil the market demanded, or to extract at a high capacity even the inferior variety. ¶¶33-40, 44-49. Lead Plaintiff further alleges that for many months, Defendants concealed that SugarLeaf was not GMP certified, which many B2B extract purchasers demanded, significantly impeding sales. ¶¶33-44, 55, 60.

13.     Lead Plaintiff alleges that as 2019 progressed into 2020, Neptune not only failed to upgrade its business at SugarLeaf, but instead slowed its extraction activities at a standstill, and eventually furloughed SugarLeaf's employees and shuttered SugarLeaf altogether in the Fall of 2020. ¶¶50-69, 96-97, 102-103. Throughout this time, Defendants made numerous statements about the health and viability of SugarLeaf and its business that Lead Plaintiff alleges were materially misleading. *Id*.

14.     On April 9, 2020, Defendants announced that Neptune was getting into the hand sanitizer market and had applied to the U.S. Food and Drug Administration to manufacture hand sanitizer at its SugarLeaf facility. ¶¶71-72. On April 23, 2020, during the brief window in which

hand sanitizer was in record demand, Defendants boasted that Neptune was "successfully accelerating production of hand sanitizers to over one million units weekly." ¶¶74-76.

15.     Lead Plaintiff alleges that at the time of these statements, Neptune did not actually have any capability to produce hand sanitizer at the time, let alone "one million units weekly." ¶74. Lead Plaintiff also alleges that, while the announcements referred to production at SugarLeaf, Neptune instead imported inferior hand sanitizer from Mexico which it rebranded as a "Neptune" product. ¶¶73, 75, 77-79. Lead Plaintiff further alleges that Neptune's use of imported inferior hand sanitizer caused a widely touted deal with Costco to collapse, which was hidden from investors. ¶¶94, 96-101, 104-105.

16.     In Neptune's Q2 2021 Earnings Call on November 16, 2020, Defendants Neptune, Cammarata, and Rinow announced that Neptune had secured "at least CAD$100 million in purchase orders" for PPE equipment, mainly nitrile gloves. ¶106. When asked by analysts for specifics about the purchase orders, Cammarata and Rinow told investors that the CAD$100 million in purchase orders was "conservative" and they did not see any issue with "bring[ing] them home." ¶¶107-112.

17.     Lead Plaintiff alleges that these statements omitted serious and specific risks to fulfillment of these orders, including the fact that Neptune lacked the inventory to fulfill the purchase orders, lacked the capacity to manufacture the PPE equipment, and had not secured any external supply of PPE equipment to fulfill the orders. *Id*.

18.     On February 15, 2021, Neptune announced disappointing financial results for the third quarter of the Company's fiscal year 2021, admitting that revenue actually declined by almost 75%. ¶114. Neptune also announced that it took three separate charges totaling more than ten times its quarterly revenue, all related to the SugarLeaf Acquisition. *Id*. Specifically, Neptune booked a

$35.6 million goodwill impairment charge, a $2.1 million tangible and intangible asset impairment charge, and a $13.95 million accelerated amortization charge, all of which it attributed to SugarLeaf. *Id.* The following morning, on February 16, 2021, Neptune filed its Form 6-K where it disclosed to investors that SugarLeaf had actually been shut down, its employees furloughed, and contracts between SugarLeaf and third parties ended. ¶¶115-116.

19.     On February 16, 2021, Neptune also held its Q3 2021 Earnings Call, where Cammarata admitted that Neptune's deal with Costco to tell its hand sanitizer had fallen through and that Neptune was having problems with selling its hand sanitizer. ¶¶117-118. On the heels of these disclosures, Neptune's stock price fell by $1.07, or 38.21%, within a two-day span. ¶120.

20.     On July 15, 2021, the concealed risks related to the fulfillment of the CAD$100 million in purchase orders materialized and Rinow informed investors that Neptune could not fulfill the $100 million in PPE purchase orders because Neptune lacked both capacity and supply chain to fulfill the orders. ¶¶119, 122-123. This news sent Neptune's stock down by 22% from $1.09 to $0.84. ¶124.

## III.    PROCEDURAL HISTORY

21.     This Action was filed on March 16, 2021. *See* ECF No. 1. Following the filing of the initial complaint, multiple parties filed motions to be appointed lead counsel and lead plaintiff, including Lead Plaintiff Kenneth Rickert. ECF Nos. 9-16, 18-23.

22.     On January 4, 2022, the Court appointed Kenneth Rickert to be Lead Plaintiff, and appointed its counsel, Pomerantz LLP as Lead Counsel. ECF No. 38.

23.     The Parties then negotiated and filed a joint stipulation setting the deadline for Lead Plaintiff to file his amended complaint and for Defendants to file their anticipated motion to dismiss. ECF No. 40.

