FILED
CLERK

2:38 pm, Jul 28, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
                              :
MARVIN GONG,                  :
                              :        21-CV-1386 (ENV)(ARL)
               Plaintiff,     :
                              :        July 18, 2023
                              :
          V.                  :        Central Islip, NY
                              :
NEPTUNE WELLNESS SOLUTIONS,   :
INC., et al.,                 :
               Defendant.     :
------------------------------X


     TRANSCRIPT OF CIVIL CAUSE FOR FAIRNESS HEARING
        BEFORE THE HONORABLE ARLENE R. LINDSAY
           UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          CHRISTOPHER TOUREK, ESQ.
                            JOSHUA SILVERMAN, ESQ.
                            Pomerantz LLP
                            10 S. LaSalle Street, Suite 3505
                            Chicago, IL 60603

For the Defendant:          SETH KRUGLAK, ESQ.
                            Norton Rose Fulbright US LLP
                            1301 Avenue of the Americas
                            New York, NY 10019


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            274 Hovey Road
                            Milo, ME 04463
                            Aria@leinen.net


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

THE CLERK:  Calling 21-CV-1386, Gong v. Neptune Wellness Solutions.  Please state your appearances.

MR. TOUREK:  Good morning, your Honor. Christopher Tourek on behalf of lead plaintiff Kenneth Rickert.

THE COURT:  All right.

MR. SILVERMAN:  Good morning, your Honor. Joshua Silverman on behalf of Mr. Rickert and the class.

THE COURT:  All right.  Between the two of you, Mr. Silverman, who's going to be addressing the issues?

MR. TOUREK:  I will be, your Honor.

THE COURT:  Okay.

MR. SILVERMAN:  I will only be addressing a discrete issue about a letter that was received last night and a person with whom I've had personal communications.

THE COURT:  Okay, good.

And for the defendant?

MR. KRUGLAK:  Good morning, your Honor. Seth Kruglak from Norton Rose Fulbright representing all defendants.

THE COURT:  All right.

MR. KRUGLAK:  Thank you.

THE COURT:  I've been advised through communications with the Court that this matter has been settled on behalf of the class, and we're here to evaluate the fairness of that settlement.  So I'll ask you, Mr. Tourek, to go through it, what was done, how you managed to reach the settlement, and why you think it's favorable to the class.

MR. TOUREK:  Absolutely, your Honor.  Your Honor, this settlement provides for 1.5 million dollars in cash and 2.75 million dollars in Neptune stock to settle all claims against defendants.  Final approval is warranted here.  The settlement was the result of serious negotiations between the parties.  There was no preferential treatment, and the settlement amount represents a recovery that is frequently approved by courts both in this circuit and nationwide. Furthermore, the relevant factors that courts look at in the Second Circuit all support final approval here.

First, public policy favors this settlement. Courts in the Second Circuit have been clear that when it comes to securities class actions, settlements are to be encouraged.  That's especially the case here, where the settlement provides the class with certainty and adequate relief for their claims.  The settlement

was also achieved by arms-length negotiation between the parties that involved a day-long mediation and subsequent followup rounds of negotiation with the help of an experienced mediator, which demonstrates that the settlement is fair and free of collusion. The complexity, expense, likely duration of the case, and the risks associated with possibly establishing not only liability and damages but also maintaining the class action through trial also support final approval.

The stage of proceedings supports final approval. Although we're at an earlier stage in this litigation, plaintiff has been able to assess both the strength and weaknesses of his claims with respect to -- against the defendants. He's conducted a thorough investigation that included the help of investigators and experts, through his counsel has conducted more than a dozen interviews of former Neptune employees, assessed the correspondence between Neptune and its insurance carrier, where it was denied coverage, fully briefed the motion to dismiss that was currently pending before the Court before settlement was achieved, and engaged in mediation. All of this helped plaintiff determine that settlement was the best possible solution for the class today.

Defendants' ability to withstand a great

judgment or lack thereof also supports final approval. As detailed in our briefs, Neptune is in serious financial trouble and my not be around for trial. The individual defendants have been denied their insurance coverage. This is the best possible solution under those circumstances and this supports final approval here.