24.    On February 16, 2022, after a thorough investigation that included multiple interviews with former Neptune and SugarLeaf employees and the engagement of a damages expert, Lead Plaintiff filed the Amended Complaint against Neptune, Cammarata, Rinow, and Landry. ECF No. 41.

25.    As a result of Lead Plaintiff's extensive investigation, the Amended Complaint contained much stronger and more detailed claims than the initial complaint, and supported an extended class period.  *Id.*  On March 16, 2022, Defendants filed an unopposed motion for an extension of time to answer or otherwise respond to the Amended Complaint, which the Court subsequently granted. ECF No. 43.

26.    Additionally, on March 16, 2022, after negotiations between Lead Counsel and Landry, Lead Plaintiff filed a waiver of service for Landry. ECF No. 44.

27.    On April 1, 2022, Defendants filed a letter requesting a pre-motion conference, pursuant to Section III(A) of the Court's Individual Motion Practice and Rules. ECF No. 45. On April 8, 2022, Lead Plaintiff filed his response in opposition. ECF No. 47. On April 12, 2022, the Court denied as moot Defendants' motion for a pre-motion conference and allowed the filing of their motion to dismiss.

28.    The Parties subsequently negotiated and filed a consent motion for the entry of a briefing schedule, which the Court adopted. ECF No. 48. The Parties then briefed Defendants' Motion to Dismiss, Lead Plaintiff's Response in Opposition, Lead Plaintiff's Notice of Supplemental Authority, and Defendants' Reply in Support of their Motion to Dismiss, all of which were filed with the Court on August 5, 2022 pursuant to the Court's "bundling rule." ECF Nos. 48-53. On October 4, 2022, Lead Plaintiff filed an additional Notice of Supplemental Authority with the Court. ECF No. 54.

29.     On October 11, 2022, while waiting on a ruling from the Court on Defendants' Motion to Dismiss, Lead Plaintiff and Defendants participated in a full-day mediation before an experienced mediator, Jed Melnick. While a settlement was not finalized at that mediation, the Parties continued to hold multiple follow-up rounds of discussions and negotiations over the ensuing week.

30.     Ultimately, the Parties reached an agreement to settle this Action for cash payments totaling $4,000,000 or, at Neptune's election, a combination of $1,500,000 in cash payments and $2,750,000 worth of Neptune stock, as documented in their agreement in a Memorandum of Understanding executed on October 20, 2022. The Parties informed the Court of the Settlement in a joint letter filed with the Court on October 20, 2022 and asked the Court to stay all proceedings in the Action pending the outcome of the Parties' motion to approve the Settlement. ECF No. 55. On February 3, 2023, Defendants informed Lead Plaintiff that it elected to fund the Settlement through a combination of $1,500,000 in cash payments and $2,750,000 worth of Neptune stock.

## IV.     THE STRENGTHS AND WEAKNESSES OF THE CASE

31.     Based on its experience and knowledge of the facts and applicable law, Lead Counsel – a law firm specializing in the prosecution of complex securities litigation – believes that the Settlement is in the best interest of the Class. Lead Plaintiff also believe the Settlement is fair, reasonable and adequate to Class Members. *See* Declaration of Kenneth Rickert, ¶7. Lead Counsel and Lead Plaintiff are also aware that in addition to potentially succeeding at the motion to dismiss stage, Defendants would likely challenge on price impact at the class certification stage and loss causation at the summary judgment stage. As discussed below, at class certification, Defendants could challenge price impact. Finally, at summary judgment, Defendants would almost certainly challenge falsity, loss causation, damages, and scienter. Each of these issues presented a

risk of non-recovery that Lead Plaintiff and Lead Counsel considered in reaching the proposed Settlement.

### A.    Motion to Dismiss

32.    While Lead Plaintiff believes that the Amended Complaint is strong, well-supported, and that he would ultimately prevail against Defendants' motion to dismiss, he recognizes that an unfavorable decision on Defendants' motion to dismiss is a distinct possibility. The Second Circuit is littered with securities cases that have been dismissed, and Defendants present strong arguments regarding falsity, scienter, and loss causation. Additionally, this case is extremely complex and, as a recent case that settled while a motion to dismiss was still pending noted, "shareholder actions are notoriously complex and difficult to prove." *Rodriguez v. CPI Aerostructures, Inc.*, No. 20CV982ENVCLP, 2023 WL 2184496, at *14 (E.D.N.Y. Feb. 16, 2023) (quoting *In re Bayer AG Securities Litigation*, No. 3 CV 1546, 2008 WL 5336691, at *5 (S.D.N.Y. Dec. 15, 2008)). Therefore, as confident as Lead Plaintiff is in the allegations put forth in the Amended Complaint, the threat of dismissal is ever-present.