Moreover, the range of reasonableness of the settlement fund supports final approval. The settlement amounts to approximately 6.07% of the total maximum damages that could be recovered, and a far greater percentage than what would likely be recovered should this case actually go to trial. This supports final approval. Moreover, the remaining 23(e) factors --

THE COURT: Could you repeat that argument?

MR. TOUREK: I'm sorry.

THE COURT: Repeat the percentage argument.

MR. TOUREK: Yes, your Honor. The settlement as it is right now amounts to essentially 6.07% of the total maximum available damages in this case.

THE COURT: Okay.

MR. TOUREK: That's on the higher end of the historical averages for settlements of this type.

THE COURT:  All right.

MR. TOUREK:  With respect to the remaining 23(e) factors, the plan of notice previously approved by this Court in March, 2023 was followed by the parties.  Further, the parties have no other agreements aside from a standard opt-out agreement, and the plan of allocation treats all the class members equitably, with each class member receiving a pro rata share.

Finally, the reaction of the settlement class supports approval.  64,000 notices were sent out to potential class members, not to mention countless others who saw it when it was transmitted over PR News Wire.  During the official response period, only one objection was submitted to the Court, and that objection, as we detailed in our briefs, was an anonymous objection that failed to provide any identification that would allow us to determine whether or not this person was actually a member of the class.

Putting that aside, the objection simply (ui) to that the settlement should be larger, provided no evidence to support that theory, and similar arguments, as we detailed in our brief, have been rejected.  And as we detailed in our brief, it simply couldn't be larger under the circumstances.  I know that the Court undoubtedly saw two objections that were

submitted late yesterday.

THE COURT: Correct.

MR. TOUREK: And I'd like to address those very briefly. I understand that they didn't follow the proper procedure but nevertheless, we'd like to make a record of it. First, the objections flouted the Court's procedure. The preliminary approval order established an official response period, at which point people could object to the settlement. Instead of following that period, the objectors submitted their objections at the eleventh hour. Nevertheless, looking at the actual substance of the objections, they're without merit. Quite simply, the objectors, Mr. Bijoi Gajar (ph), his wife, and Mr. Sumar (ph), essentially have conflicting interests with that of the class.

THE COURT: How so?

MR. TOUREK: The class purchased shares between July 24th, 2019 and July 15th, 2021 and dealt with misrepresentations made during that period. As opposed to that, Mr. Gajar and Mrs. Gajar as well as Mr. Sumar continued to purchase shares after the class period, up until, as I believe defendants filed something this morning that demonstrated that Mr. Sumar purchased I believe 250,000 more shares on March 11th, 2023.

THE COURT:  While this action was pending.

MR. TOUREK:  I'm sorry?

THE COURT:  During the pendency of this matter.

MR. TOUREK:  Yes, your Honor.  Looking at the actual substance of the objections, they're not concerned with whether or not this settlement is good for the class.  It is.  They're concerned with how the settlement would impact their standing as large Neptune shareholders.  That's simply not the standard by which a class settlement should be approved or denied.

THE COURT:  Right.

MR. TOUREK:  Mrs. Gajar also in her letter, she complained about -- that there were problems with Neptune management.  I can't speak to that but there's a place and a time for that, and that's at a shareholders meeting.  That has nothing to do with whether or not the settlement here is for the benefit of the class.

THE COURT:  Just so I'm clear, though, it's Mr. Gajar that bought into the company during the pendency of this lawsuit.  What about Mr. Sumar?

MR. TOUREK:  No, Mr. Sumar purchased -- I believe they both did but Mr. Sumar -- essentially, he filed a Schedule 13(d) on I believe it was June 1st,

showing a substantial purchase of 250,000 shares on March 11th.

THE COURT: Okay.

MR. TOUREK: So I just wanted to reference that.

THE COURT: So they're both shareholders, current shareholders, and have purchased during the pendency of the action.

MR. TOUREK: Correct, your Honor.

THE COURT: Again, there was the other letter from -- let me see if I find it.

MR. TOUREK: I have a copy if the Court would --

THE COURT: I have it. I just have a lot of papers in front of me. What's the name of the other individual? Do we have that? Yeah, the third one. It's not here. I thought I got all the letters. I do not have a copy of all the letters. This was one letter. These are the supporting materials. Maybe it got buried in there.