### B.    Certification of the Class

33.    While Lead Plaintiff believes that securities fraud actions such as this Action are appropriate for class action treatment, Lead Plaintiff is also aware that Defendants would have opposed class certification outside the context of the Settlement. Lead Plaintiff believes that the Class satisfies the requirements of Fed. R. Civ. P. 23, and that he would prevail in establishing numerosity, commonality, typicality, and predominance. Further, Lead Plaintiff believes that he has, and would continue to, adequately and fairly protect the interests of the Class. Lead Plaintiff acknowledges, however, that Defendants would likely advance arguments against and submit an expert report challenging price impact as well as potentially challenging market efficiency. If the

Court found these arguments persuasive, it could deny certification, which would prevent recovery for absent Class Members. While Lead Counsel believes its arguments would have prevailed, class certification would not have been certain.

34. Even if the Class was certified, Defendants could petition the Second Circuit for leave to appeal that decision immediately pursuant to Rule 23(f), which could result in substantial delays in the resolution of the litigation. The recent case of *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 CIV. 3461 (PAC), 2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021), is instructive on this point. There, the district court originally granted plaintiffs' motion for class certification on September 24, 2015. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 CIV. 3461 PAC, 2015 WL 5613150, at *8 (S.D.N.Y. Sept. 24, 2015), *vacated and remanded sub nom. Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474 (2d Cir. 2018). Thereafter, defendants appealed the district court's order to the Second Circuit *twice*, then to the Supreme Court, and then *again* to the Second Circuit. In other words, over seven years after the *Goldman* plaintiffs first moved to certify the class, its fate remained undetermined. *See also In re Vivendi Universal, S.A. Sec. Litig.*, No. 11-908 (2d Cir. July 20, 2011) (denying second Rule 23(f) petition over four years after district court originally granted class certification). Thus, the danger of a protracted delay over class certification is very real.

### C. Risk of Establishing Liability and Damages at Summary Judgment and Trial

35. If the Court granted Lead Plaintiff's motion for class certification, Defendants would have then presented additional arguments at summary judgment and trial to oppose Lead Plaintiff's claims. Most notably, Defendants would likely challenge the evidence regarding falsity, scienter, damages, and loss causation, the outcome of which is difficult to predict. For the Class to recover damages at the level estimated by Lead Plaintiff's expert, Lead Plaintiff would need to

prevail on each and every one of the remaining allegations, for the entire Class. Notwithstanding this fact, the jury would also have to adopt Lead Plaintiff's expert's damages analysis over Defendants' expert's analysis, and such expert battles are never predictable. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *9 (S.D.N.Y. Nov. 7, 2007).

36.   Defendants' arguments at summary judgment and trial would be informed by extensive fact discovery, which could potentially undermine Lead Plaintiff's allegations regarding the falsity of Defendants statements relating to known deficiencies in the capability and utilization of the acquired SugarLeaf facility, a deal with Costco that was supposed to cement its entry into the hand sanitizer business at the height of the Covid-19 pandemic, and a purported $100 million purchase order for personal protective equipment, thereby undercutting the elements of materiality, loss causation, and/or scienter.

37.   The risks inherent in proving scienter were also significant due to, *inter alia*, the nature of Defendants' alleged misrepresentations and omissions, which center on Defendants' representations regarding known deficiencies in the capability and utilization of the acquired SugarLeaf facility, a deal with Costco that was supposed to cement its entry into the hand sanitizer business at the height of the Covid-19 pandemic, and a purported $100 million purchase order for personal protective equipment. There is no guarantee that a jury, upon assessing the totality of the evidence and the credibility of witnesses, would find the Defendants to have a culpable state of mind. Indeed, securities cases that have survived a motion to dismiss have later been defeated on scienter and/or loss causation grounds at summary judgment. *See, e.g.*, *In re Symbol Techs. Class Action Litig.*, 950 F. Supp. 1237, 1246 (E.D.N.Y. 1997) (granting summary judgment because the plaintiffs failed to adequately support their allegations of scienter).

## V.    SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT

### A.    The Parties' Settlement Negotiations and Resulting Settlement

38.    The Parties began discussing settlement in the Fall of 2022, and on October 11, 2022, they participated in a full-day mediation before an experienced mediator, Jed Melnick. While that mediation did not result in an immediate resolution, the Parties built upon the discussions held on October 11, 2022, and ultimately agreed to settle this Action for a payment of $4,250,000.  On October 20, 2023, the Parties executed the Settlement Term Sheet.  On December 6, 2021, Lead Counsel for Lead Plaintiff and counsel for Defendants executed the Stipulation and Agreement of Settlement.  *See* ECF 57-2.

39.    On December 6, 2022, Lead Plaintiff filed a Motion for Preliminary Approval of the Settlement, along with the Stipulation of Settlement. *See* ECF No. 57. On March 16, 2023, the court entered an Order preliminarily approving the Settlement (the "Preliminary Approval Order"). *See* ECF No. 59.