I don't see the letter in my pile but it is the letter of May 8th of '23, and I think the signature on it is the one that is the unnamed investor. So there was no ability, I gather, given the inability to read the name of that individual, to determine whether

that person was a current investor or not, correct?

MR. TOUREK:  Correct, your Honor.

THE COURT:  Okay, all right, go ahead.

MR. TOUREK:  Thank you, your Honor.

THE COURT:  Sorry to interrupt.

MR. TOUREK:  As I go through -- finally, the objectors fail to take account of the circumstances that actually are in front of the Court here today.  As we detailed before, Neptune is in a precarious financial position.  They have no insurance for this lawsuit and have little cash.  In their most recent 10(k) filings, they demonstrated that they had I believe 1.3 million dollars in cash on hand.  That's it.  In the objectors' letters, they said that they would prefer to wait for the four million dollars that was an option that was in the stipulation of settlement.  They would prefer to wait for that, but it's simply not plausible and it's not --

THE COURT:  Would you say that their position as shareholders, current shareholders and significant shareholders it appears, puts them in a conflict situation with the class?

MR. TOUREK:  Absolutely, your Honor.

THE COURT:  Yeah.

MR. TOUREK:  It essentially -- they're

trying to hold up the settlement, not because it's in the best interests of the class but because the settlement impacts their current position.

THE COURT:  Okay.

MR. TOUREK:  That leads me to my final point about this, which is that at the end of Mr. Gajar's letter, he essentially states that he hopes that the rest of the class agrees with him, but they don't. Over 3,000 class members submitted proofs of claim during the official response period, when they were allowed to, and they supported the settlement with their actions.  At the eleventh hour, Mr. Gajar, Mrs. Gajar, and Mr. Sumar tried to throw a wrench in these proceedings but it's a thousand to one in terms of the support versus against the settlement.  They are asking to scuttle the settlement because their interests, personal interests conflict with the will and the interests of the class.  That is not a sufficient basis to deny final approval.  Therefore, I believe final approval should be granted here.

I can move on to our motion for attorneys' fees, costs, and award to plaintiffs, but I'd like to ask if the Court has any questions now or would like me to address them all at the end.

THE COURT:  Let me just take a gander at

this.  I want to know a little bit more about the investigation in terms of -- I understood that investigators were deployed to some examination of the company's resources and operations.  Could you expand on that a little bit?

MR. TOUREK:  Absolutely, your Honor, as I was personally involved in leading this from our firm. We engaged an investigator who, along with his colleagues, interviewed -- conducted more than a dozen interviews with former Neptune employees.  It helped us initially expand the class from simply detailing the issues about solely the Sugar Leaf facility that was purchased and touted at the beginning -- on July 24th, 2019, and instead expanded it to include purported misrepresentations with respect to the hand sanitizer business that they engaged in right after the pandemic began, as well as statements made in October, 2021 with respect to large PPE orders, over a hundred million dollars.

Essentially, we engaged with numerous employees to understand what exactly was happening, and this included throughout the class period.  So we understood when exactly the Sugar Leaf factory started to slow down, when it actually did shut down, and what was expressed to the class itself.  So the

investigation helped expand this class period to a point that allowed this case to be more than just about the Sugar Leaf facility but rather about Neptune's entire operations from July 24th, 2019 through July 15th, 2021.

THE COURT:  Tell me more also about how you arrived at the conclusion that they had 1.5 million dollars in cash on hand.

MR. TOUREK:  Through our negotiations with -- and our mediation with the defendants, we essentially -- at first, we kept trying to determine whether or not -- what the appropriate amount was, what could actually be recoverable.  And through the help of the mediator, we determined, after assessing that they didn't have any insurance coverage, that 1.5 million dollars in cash was the lowest we would go for cash alone.  We then tried to incentivize the company, actually, to submit the four million in cash as opposed to, you know, 1.5 --

THE COURT:  (Ui) deal, yeah.

MR. TOUREK:  Yes.  Unfortunately, the current state of Neptune simply didn't allow them to do that.  Nevertheless, we wanted to obtain a sufficient cash basis for the class as a whole, irrespective of the stock compensation.