### B.    Notice to the Class Meets the Requirements of Due Process and Rule 23 of the Federal Rules of Civil Procedure

40.    Pursuant to its Preliminary Approval Order, the Court set: (i) May 23, 2023 as the deadline for filing papers in support of the Final Settlement, the Plan of Allocation,  and  the application by Lead Counsel for attorneys' fees or reimbursement of expenses (collectively, the "Applications"); (ii) May 30, 2023 as the deadline for submitting any written objections to the Settlement; (iii) May 30, 2023 as the deadline for submitting requests to be excluded from the Class or filing any opposition to any of the applications; (iv) June 13, 2023 as the deadline for all replies to responses to any opposition to the Applications; and (v) a Final Approval Hearing to be held on June 20, 2023 at 11:00 a.m. *Id.* at 11-12.

41.     In accordance with the Preliminary Approval Order, Lead Counsel instructed AB Data Ltd. ("AB Data"), the Court-approved Claims Administrator for the Settlement, to: (1) e-mail and mail copies of the Court-approved Mailed Notice ("Mailed Notice") by first-class mail, postage prepaid to potential members of the Class and nominees; and (2) publish the Summary Notice in accordance with the Preliminary Approval Order (*i.e.*, in *PR Newswire*). The Mailed Notice contains, among other things, a description of the Settlement and information regarding the lawsuit and the right of Class Members to: (a) participate in the Settlement; (b) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (c) exclude themselves from the Class. The Mailed Notice also directs recipients to the settlement website, www.neptunesecuritiessettlement.com, for complete details regarding the proposed Settlement.

42.     As set forth in the Declaration of Eric Nordskog Regarding: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Nordskog Decl.", attached as **Exhibit 2**) regarding mailing of the notice of pendency and proposed settlement of class action and proof of claim, AB Data initially disseminated 5,513 copies of the Mailed Notice to potential Class Members and nominees in accordance with the Preliminary Approval Order. *See* Nordskog Decl. at ¶¶2-4. In accordance with the Preliminary Approval Order, on April 11, 2023, AB Data caused the Summary Notice to be published via *PR Newswire*. *Id.* at ¶9.

43.     Lead Counsel also caused AB Data to establish a website dedicated to the Settlement (www.neptunesecuritiessettlement.com). The website provides members of the Class with information concerning the Settlement and access to downloadable copies of the Claim Form, Notice, Stipulation, and the Preliminary Approval Order, as well as copies of other filings in this

Action. Additionally, AB Data established and maintains a toll-free telephone number, 1-877-254-8530, to respond to inquiries from Class Members regarding the Settlement.

44. During the process of providing Notice to Class Members, AB Data received requests from brokers and nominees to either: (1) send the Notice to the broker or nominee for distribution to their customers with relevant holdings, or (2) send the Notice directly to their customers with relevant holdings. To date, through direct mailings and mailings to brokers and nominees, AB Data has mailed over 34,471 claim forms to potential Class Members, and will have mailed a total of 63,993 claim forms after additionally requested Postcard Notices are mailed out on May 25, 2023, and received 2,003 submitted claims forms. *See* Nordskog Decl. at ¶¶6-8, 15. The vast majority of the claims forms are expected to be submitted on or around the claim filing deadline, so the total number of submitted claims forms is almost certain to increase substantially. *Id*. at ¶15.

45. As set forth above, the deadline for members of the Class to request exclusion from the Class or file an opposition to the Settlement, Plan of Allocation, and/or Fee and Expense Application is May 30, 2023. Thus, while the deadline for submitting requests to be excluded from the Class has not yet passed, as of the date of this filing, May 23, 2023, AB Data has received no exclusions and only one objection from an anonymous source who failed to follow the proper procedure set out in the Notice and failed to provide any documentation to establish that the objector(s) were actual Class Members. *Id.* at ¶¶12-14; ECF No. 61.

C. **Participation in the Settlement and Submission of Claims**

46. Class Members who wish to be potentially eligible to receive a distribution from the Settlement Fund are required to submit a completed Proof of Claim to the Court-authorized Claims Administrator, AB Data, postmarked or submitted no later than May 30, 2023.

47.     The Claims Administrator, supervised by Lead Counsel, will make reasonable efforts to resolve any curable defects in Proof of Claim Forms to ensure that all Class Members with otherwise valid Claims are not rejected and obtain their rightful compensation from the Settlement Fund. Lead Counsel has been, and will continue to be, involved in the claims administration process.  It will continue to communicate with Class Members, answer their questions, and ensure the process runs smoothly and efficiently.

## VI.    PLAN OF ALLOCATION

48.     As mentioned above, pursuant to the Court's Preliminary Approval Order and as set forth in the Notice, Class Members who wish to participate in the Settlement and be eligible to receive a distribution from the Settlement Fund must provide a valid Proof of Claim to the Claims Administrator postmarked or submitted on or before June 5, 2022. *See* ECF. No. 59 at 11.