THE COURT:  Was there -- the mediation that took place, was that court-annexed or was that private mediation?

MR. TOUREK:  I apologize, your Honor?

THE COURT:  The Court has a mediation program.  Was it done through the Court or --

MR. TOUREK:  No, your Honor.

THE COURT:  -- did you do it privately?

MR. TOUREK:  No, this was -- while the motion to dismiss was pending before the Court, the parties reached out and decided maybe something could be done here and now.  From our perspective, our overriding goal has always been what's in the best interests of the class, and this is in the best interests of the class.

THE COURT:  All right.  So with respect to the expert review, had you retained experts, gotten to the actual point of retaining experts to do all the forensic examination you've described?

MR. TOUREK:  Yes, your Honor.  We retained experts to do a damages analysis of what the total possible damages could be.

THE COURT:  Okay.  And consistent with those findings, is that how you reached the settlement proposal that you're submitting to the Court?

MR. TOUREK:  Yes, your Honor, consistent with those findings along with an analysis of just the correspondence with the insurance coverage, as well as just an analysis of the filings of Neptune.  Their filings demonstrate what cash they have on hand.  As the most recent filing showed, they have 1.3 I believe million dollars in cash on hand today.  That informed us that, you know, while we would always like a settlement to be larger, you know, that was not feasible under the current circumstances.

THE COURT:  All right.  Why don't you address the attorneys' fees application and the administrative fees.

MR. TOUREK:  Yes, your Honor.  We are asking for one-third of the settlement fund along with attorneys' fees -- costs and expenses, and an award to plaintiff.  We believe that lead counsel should be awarded a reasonable percentage of the common fund.  It's the dominant approach in the Second Circuit and more importantly, it aligns our interests with that of the class so that we have an effective prosecution and early resolution of all litigation, for the best interests of the class.  Further, the requested one-third fee is reasonable and is supported by the Goldberger factors in the Second Circuit.

First, the time and effort spent by lead counsel supports the one-third fee. At the time of briefing, lead counsel put in approximately 1,073 hours in support of prosecution of this case. At this point, it's about 1,100 hours.

THE COURT: Okay.

MR. TOUREK: This included thoroughly investigating the claims, engaging with experts, conducting dozens of interviews, briefing the motion to dismiss, and engaging in mediation. All of this supports our requested one-third fee. Lead counsel also achieved a fair, reasonable, and adequate result in a risky and complex action. As previous courts have held, counsel's willingness to take on a risky action with no chance -- with no certainty of payment supports a fee like the one-third requested here today.

Moreover, the quality of representation supports the requested one-third fee. Pomerantz LLP has extensive experience in the field of securities class action litigation and leveraged that experience in support of attaining this settlement. They also did so against experienced and adept counsel for defendants.

The (ui) class action also supports the requested award. As I outlined before, 64,000

potential class members were notified of our request for one-third of the fee in the notice, not to mention countless others who saw it over the PR News Wire. Of those 64,000 potential class members, zero objected to our request for the fees. Indeed, even the objectors who filed their objections last night --

THE COURT: Yeah.

MR. TOUREK: -- they did not even object to that. They focused only on the sufficiency of the settlement itself. This overwhelming support demonstrates that our requested fees is appropriate. Moreover, lead counsel's request of one-third of the common fund is in line with other courts in this circuit, as detailed in our briefs, and is eminently reasonable.

Finally, with respect to our fees, the lodestar cross-check confirms the reasonableness of the requested fee. The requested fee yielded a lodestar multiplier of 1.77, right now more likely 1.7 just due to the extra time we've spent. This is within the range of possible approval and actually is at the lower end of the range. All of this supports the requested one-third fee.

Then with respect to our request for reasonable expenses and costs, the class was notified

that lead counsel would seek up to $60,000 in costs and expenses. Here, we're seeking well below that. We're seeking $55,012.88. As exemplified in our declaration, all of these expenses were reasonable and necessary in the prosecution.