49.     The proposed Plan of Allocation equitably distributes the net proceeds of the Settlement  to Class Members who submit timely and valid Proofs of Claim based  on  their respective  alleged  economic  losses  as  a result of the alleged violations of federal securities laws asserted in the Action, as opposed to market-wide or industry-wide factors, or company-specific factors unrelated to the alleged fraud.  Calculations under  the Plan of Allocation  are consistent with Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

50.     The Plan of Allocation was prepared in consultation with an econometric expert firm that Lead Counsel retained as consultants. Although the Plan of Allocation is not a formal damages analysis, it reflects the informed views of Lead Plaintiff's consultants, including their review of publicly available information regarding Neptune and statistical analysis of the price

movements of Neptune securities during the Class Period. Lead Counsel believes that the Plan of Allocation is reasonable, well-supported, and should be approved.

51.    Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each share of Neptune common stock purchased or otherwise acquired during the Class Period  from  July 24, 2019 through July 15, 2021, both dates inclusive. The calculation of the Claimant's Recognized Loss Amounts will depend upon several facts, including when the shares of Neptune common stock were purchased or otherwise acquired during the Class Period, and in what amounts, and whether those shares were sold, and if sold, when they were sold, and for what amounts. *See* Notice, ECF No. 57-2 at 54-57.

52.    The Plan of Allocation reflects the estimated alleged artificial inflation in the price of Neptune common stock during the Class Period. Artificial inflation is estimated from the changes to the price of Neptune's common stock during the Class Period resulting from alleged misrepresentation and disclosure events, net of market-wide and industry-wide factors.

53.    Under the Plan of Allocation, Recognized Loss Amounts also take into account the PSLRA's statutory limitation on recoverable damages, whereby losses on eligible shares of Neptune common stock cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the 90-day period subsequent to the Class Period if the share was held through October 13, 2021 (*i.e.*, the end of the 90-day period) and losses on eligible shares of Neptune common stock purchased or otherwise acquired *during* the Class Period and sold during the 90-day period subsequent to the Class Period cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the portion of the 90-day period elapsed as of the date of sale. A table showing the average 90-day lookback price

for each day of the 90-day period is attached as Table 2 to the Notice. *See* Notice, ECF No. 57-2 at 56-57.

54.    To avoid wasteful *de minimus* distributions that would erode the Net Settlement Fund without providing any meaningful benefit to Class Members, the Plan of Allocation provides that no distributions will be made to Claimant's with a *pro rata* share of less than $20.00.

55.    Pursuant to the Plan of Allocation, any remaining funds in the Net Settlement Fund, after six (6) months from the date of distribution of such Net Settlement Fund, shall be used: (i) first, to pay any amounts mistakenly omitted from the initial distribution to Authorized Claimants; (ii) second, to pay any additional Notice and Administration Costs incurred in administering the Settlement; and (iii) finally, if economically feasible, to make a second distribution to Authorized Claimants who cashed their checks from the initial distribution and who would receive at least $20.00 from such second distribution, after payment of the estimated costs or fees to be incurred in administering the Net Settlement Fund.

56.    The structure of the Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund among Authorized Claimants. Lead Counsel submits that the Plan of Allocation is fair and  reasonable and should be finally approved together with the Settlement.

57.    Despite broad dissemination of the Plan of Allocation to potential Class Members in the Mailed Notice, only one objection to the Settlement has been filed, and that objection did not specifically object to the Plan of Allocation itself.

**VII.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS FINAL APPROVAL**

58.    Lead Plaintiff believes that he would have prevailed on Defendants' motion to dismiss. Defendants are similarly convinced that they would have succeeded at the dismissal stage.

Likewise, Lead Plaintiff believes that he would have prevailed on the merits at trial. Defendants are equally adamant that they would prevail. Lead Plaintiff faced a significant risk that he would not have convinced a jury that Defendants made false and misleading statements with the requisite state of mind and that these statements caused Lead Plaintiff's losses. Moreover, the Court could have granted Defendants' motion to dismiss, denied Lead Plaintiff's motion for class certification or entered summary judgment for Defendants, the jury could have found in Defendants' favor, or Lead Plaintiff could have lost on appeal. Finally, even if Lead Plaintiff prevailed, by the time of that eventual victory, Neptune could have gone bankrupt or become so financially distressed that it could not afford to pay any award of damages.

59.    Having considered the foregoing risks and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement before this Court is fair, reasonable, and adequate, and in the best interests of the Class.

## VIII.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

60.    The Notice provides that Lead Counsel will apply to the Court for attorneys' fees not to exceed 33 1/3% of the Settlement Amount and reimbursement of expenses not to exceed $60,000, plus interest earned on these amounts at the same rate as the Settlement Fund. As set forth in the accompanying memorandum of points and authorities in support of its Unopposed Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Compensatory Award for Plaintiff (the "Fee Memorandum"), Lead Counsel is requesting attorneys' fees in the amount of 33 1/3% of the Settlement Fund and reimbursement of expenses in the amount of $55,012.88. As discussed in the accompanying Fee Memorandum, the requested fee is within the range of what is customarily awarded in similar complex actions. The recovery

of $4,250,000 represents a meaningful percentage of total maximum damages and is an excellent result for the Class.