And finally, lead plaintiff requests $7,000 as an award for his time and effort. As demonstrated by his declaration, he was integral to this case. He was -- he helped prosecute this case with zeal. He participated in the investigation, in the drafting of the amended complaint, in the motion to dismiss period, and in the settlement period, not to mention consistently keeping up to date with the case on his own. He has been a zealous advocate not just for himself but for the class as a whole. Therefore, we believe that a $7,000 award is reasonable and just for those efforts. Therefore, we would respectfully request that the Court grant both our motion for final approval as well as our motion for attorneys' fees, costs, and award to plaintiff.

THE COURT: All right. Mr. Silverman?

MR. SILVERMAN: Thank you, your Honor. Last night, we received another letter from a shareholder of Neptune, who we do not believe is a class member. We understand it was sent to your Honor and to Judge

Vitaliano.  With your Honor's permission, I would like to pass up a copy of that letter so you have it in front of you.

THE COURT:  Yes, please.

MR. SILVERMAN:  And, your Honor, I appreciate your willingness to hear from both of us today.  I'd like to address this issue --

THE COURT:  Before you go forward, was the defense attorney provided a copy of this.

MR. SILVERMAN:  Yes, your Honor.

MR. KRUGLAK:  I have it.

MR. SILVERMAN:  You have it on your screen.

THE COURT:  Okay.  Just for the record, it's a letter dated July 14th, 2023 from letter PMGSL Holdings LLC at 669 Old Tweetsy (ph) Road in Vilas, North Carolina, 28605, signed by a Peter M. Galloway, manager and president.  Go ahead.

MR. SILVERMAN:  and to give a little background, your Honor --

THE COURT:  Yeah.

MR. SILVERMAN:  Mr. Galloway is -- was an officer of Neptune.  He was the president of U.S. operations.  He was also the CEO of Sugar Leaf, which was acquired by Neptune and was a big part of this litigation.  I don't know if he was a director at any

time but at any rate, he is not in our view a class member for multiple reasons, number one because he was formerly an officer, number two because the shares he received were received in a transaction and they were restricted shares.  The class definition that your Honor approved certified a class of those who purchased or acquired shares on a U.S. trading venue.  He didn't purchase his shares or acquire them on any trading venue.  He received them because he entered into a contract.

THE COURT:  It was compensation.

MR. SILVERMAN:  It was compensation.  It was compensation for the consideration for sale of his company, yes.  We don't believe his -- so his letter is not that of a class member, it's not an objection in the way that we speak of when we talk about the approval or non-approval of a class action.  But nonetheless, I believe it will hit your Honor's docket at some point this week.  I want to be candid about it and I'd like to make a very brief record.

THE COURT:  Could you just -- let me pause for a minute.  Mr. Silverman, just give me one second to scan it because I just realized that there's a reference here that Mr. Galloway believes that Neptune may have withheld information.  And he, as a former

officer of Neptune -- I mean, that's certainly an interesting charge.  So explain to me what he did -- explain to me what his position was at Neptune.

MR. SILVERMAN:  His position was president of U.S. operations, so he was overseeing what was at one time called Sugar Leaf --

THE COURT:  Right.

MR. SILVERMAN:  -- and then I think became known as Neptune U.S.

THE COURT:  Okay.

MR. SILVERMAN:  Those were factories in North Carolina.

THE COURT:  Was he president during the years in the complaint?

MR. SILVERMAN:  During part of it, yes.

THE COURT:  Okay.  What part?  Would you be clear?

MR. SILVERMAN:  I believe -- counsel will correct me if I'm wrong.  I believe he assumed that role shortly after the beginning of the class period, like within days or a week, and I believe he held that for a little over a year.  I could be wrong about that.

THE COURT:  So approximately a year during the period.

MR. SILVERMAN:  Correct.

THE COURT:  Okay.

MR. SILVERMAN:  Correct.  But I also have information about what he meant by withholding information about the settlement.

THE COURT:  Okay, expand on that.

MR. SILVERMAN:  That's why I thought it was important to explain to your Honor my communications with him.  When I received this letter, I called him late last night, tried to understand what he meant.  He called me again this morning, added a little more color.  Essentially, what he is saying is, he is in a private arbitration against Neptune.  It deals with the asset purchase agreement.  He said that he either -- he said he wasn't at liberty to tell me more.  I don't know if that was actual or strategic but he wouldn't tell me more about the substance of the arbitration.