61. The expenses incurred by Lead Counsel in connection with this litigation are set forth below. Lead Counsel, in seeking reimbursement of $55,012.88 in reasonable expenses, has averred that the expenses incurred in this Action are reflected on the books and records maintained by the firm and are an accurate recording of the expenses incurred. Those expenses consist of the reasonable fees paid to Lead Plaintiff's experts who provided Lead Plaintiff with extensive assistance during this litigation, and other expenses like filing fees and database charges. Such expenses were reasonably necessary for the prosecution of this Action and of the type normally chargeable to a client in non-contingency litigation.

**A.    Lead Counsel's Application for Attorneys' Fees**

62. For its efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage-of-recovery basis. The percentage-of-recovery method is appropriate because it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.[2]

63. Lead Counsel requests a fee of 33 1/3% of the Settlement Fund. As set forth in the accompanying Fee Memorandum, numerous district courts within the Second Circuit have applied the percentage-of-recovery method in awarding fees. The percentage sought is merited in this case

---

[2] Districts in the Second Circuit also consider the factors enumerated in *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) when assessing a request for attorneys' fees from a common fund. The *Goldberger* factors include: (1) the time and labor expended by counsel; (2) the risks of the litigation; (3) the magnitude and complexity of the litigation; (4) the requested fee in relation to the settlement; (5) the quality of representation; and (6) public policy considerations. *Id.* at 50. As discussed in the Fee Memorandum, each of these factors favors the requested fee award.

in light of the effort required and the result obtained and is in line with percentages awarded by many courts in this Circuit in common fund cases. Lead Plaintiff endorses Lead Counsel's fee request.

### 1.    The Requested Fee is Reasonable

64.    Lead Counsel undertook time-consuming, challenging, and risky work to prosecute the claims against Defendants and to achieve this Settlement. As detailed above, this Action was settled only after Lead Counsel had conducted an extensive and ongoing investigation into the Class's claims, thoroughly researched the facts and law applicable to the Class's claims and Defendants' defenses thereto, prepared and filed an amended complaint detailing each Defendant's alleged violations of the federal securities laws, opposed Defendants' motion to dismiss the Amended Complaint, considered the risks of continued litigation, and engaged in vigorous settlement negotiations with defense counsel, which resulted in a favorable recovery for the Class.

65.    Since the inception of the Action, Lead Counsel has dedicated over 1073 hours to the investigation, prosecution, and resolution of the claims against Defendants, resulting in a lodestar of $797,525. The requested fee of 33 1/3% of the Settlement Fund, yields a multiplier of approximately 1.77. In other words, the attorneys' fees requested here represent near what counsel would have earned had counsel been compensated if billed hourly using counsel's hourly billable rates, even before accounting for the considerable risk of nonpayment undertaken by Lead Counsel.

66.    The lodestar enumerated below includes a schedule that indicates the amount of time spent by each attorney at Pomerantz who worked on this Action and the lodestar calculations based on their current billing rates. The hourly rates for the attorneys included in the schedule are

22

commensurate with the hourly rates charged by lawyers of reasonably comparable skill, experience, and reputation which have been accepted in other securities or shareholder litigation. For personnel who are no longer employed by Lead Counsel, the lodestar is based upon the billing rates for such personnel in their final year of employment.

| ATTORNEY | STATUS | CURRENT RATE | HOURS | CURRENT TOTAL |
|---|---|---|---|---|
| Bruckner, Gustavo F. | Partner | $1,000.00 | 1.00 | $1,000.00 |
| Silverman, Joshua B. | Partner | $1,000.00 | 290.80 | $290,800.00 |
| Hood, Alex | Partner | $875.00 | 3.70 | $3,237.50 |
| Jafri, Omar | Partner | $875.00 | 4.60 | $4,025.00 |
| LoPiano, James | Associate | $500.00 | 3.36 | $1,680.00 |
| Pryzblowski, Thomas | Associate | $550.00 | 10.30 | $5,665.00 |
| Tourek, Christopher | Associate | $650.00 | 750.70 | $487,955.00 |
| Ferrogari, Dean | Associate | $450.00 | 0.70 | $315 |
|  | ATTORNEY TOTAL |  | 1065.16 | $794,677.50 |
| PARALEGAL AND LEGAL ASSISTANTS | STATUS | CURRENT RATE | HOURS | CURRENT TOTAL |
| Lo, Jack | Paralegal | $365.00 | 7.50 | $2,737.50 |
| Huang, Jessie | Paralegal | $110.00 | 1.00 | $110.00 |
|  |  |  | GRAND TOTAL | $797,525.00 |

### 2.    The Support of Lead Plaintiff and Reaction of the Class

67.    Lead Plaintiff was consulted about, and approved, Lead Counsel's Fee and Expense Application. *See* Declaration of Kenneth Rickert. The request is also consistent with the retainer agreements that Lead Plaintiff entered into with Lead Counsel. Lead Plaintiff's support of the requested attorneys' fees should be given considerable weight.