He said that the information that the company he felt should disclose is the results of that arbitration, which he said are coming in about a month or two.  He said he believed a month but at any rate, he thought that would be significant because the dollar amounts in arbitration are significant.  Each side is seeking tens of millions of dollars from the other.

THE COURT:  So he is -- just so I understand, he's under the impression that Neptune may

come into possession of a significant number -- a significant amount of money as a consequence of this arbitration?

MR. SILVERMAN: I think he's saying both possibilities are on the table because there is --

THE COURT: Meaning they could lose money or gain money.

MR. SILVERMAN: Correct.

THE COURT: Okay.

MR. SILVERMAN: There are cross-claims in arbitration.

THE COURT: All right.

MR. SILVERMAN: Cross-claims, counterclaims, however you'd like to define them. I don't have the arbitral papers but I know each side is seeking tens of millions of dollars from the other side, so it could potentially lose money or gain a lot of money but at some unspecified point in the future. He believes it's sooner rather than later. I have no reason to believe that's accurate or inaccurate.

THE COURT: But his estimation is that within a month's time, that arbitration will come to some close.

MR. SILVERMAN: Yes. It wasn't clear to me if he was saying that the proceedings would come to a

close.  Of course, nobody has control over when an arbitrator issues a ruling, or an arbitral panel, following the close of the actual proceedings.

THE COURT:  Right.

MR. SILVERMAN:  I don't have any more information to provide the Court as to that but I can tell the Court, in terms of what he relayed to me, he was not speaking about withholding information about their financial state during the class period or currently.  That's known.

You know, your Honor, for that matter, it's also known that there's considerable uncertainty about the company's future.  There are many loans outstanding which could go into default.  There are many things that could happen negatively as time progresses with the company.  I believe that Mr. Galloway is trying to exert against the benefit of the class for his own litigation gain.  I believe he would like to be first in line to try to gather assets.

THE COURT:  Would he become first in line over the class?  Assuming that the arbitration goes against Neptune and the class action isn't resolved by that date, would he be the first one to, you know, I mean take whatever is there?

MR. SILVERMAN:  He might.  He very well

might, and that I think is the purpose of his attempt. I don't know without seeing those papers and being able to ascertain the state of the company about whether we're talking about priority of receipts in bankruptcy or outside of a bankruptcy context. I don't have that information in detail.

THE COURT: Is there any good reason -- I mean, I understand what you've suggested, that the risk is that he could wind up emptying the coffers, the company coffers for his benefit, or it could be a windfall for the company which benefits the class, so it's a jump ball at this point is what I understand you to be saying. Is that right?

MR. SILVERMAN: Your Honor, I understand -- yes, it could happen either way, or an arbitrator of course could find for neither of the claimants.

THE COURT: Right.

MR. SILVERMAN: And they would be each in the exact same position outside of any arrangement they had for attorneys' fees.

THE COURT: Do you think that it would be prudent at this point, because it certainly strikes me as so, to at least learn a little bit more about the claims that are the subject of this arbitration and determine whether there's any advantage to the class in

holding off?  I mean, I know you got hit with this last night and you haven't really had enough time to -- I mean, I appreciate the disclosure, but maybe you need a little bit more time to digest this to really make a judgment about whether or not it's prudent to wait.

MR. SILVERMAN:  Your Honor, I think quite the opposite is true.  I think the passage of time will not allow us to gather the detailed information we need to change -- to effect our analysis at all because arbitrations are subject to confidentiality provisions. I don't think there's any opportunity.  He told us -- and I take him at his face -- at face value for this, that he could not -- he wasn't allowed to tell us the details, so I don't think a second or third -- I've had two phone calls totaling probably 50 minutes with him. I believe I found all the information I can find.

I also know that the dollar amounts are significant on either side and your Honor is absolutely right to characterize it -- it could be a windfall, it could be a big hit.  But what all that leads me to conclude is that -- it leads me to conclude that a delay would be even more dangerous under these circumstances.  If anything, the letter suggests to me that we have a greater reason to wrap this up promptly and to allow the class the best opportunity -- now,

they have 1.5 million dollars in hard cash that's in escrow.  31 days from the issuance of this -- of an approval here, if your Honor approves it, 2.75 million -- I'm sorry, 2.75 million dollars' worth of shares would be issued pursuant to a rule called the minimum price rule on NASDAQ, and that rule adjusts the number of shares for -- it takes essentially the minimum closing price, I believe, of three of the past five business days and averages those out.  So it adjusts for whatever news has come in between your Honor's approval and the intervening period.