68.    To date, following the dissemination of approximately 34,471 copies of the Mailed Notice, each of which informed potential Class Members of Lead Counsel's intent to seek a fee of up to 33 1/3% of the Settlement Fund and reimbursement of litigation expenses up to $60,000, there has been only one objection to the Settlement, without any specific objection to the amount of attorneys' fees and expenses set forth in the Notice.

### 3.    Standing and Experience of Lead Counsel

69.    The expertise and experience of counsel is an important factor in setting a fair fee. As Lead Counsel's firm resume demonstrates, the attorneys at Pomerantz are experienced and skilled securities class action litigators and have successful track records in securities cases throughout the country.  *See* Pomerantz LLP Firm Resume, attached as **Exhibit 3**.

### 4.    Standing and Caliber of Opposing Counsel

70.    The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants are represented by Norton Rose Fulbright US LLP. This well-regarded firm spared no effort in the vigorous defense of its clients. In the face of this formidable opposition, Lead Plaintiff and Lead Counsel developed, litigated, and successfully negotiated an excellent recovery in this Action for the Class.

### 5.    The Monetary Settlement Achieved

71.    The $4,250,000 Settlement was achieved as a result of extensive negotiations, as detailed herein. The Settlement is a favorable recovery to the Class representing approximately 6.07% of the maximum amount that would likely be awarded if Plaintiff prevailed, and the majority of the amount that Lead Counsel believes could actually be collected if this litigation proceeded to trial. maximum likely recoverable aggregate damages estimated by Lead Plaintiff's damages consultants, prior to any discount for the very real risks regarding liability, causation, and

disaggregation. The Settlement recovers a far greater proportion of damages than the median recovery in securities class actions of this size, and an overwhelming portion of the amounts that could practically be collected. Therefore, the Settlement is not only fair, reasonable and adequate, but an excellent result for Class Members.

6. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High Risk, Contingent Securities Cases

72. This litigation was undertaken by Lead Counsel on a wholly contingent basis, with no guarantee of ever being compensated for the enormous investment of time and money the case required. In undertaking that responsibility, Lead Counsel dedicated significant resources to the prosecution of this Action and advanced considerable expenses without any assurance of reimbursement. Thus, it incurred a financial burden and risk far greater than a firm paid on an ongoing basis.

73. Lead Counsel took on these risks despite the possibility of no recovery. There have been many hard-fought lawsuits where, because of discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee to counsel.

74. Many post-PSLRA cases in this Circuit have been dismissed at summary judgment after thousands of hours have been invested in successfully opposing motions to dismiss and pursuing discovery. *See, e.g.*, *In re All. Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 189-90 (S.D.N.Y. 2003) (dismissing Section 11 claims on summary judgment).

75. The risks of contingent litigation are also highlighted by the fact that a change in the law can result in dismissal even after a great deal of time and effort has been expended on the case. This is especially true of securities class actions, where intervening shifts in legal standards

25

have undermined trial victories. *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 533 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (in a case brought in 2005, a Supreme Court decision after entry of a verdict in Lead Plaintiff's favor reduced the billion-dollar award to approximately $78 million); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 414, 433 (7th Cir. 2015) (reversing and remanding securities class action jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction in light of intervening Supreme Court case); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1231-32 (10th Cir. 1996) (1973 case tried to a verdict for plaintiffs in 1988 vacated in 1996 as a result of an intervening Supreme Court decision).

76.     Public interest also supports the fee request. Courts have repeatedly held that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations. The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). "'[P]rivate securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses' - a matter crucial to the integrity of the domestic capital markets." *Id.* at 320 n.4. The SEC, a vital but understaffed government agency, does not have the budget or the resources to ensure complete enforcement of the securities laws. If this important policy is to be carried out, the courts should award fees which will adequately compensate plaintiffs' counsel, considering the enormous risks undertaken with a clear view of the economics of the situation.

IX. **REIMBURSEMENT OF THE REQUESTED EXPENSES IS FAIR AND REASONABLE**

77.    Lead Counsel also seeks reimbursement from the Settlement Fund of $55,012.88 for expenses reasonably and actually incurred in connection with its commencement prosecution and mediation of the claims asserted in the Action, below the $60,000 maximum set forth in the Mailed Notice. These expenses are detailed in ¶80 below for Pomerantz.

78.    From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and at the very least, would not recover anything until the Action was successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement would not compensate for the lost use of the funds advanced to prosecute this Action. Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

79.    As attested to, Lead Counsel's expenses are reflected on the books and records maintained by Lead Counsel, which are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred. These expense items are billed separately by Lead Counsel, and such charges are not duplicative in its billing rates.