So if he's right and it comes out in early August, then there would be already an adjustment mechanism for -- let's say it's terrible news.  It comes out in early August, and let's say that the share price, which is roughly 15 cents today, let's say it drops to 5 cents.  Well, that would be adjusted in the pricing mechanism that the parties agreed to months ago in the stipulation of settlement.

THE COURT:  And if the deal goes through and is approved by the Court, what's the upside in terms of the stock transfer that's going to the class here?

MR. SILVERMAN:  Your Honor, honestly, if I could divine stock movements with certainty, I probably would be in a different profession.

THE COURT:  A ten-million-dollar infusion -- if it turned out to be a ten-million-dollar infusion into the company, what would that do to this?

MR. SILVERMAN:  If it's collected, it would dramatically increase the stock.

THE COURT:  The value to the class as well.

MR. SILVERMAN:  It depends on when it comes certainly.

THE COURT:  Yeah.  I'm just speculating.

MR. SILVERMAN:  Right.  Let me give you two scenarios.

THE COURT:  Go ahead.

MR. SILVERMAN:  The first scenario is that it's announced next week.  I guess in an efficient market, you'd expect that that information would be priced into the stock.  Maybe it goes up to a dollar, I don't know.

THE COURT:  Right.

MR. SILVERMAN:  But that would be -- because the minimum pricing rule is under the stipulation of settlement --

THE COURT:  It gets averaged out.

MR. SILVERMAN:  It applies 31 days after the approval.  My assumption is, if we get it next week, it would be priced in.  If it came two months from now, of

course, we'd have a much greater amount of shares and the class might enjoy the benefit of that windfall.

THE COURT: Right.

MR. SILVERMAN: The opposite could happen as well. We could get a number of shares and then a terrible decision came out from the arbitrator. Those are risks going forward and the only way -- there are really only two options and the first is to say, this is the greatest degree of certainty that we can provide for the class, let's get them this benefit. And the second is to say, because we cannot have perfect certainty, we shouldn't move forward at this point. Frankly, your Honor, I think that leaves the class in a place where they have a very high chance of recovering nothing, no matter how the litigation proceeds.

THE COURT: I tend to agree with you. I think that after listening to what you just described and the outline here, that it would be very risk for the class to await the outcome of the arbitration. If the arbitration turns against Neptune or is against Neptune and decreases their profitability or their buyability, then we're much better off taking -- the class would be much better off taking a settlement now. And on the upside, if it winds up with a cash infusion, there will be some benefit to the class with the stock

price, which nobody can predict with any certainty what it would be, but there would be, I would imagine, an upside at some point.  Okay, I get it.

MR. SILVERMAN:  Yes, your Honor.

THE COURT:  All right, thank you for that.

MR. SILVERMAN:  May I make one final housekeeping point?

THE COURT:  Of course, go ahead.

MR. SILVERMAN:  Attached to our reply brief, we included a slight amendment to the proposed order. We'd ask that your Honor consider that.  The only difference is that the paragraph which addresses the applicability of Section 3(a)(10) of the Securities Act has a little -- is a little more robust, has a few citations to cases.  And if your Honor is inclined to enter one of the proposed orders that we've provided, I'd ask that your Honor consider that order so it has that language in it.

THE COURT:  I will do that.

MR. SILVERMAN:  Thank you.

THE COURT:  All right.  At this point, I don't have any additional questions.  I don't know if -- Mr. Kruglak, do you have anything you want to put on the record?

MR. KRUGLAK:  Sure, just two items, your

Honor, very briefly.  Thank you, your Honor.  The first is that --

THE COURT:  I apologize if I mispronounced your name.  How is it pronounced?

MR. KRUGLAK:  Sure, Kruglak.

THE COURT:  Kruglak.

MR. KRUGLAK:  Yes.

THE COURT:  Okay.