80.    The expense schedule below identifies the specific categories of expenses, *e.g.*, court fees, fees for experts and consultants, online legal and factual research, travel costs, reproduction costs, messenger and courier costs, and overnight mail costs incurred by Pomerantz. These expenses were reasonable and necessary to the prosecution and resolution of this Action and are the type of expenses that counsel typically incur in complex litigation, and for which counsel are typically reimbursed when the litigation gives rise to a common fund. The

27

travel costs also include anticipated travel costs for Lead Counsel to attend the final approval hearing on June 20, 2023.

| Pomerantz LLP | |
|---|---|
| **Category:** | **Total:** |
| Filing Fees/PACER/Service | $560.00 |
| Computerized Legal Research | $2,210.37 |
| Photocopy, Delivery, and Clerical Overtime | $415.08 |
| Experts | $13,540.00 |
| Private Investigator Fees | $15,814.10 |
| Mediator Fees | $15,361.56 |
| Press Releases | $3,591.95 |
| Travel, Lodging, and Meals | $3,519.82 |
| **Total Expenses Incurred:** | **$55,012.88** |

81.     Of the total amount of expenses, $13,850.00, or approximately 25.17%, was expended on experts. Lead Counsel worked extensively with experts at Stanford Consulting Group Inc. in the complex and specialized areas of loss causation and damages. These experts were utilized to assist in: (i) determining the likely recoverable damages; (ii) preparing for settlement negotiations; and (iii) developing the Plan of Allocation. Additionally, another expert (Forensic Economics Inc.) was used to obtain certain analyst reports considered in Lead Plaintiff's investigation, which were not otherwise available at a cost-effective price to Lead Counsel.

82.     The expenses detailed above and the other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are customarily incurred in litigation and routinely charged to clients billed by the hour. Moreover, all of the expenses incurred by Lead

Counsel were necessary to the successful prosecution and resolution of the claims against Defendants. These expenses have been approved by Lead Plaintiff.

83.    Both the Mailed Notice and Summary Notice apprise potential Class Members that counsel will be seeking reimbursement of expenses in an amount not to exceed $60,000. As noted above, to date, there has been only one objection to the Settlement, with no specific objections to the request for reimbursement of expenses as set forth in the Notice. In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, Lead Counsel respectfully submits that the costs and expenses incurred by Lead Counsel should be reimbursed.

## X.    COMPENSATORY AWARD REQUESTED FOR LEAD PLAINTIFF

84.    Lead Plaintiff Kenneth Rickert seeks a compensatory award in the amount of $7,000. Lead Plaintiff has devoted substantial time and effort to the prosecution of this Action. Lead Counsel, who worked under his supervision and is familiar with his efforts, believe those requests are fair, reasonable and adequate.

85.    The requested award to Lead Plaintiff is modest in light of his dedication and efforts spent working on the Action. Specifically, Lead Plaintiff Kenneth Rickert: (i) analyzed whether to participate as a representative plaintiff, including review of initiating documents, consideration of damage estimates, and consultation with counsel regarding the responsibilities of serving as a representative plaintiff; (ii) reviewed case-related documents and correspondence with Lead Counsel; (iii) gathered documents to inform the expansion of the Class Period when drafting the Amended Complaint; (iv) reviewed and edited the Amended Complaint; (v) commented on Defendants' motions to dismiss the Amended Complaint and Lead Plaintiff's opposition thereto; and (vi) coordinated with Lead Counsel during settlement negotiations and

approved the Settlement. *See generally* accompanying Declaration of Kenneth Rickert. Given the contributions and the time and effort expended by Lead Plaintiff Kenneth Rickert, the requested awards of $7,000 is warranted and should be approved.

86.     Further, in Lead Plaintiff's profession as a financial planner, he makes approximately $300 per hour, which means that the award of $7,000 for 30 hours of work is less than his normal hourly rate ($7,000 / 30 = $233.33 per hour). *See* Declaration of Kenneth Rickert, ¶¶2, 5.

## XI.    CONCLUSION

87.     For the reasons set forth above and in the accompanying motions and supporting memoranda, I respectfully submit that: (a) the Settlement is fair, reasonable, and adequate and should be granted final approval; (b) the Plan of Allocation represents a fair method for allocating and distributing the Net Settlement Fund among eligible Class Members and should be approved; (c) final certification of the Settlement Class should be granted; (d) the Fee and Expense Application should be granted; and (e) Lead Plaintiff should be granted a compensatory award of $7,000.

88.     I declare under penalty of perjury of the laws of the United States of America and the State of Illinois that the foregoing is true and correct.

Executed this 23rd day of May, 2023 at Chicago, Illinois.

*/s/ Christopher P.T. Tourek*
Christopher P.T. Tourek

30