MR. KRUGLAK:  You have it right, thank you. The first is just one point about Mr. Sumar's purchases.  They were actually on May 11th, 2023 just for the record.  It was in our filing of last night and we attached a securities filing.

THE COURT:  Okay.

MR. KRUGLAK:  The second was, if it assists your Honor, if you approve the settlement, if you would like, you could give Neptune the ability to issue the shares 31 days or earlier, if you think it would give them the ability to actually not wait the 31 days and just issue the shares when they can.

THE COURT:  Is there any objection to that request?

MR. SILVERMAN:  Your Honor, I believe the 31 days should be kept.  The reason we put that in was so that we would have a fine period and there could be --

there wouldn't be an incentive for either party to make adjustments during that period.

THE COURT:  So it's a fixed date.

MR. SILVERMAN:  I believe that fixed date makes sense and I would like for us to retain it.

THE COURT:  Okay.

MR. KRUGLAK:  Right.  It wasn't to push it out.  I said 31 days or sooner.

MR. SILVERMAN:  I appreciate that, your Honor.

MR. KRUGLAK:  Okay.

THE COURT:  I think the point is that they don't want you to time the -- meaning the defendants to time the issuance of the stock to their advantage perhaps and to the disadvantage of the class.  So I agree that you should have a fixed date.  No one gets to pick the timing.

MR. KRUGLAK:  Understood, your Honor.  If there are no further questions, I will take my seat.

THE COURT:  All right, thank you.

MR. KRUGLAK:  Thank you.

THE COURT:  We will be issuing an order. Remember, this is on an R&R to Judge Vitaliano.  My recommendation to the judge will be that he approve the settlement.  I'm going to issue an order outlining the

basis for my determination but essentially, I find that based on everything that's been presented here today, there was a lot of hard work put into achieving this settlement, a lot of negotiations, a lot of examination as to the viability and profitability of Neptune so that there was a very good understanding and appreciation for what that company can and can't do and what would be beneficial to the class in terms of reaching a settlement.

I do feel that there is a substantial issue with respect to the complexity of this case, and the likelihood of success, no one can really predict. Every trial is a jump ball and in light of the size of this class -- 3,000 I think was the number, is that right?

MR. SILVERMAN:  3,004 or 5, I believe is the number.

THE COURT:  I remember there was a little tail there but it's over 3,000.  The overwhelming majority approved or not objected to the settlement. The few who have, one, as the record reflects, we can't identify so it's of no value really to the Court.  I don't know who it might have been.  Notwithstanding that, we did look at it to see if there was anything that had to be -- raised a concern with the Court.  It

did not.  The letters or the letter from Mr. Gajar and is it Ms. Sumar?  It's hard to tell the gender but --

MR. TOUREK:  It's Mr. Sumar and Ms. Helia (ph) is also married to Mr. Gajar.

THE COURT:  Okay.  Well, as to those folks, once I learned that they were current stockholders in the company, I thought that that colored their position.  At least for the Court, it raised concerns about whether or not they were in a conflict situation with the class, which counsel -- I questioned counsel about and he seems to agree that that puts them at odds with the class since their interests are divided.

So with respect to -- let me just add that with respect to the attorneys' fees of one-third, I find that reasonable.  I certainly think it's consistent with the case law and the awards that have been granted in cases of this type.  The costs are the costs.  And the $7,000 counsel award I think is appropriate.

So pretty much I agree with everything that's in that proposal.  I don't think I left anything out.  There will be an order issued to that effect or a recommendation to that effect to Judge Brown.  That will go out very quickly, probably by tomorrow at the latest, and then it will be up to Judge Vitaliano,

after his review, to make a final determination, okay?

I don't have anything else.  Let me just check with my law clerk.  I always have to check with the law clerk, make sure I didn't miss anything.

All right, folks, thank you very much and thank you for all your hard work.  It's important work and it's always -- it's always beneficial to the parties and the Court when things can be resolved.  Thank you.

MR. TOUREK:  Thank you, your Honor.

MR. SILVERMAN:  Thank you, your Honor.

MR. KRUGLAK:  Thank you, your Honor.

* * * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

ELIZABETH BARRON                          July 28, 2023